COPY

LODGED

1  MARK A. FINKELSTEIN (State Bar No. 173851)
2  mafinkelstein@jonesday.com
   JONES DAY
3  3161 MICHELSON DRIVE
   SUITE 800
   IRVINE, CA 92612-4408
4  949.851.3939
   949.553.7539 (Facsimile)
5

6  SUSAN M. KAYSER (*pro hac vice* application pending)
   skayser@jonesday.com
7  JESSICA D. BRADLEY (*pro hac vice* application pending)
   jbradley@jonesday.com
8  JONES DAY
   51 LOUISIANA AVE, NW
9  WASHINGTON, DC 20001
   202.879.3939
10 202.626.1700 (Facsimile)

11 Attorneys for Plaintiffs Chloé SAS, Alfred Dunhill Limited,
   Officine Panerai AG, and Montblanc-Simplo GmbH

12

13

FILED
CLERK, U.S. DISTRICT COURT

MAY 17 2011

CENTRAL DISTRICT OF CALIFORNIA
BY              DEPUTY

          UNITED STATES DISTRICT COURT
      FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 CHLOE SAS, a French Corporation;     )
   ALFRED DUNHILL LIMITED, a UK         )
15 Corporation; OFFICINE PANERAI AG,    )
   a Swiss Corporation; and             )
16 MONTBLANC-SIMPLO GMBH, a             )
   German Corporation                   )
17                                       )
                                         )
18            Plaintiffs,                )
                                         )
19       vs.                             )
                                         )
20 SAWABEH INFORMATION                   )
   SERVICES CO.(d/b/a "SISCOM",         )
21 tradekey.com, saudicommerce.com,      )
   and b2bfreezone.com), a Saudi Arabian )
22 Corporation; TRADEKEY (PVT) LTD,     )
   a Pakistani Corporation; TRADEKEY,   )
23 LLC, a Delaware Corporation;          )
   WALEED ABALKHAIL; JUNAID             )

Case No. CV11   04147 GAF

(MANX)

MEMORANDUM OF POINTS
AND AUTHORITIES IN
SUPPORT OF PLAINTIFFS' *EX
PARTE* APPLICATION FOR A
TEMPORARY RESTRAINING
ORDER, SEIZURE ORDER,
SUBSTITUTE CUSTODIAN
ORDER AND ORDER TO SHOW
CAUSE FOR PRELIMINARY
INJUNCTION

TO BE FILED UNDER SEAL[1]

Date:
Time:
Courtroom:
Judge:

24    [1] Plaintiffs request that this case be filed under seal so as not to alert the
25 Defendants or other involved parties of the filing of this civil action.  The Motion to
   file this action under seal, an Application seeking an ex parte seizure order, a
26 temporary restraining order, and preliminary injunction, a motion seeking expedited
   discovery, an asset freeze as to Defendants' assets and a domain transfer order, and
27 a motion to appoint counsel as substitute custodians are being filed concurrently
   herewith.
28

1  MANSOOR;  BOSUN
   INTERNATIONAL TRADE CO.;
2  CCTRUE INTERNATIONAL TRADE
   CO., LTD.; FANCYSALER
3  TRADING CO.; FUZHOU
   SUNSHINE TRADE CO., LTD;
4  HENGTAI INTERNATIONAL;
   JAMILAH MOUREH; KK FASHION
5  LOVE ZONE; LOVE IN APPAREL
   TRADE CO., LTD.; MELCHIC
6  INTERNATIONAL TRADE CO,
   .LTD; MYSTOCKWATCH CO., LTD;
7  OFFRUNWAYBAGS.COM; ORIENT-
   ONLINE CO., LTD; PARK CO. LTD;
8  RICHEN-ONLINE CO., LTD;
   SEASON-ONLINE CO., LTD;
9  SEASONS-ONLINE CO. LTD-
   ELAINE; SEVEN STAR REPLICASS;
10 SHANGHAI TAOLAN
   INTERNATIONAL TRADE LIMITED
11 COMPANY; SHOP STAR STYLE;
   SINOESTAR CO., LTD;
12 SUPEROCEANS CO., LTD.; V52
   INTERNATIONAL TRADE CO.,
13 LTD; VERTEX ONLINE CO., LTD.;
   WIN-WIN TRADE CO., LTD.;
14 WWW.ECWATCH.NET;
   YONGCHUANG TRADE CORP;
15 ZHONGSHENG TRADE CO., LTD;
   and JOHN DOES 1 through 5
16 inclusive,

17        Defendants.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..................................................................1

II.  FACTUAL BACKGROUND.................................................3

    A.   Plaintiffs' Trademarks ...............................................3

    B.   TradeKey Defendants' Illegal Activities............................5

        1.   TradeKey Controls All Listings.............................5

        2.   TradeKey Optimizes Counterfeit Listings ...............6

        3.   TradeKey's Active Replica Industry ......................7

        4.   Replica Goods Rampant on TradeKey ...................8

        5.   TradeKey Provides Legitimacy to Counterfeiters .....8

        6.   TradeKey Is Not A B2C Site, Nor Legitimate Platform Such As Ebay ..............................................9

        7.   Sellers on TradeKey.......................................9

        8.   Counterfeit Products Sold Through TradeKey ........10

        9.   Targeting the United States .............................12

III. LEGAL ARGUMENT.......................................................12

    A.   Plaintiffs Are Entitled To Immediate Injunctive Relief...........13

Against All Defendants......................................................13

        1.   Plaintiff Is Likely To Succeed On The Merits..........14

        2.   Plaintiffs Will Continue To Suffer Irreparable Harm If Injunctive Relief Is Not Granted...........................17

        3.   The Balance Of Equities Is Decidedly In Favor Of Plaintiffs ...................................................17

    B.   An Ex Parte Seizure Order is Fully Warranted ...................18

        1.   A Seizure Order Is The Only Relief That Will Adequately Protect Plaintiff's Trademark Rights ...................20

        2.   Plaintiff Has Not Publicized the Requested Seizure..........21

        3.   Plaintiff Has Shown the Sale of Counterfeit Goods, Irreparable Injury Without the Seizure, and that Defendant Will Destroy Evidence if Provided Notice...............21

        4.   The Location of the Counterfeit Goods to be Seized................22

        5.   The Equities Weigh in Favor of Plaintiff....................22

    C.   Service of Process By E-mail is Warranted in This Case ...................23

    D.   Request to Appoint Substitute Custodian................................24

IV.  CONCLUSION................................................................24

Memo. Re: Ex Parte App. for TRO, Seizure Order, & Substitute Custodian

1

2

3

**<u>TABLE OF AUTHORITIES</u>**

4

**Page**

5

<u>CASES</u>

6

*AMF Inc. v. Sleekcraft Boats,*
  599 F.2d 341 (9th Cir. 1979) ..............................................15

7

8

*Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.,*
  457 F.3d 1062 (9th Cir. 2006) ............................................15

9

*Cartier v. Faber,*
  396 F. Supp. 2d 356 (S.D.N.Y. 2005) .................................15

10

11

*Century 21 Real Estate Corp. v. Sandlin,*
  846 F.2d 1175, 6 U.S.P.Q.2d 2034 (9th Cir. 1988) .............14

12

13

*FimabFinanziaria Maglificio Biellese Fratelli Fila S.P.A. v. Kitchen,*
  548 F. Supp. 248 (D.C. Fla. 1982) .....................................19

14

15

*Fuentes v. Shevin,*
  407 U.S. 67 (1972) .............................................................19

16

17

*GEICO v. Google, Inc.,*
  330 F. Supp. 2d 700 (E.D. Va. 2004) .................................16

18

19

*In re Vuitton et Fils S.A.,*
  606 F.2d 1 (2d Cir. 1979).......................................... 17, 19, 22

20

21

*Inwood Labs. v. Ives Labs,*
  456 U.S. 844 (1982) ...........................................................16

22

23

*Lavan v. City of Los Angeles,*
  2011 WL 1533070 (C.D.Cal. 2011) ...................................13

24

25

*Louis Vuitton Malletier, S.A. v. Akonoc Solutions, Inc.,*
  2010 U.S. Dist. LEXIS 85266 (N.D. Cal. 2010) ................16

26

27

*Microsoft Corp. v. Marturano,*
  2009 WL 1530040 (E.D.Cal. 2009).....................................18

28

Memo. Re: *Ex Parte* App. for TRO, Seizure Order, & Substitute Custodian

*Phillip Morris USA Inc. v. Liu,*
    489 F. Supp. 2d 1119 (C.D.Cal. 2007) ................................................14

*Phillip Morris USA Inc. v. Shalabi,*
    352 F. Supp. 2d 1067 (C.D.Cal. 2004) ............................... 14, 15, 17, 18

*Polymer Tech. Corp. v. Mimran,*
    No. 92-7177, 1992 U.S. App. LEXIS 32204 (2d Cir. Nov. 25, 1992)...............16

*Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.,*
    970 F.2d 552 (9th Cir. 1992) ........................................................19

*Rio Properties, Inc. v. Rio Int'l Interlink,*
    284 F.3d 1007 (9th Cir. 2002) .....................................................23

*Sony Computer Entertainment America Inc. v. GameMasters,*
    87 F. Supp. 2d 976, 54 U.S.P.Q.2d (BNA) 1401 (N.D.Cal. 1999) ............. 14, 17

*Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.,*
    609 F.3d 975 (9th Cir. 2010) ........................................................13

STATUTES

15 U.S.C. § 1051, et seq. ..................................................................2

15 U.S.C. § 1116(d)(9)....................................................................19

15 U.S.C. § 1118 ...........................................................................19

All Writs Act (28 U.S.C. § 1651) ........................................................19

15 U.S.C. § 1116(d)(4)(B) ............................................................ 20, 23

15 U.S.C. § 1116(d) ........................................................................18

15 U.S.C. § 1114 ...................................................................... 14, 20

OTHER AUTHORITIES

130 Cong. Rec. H12081 (daily ed. October 10, 1984) ...............................22

130 Cong. Rec. H12082 (daily ed. October 10, 1984) ...............................19

- iii -

1
2
3      Fed. R. Civ. P. 4(f)(3) ....................................................................23

4      Rule 65(b)(1) ....................................................................................17
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Memo. Re: *Ex Parte* App. for TRO, Seizure Order, & Substitute Custodian

1  **I.     INTRODUCTION**

2          Plaintiffs Chloé SAS ("Chloé"), Alfred Dunhill Ltd. ("Alfred Dunhill"),

3  Officine Panerai AG ("Panerai"), and Montblanc-Simplo GmbH ("Montblanc"),

4  (collectively "Plaintiffs"), each an owner of an international luxury brand, seek

5  injunctive and monetary relief from defendants Sawabeh Information Services Co.

6  (d/b/a "SISCOM", tradekey.com, saudicommerce.com, and b2bfreezone.com)

7  ("SISCOM"), TradeKey (Pvt) Ltd. ("TradeKey Pakistan"), TradeKey LLC

8  ("TradeKey US"), Waleed Abalkhail ("Abalkhail") and Junaid Mansoor

9  ("Mansoor") (collectively, the "TradeKey Defendants") for direct and contributory

10 trademark infringement, unfair competition, false designation of origin, trademark

11 dilution, and counterfeiting.

12         TradeKey.com, unlike eBay or other consumer auction websites, is a

13 business-to-business ("B2B") on-line website designed to attract, induce, enable

14 and assist counterfeit luxury goods manufacturers, exporters, importers, and

15 distributors to traffic counterfeit luxury goods on a massive scale in over 200

16 countries worldwide.  By TradeKey's own admissions, counterfeit luxury goods is

17 one of its biggest "industries."  TradeKey is one of the few sites that allow their

18 member client to offer for sale "replica" goods  – a term well understood to refer

19 to counterfeit goods.  Thousands of TradeKey members claim to offer Plaintiffs'

20 branded goods on TradeKey.com; yet none are genuine or authorized manufacturers

21 or distributors.  Tradekey.com's "luxury" goods market is counterfeit, not genuine.

22         Plaintiff further brings this action seeking injunctive and monetary relief

23 against Bosun international trade corp, Cctrue International Trade Co., Ltd.,

24 Fancysaler Trading Co., Fuzhou Sunshine Trade Co, Ltd., HengTai International,

25 Jamilah Moureh, KK Fashion Love Zone, Love In Apparel Trade Co., ltd., Melchic

26 International Trade CO, .LTD, Mystockwatch Co., Ltd, OffRunwayBags.com,

27 Orient-online Co., Ltd, Park Co. Ltd, Richen-online Co., Ltd, Season-online Co.,

28 Ltd, Seasons-online CO. LTD-Elaine, Seven Star Replicass, Shanghai Taolan

1   International Trade Limited Company, Shop Star Style, Sinoestar Co., Ltd,

2   Superoceans Co., Ltd, V52 International Trade Co., Ltd, Vertex-online Co., Ltd,

3   Win-Win Trade Co., Ltd, www.ecwatch.Net, Yongchuang Trade Corp,

4   ZhongSheng Trade Co., Ltd, and JOHN DOES I-V ("John Does") (collectively,

5   "Individual Defendants") for trademark infringement, unfair competition, false

6   designation of origin, trademark dilution, and counterfeiting with respect to

7   Plaintiffs' famous marks CHLOÉ, ALFRED DUNHILL, PANERAI, and

8   MONTBLANC. Each of the Individual Defendants is offering for sale counterfeit

9   goods infringing the marks owned by Plaintiffs as specified herein.

10       In addition, the TradeKey Defendants intentionally induce these Individual

11   Defendants to infringe Plaintiffs' marks and continue to supply its services on

12   TradeKey.com to Individual Defendants it knows or has reason to know are

13   offering for sale and selling Counterfeit CHLOÉ Handbags, Counterfeit ALFRED

14   DUNHILL Men's Goods, Counterfeit PANERAI Watches, and Counterfeit

15   MONTBLANC Goods (collectively, "Counterfeit Plaintiff's Branded Goods") on

16   TradeKey.com, b2bfreezone.com, and saudicommerce.com.

17       As alleged more fully below, the TradeKey Defendants and Individual

18   Defendants (collectively, the "Defendants") have violated, and continue to violate,

19   the Federal Trademark Act of 1946 as amended, 15 U.S.C. §§ 1051, et seq. (the

20   "Federal Trademark Act"), and California law through the unauthorized sale, and

21   enabling and facilitating the unauthorized sale, of counterfeit CHLOÉ handbags,

22   clothing, footwear, jewelry and accessories (the "Counterfeit CHLOÉ Handbags"),

23   counterfeit ALFRED DUNHILL leather goods, watches, pens and men's

24   accessories (the "Counterfeit ALFRED DUNHILL Men's Goods"), counterfeit

25   PANERAI watches (the "Counterfeit PANERAI Watches"), and counterfeit

26   MONTBLANC writing instruments, watches, jewelry and leather goods (the

27   "Counterfeit MONTBLANC Goods").

28       Unless this Court enters a Temporary Restraining Order prohibiting

1   Defendants continued sale of Counterfeit branded goods, facilitated and induced by
2   Defendant, the sale of Counterfeit branded goods will only proliferate, further
3   harming the goodwill associated with Plaintiffs' marks.  This relief is being sought
4   on an *ex parte* basis because Defendants are engaged in counterfeit activities and, if
5   notice were given, the records and data of counterfeit activity very likely would
6   disappear thus precluding this Court from granting effective relief.

7   **II.   FACTUAL BACKGROUND**

8       **A.   Plaintiffs' Trademarks**

9         Plaintiff Chloé has long distributed its handbags, clothing, footwear, jewelry
10   and accessories under the mark CHLOÉ to its boutiques and authorized retailers in
11   the United States.  (Verified Complaint ¶ 23).  Chloé's extensive and continuous
12   use of the mark CHLOÉ has enabled Chloé to achieve fame and celebrity in the
13   handbag, clothing and accessories market.  (*Id.* ¶ 33).  Chloé's reputation and
14   goodwill in its marks is a direct result of Chloé's quality standards, extensive
15   advertising and promotion, sales, and exclusive sales through boutiques and limited
16   authorized distributors. (*Id.*)  Chloé is the owner of valid and subsisting federal
17   trademark registrations for the CHLOÉ marks, including incontestable trademark
18   registrations. (*Id.* ¶¶ 28-30).

19         Since 1893, Plaintiff Alfred Dunhill has manufactured and distributed formal
20   and casual menswear, handcrafted leather goods, fine men's jewelry and timepieces,
21   pens, men's designer clothes and accessories bearing the mark ALFRED
22   DUNHILL.  (*Id.* ¶ 35).  Luxury menswear and accessories bearing the mark
23   ALFRED DUNHILL have come to be well-known by the purchasing public
24   throughout the United States as products of the highest quality and exclusively
25   originating from Alfred Dunhill. (*Id.* ¶ 36).  For over one hundred years, this well-
26   known and famous mark has received enormous exposure in the marketplace. (*Id.*)
27   Alfred Dunhill is the owner of valid and subsisting federal trademark registrations
28   for the ALFRED DUNHILL marks, including incontestable trademark

- 3 -

1   registrations. (*Id.* ¶¶ 39-41).

2   The PANERAI brand dates back to 1860 and is well-known for high
3   precision mechanisms and instruments and professional divers' instruments.
4   (Verified Complaint ¶ 47).  Plaintiff Panerai has for many years been the supplier
5   of high precision underwater instruments to the Royal Italian Navy. (*Id.*)

6   Plaintiff's extensive and continuous use of the mark PANERAI has enabled
7   Plaintiff to achieve fame and celebrity in the watches and timepieces market.  (*Id.*
8   ¶ 57).  Plaintiff's reputation is a direct result of the robustness, high technical
9   quality and craftsmanship of Plaintiff's timepieces and watches, Plaintiff's extensive
10  advertising, promotion, sales, and exclusive sales through boutiques and authorized
11  distributors.  (*Id.*)  Indeed, Plaintiff has experienced extensive sales and fame as a
12  result of the popularity of a number of highly sought-after watches, including but
13  not limited to the "Luminor" and "Radiomir" style PANERAI watches that are
14  enormously popular with celebrities and the consuming public.  (*Id.*)  Panerai is the
15  owner of valid and subsisting federal trademark registrations for the PANERAI
16  marks, including incontestable trademark registrations. (*Id.* ¶¶ 51-53).

17  Since at least as early as 1913, Plaintiff Montblanc has manufactured and
18  distributed writing instruments under the mark MONTBLANC, and over time has
19  expanded the products offered under the mark MONTBLANC to include leather
20  goods, jewelry and watches.  (Verified Complaint ¶ 59.)  Montblanc has become
21  well-known in the U.S. and worldwide for quality design, tradition and master
22  craftsmanship in connection with luxury writing instruments, watches, jewelry, and
23  leather goods bearing the mark MONTBLANC and as originating exclusively from
24  Plaintiff. (*Id.*, 67)      Plaintiff's    reputation    and    association    of    the
25  MONTBLANC brand with perfection, achievement and quality is a direct result of
26  Plaintiff's high quality standards, and extensive advertising and promotion.  (*Id.*)
27  Indeed, Plaintiff has experienced extensive sales and fame as a result of the
28  popularity of a number of highly sought-after writing instruments, including but not

- 4 -

1   limited to the "MEISTERSTÜCK" style MONTBLANC fountain pen that is
2   enormously popular with the consuming public. (*Id.*) Montblanc is the owner of
3   valid and subsisting federal trademark registrations for the MONTBLANC marks,
4   including incontestable trademark registrations. (*Id.* ¶¶ 62-64).

5   **B.   TradeKey Defendants' Illegal Activities**

6   TradeKey.com makes its money by knowingly soliciting manufacturers,
7   exporters, importers, and distributors of counterfeit luxury goods to become paying
8   members of TradeKey.com ("GoldKey" or "SilverKey" members). The GoldKey
9   membership costs $3,000 per year and the SilverKey membership costs $500 per
10  year. (R. Holmes First Decl. ¶ 6). A Free Member does not have any rights to post
11  sell or buy offers and cannot post any "Products." (*Id.* ¶ 84, Ex. 28)[2]. TradeKey
12  member ads are automatically posted on TradeKey's three affiliated websites:
13  tradekey.com, saudicommerce.com and b2bfreezone.com further maximizing
14  exposure of counterfeit listings. (*Id.* ¶ 6). Searches for counterfeit listings of
15  Plaintiffs' branded goods on TradeKey.com, b2bfreezone.com and
16  saudicommerce.com revealed identical results – the identical postings listed in the
17  exact same order.[3] (J. Holmes Decl. ¶¶ 37-39, Exs. 22-24).

**1.   TradeKey Controls All Listings**

18  TradeKey, not the member, manages and controls each member listing for
19  counterfeit goods. (R. Holmes First Decl. ¶ 31). Among other services provided to
20  paying GoldKey and SilverKey members, TradeKey revises descriptions of listings
21  for counterfeit goods on TradeKey.com, including to mask the unlawful activity (R.
22

23  _____
24  [2] If a paying member fails to renew, the listings will still appear, but the
    member is downgraded to a Free Member without any rights to post new Sell
25  Offers or Products. (R. Holmes Fourth Decl. ¶ 2). In addition, "Trust Points" are
    taken away. (Id.) Nonetheless, the featured product listing for the Chloe
    Paddington handbag remained posted on TradeKey.com's homepage as of May 10,
26  2011. (Id. ¶ 3).
27  [3] The counterfeit listings described herein on TradeKey.com are equally
    applicable to b2bfreezone.com and saudicommerce.com.
28

Memo. Re: *Ex Parte* App. for TRO, Seizure Order, & Substitute Custodian

1    Holmes Second Decl. ¶¶ 21-22, Ex. 50), and inserts keywords and metadata into
2    member listings to direct Internet traffic searching for counterfeit goods to
3    TradeKey's GoldKey and SilverKey members on TradeKey.  (R. Holmes Third
4    Decl. ¶¶ 55-60, Ex. 19).

5              **2.     TradeKey Optimizes Counterfeit Listings**

6         TradeKey enables and assists its GoldKey and SilverKey members to list
7    counterfeit goods on TradeKey.com, suggesting "keywords" such as "replica
8    watches," and optimizes those listings (primarily on Google) to maximize their
9    reach and exposure. (R. Holmes First Decl. ¶¶ 14, 19, 75).  GoldKey members (six
10   times the annual fee of a SilverKey member) are also provided a "dedicated
11   relationship manager" and TradeKey's search engine optimization department to
12   ensure offerings for counterfeit luxury goods are provided maximum exposure to
13   anyone searching on the Internet or TradeKey.com for counterfeit luxury goods.
14   (*Id.* ¶¶ 48, 76 (if you search "any particular replica brand and then wholesale, you'll
15   find that they [TradeKey] will be there."), 77).

16        TradeKey automatically suggests keywords when any word is typed in.
17   Among the keywords suggested are "replica" and unrelated brand names.  (*Id.*
18   ¶¶ 57-59, Ex. 19).  In addition, TradeKey inserts into the coding of the web page
19   certain words also associated with counterfeiting such as exporter, manufacturers,
20   exporters, factories, suppliers, and China that can then be found when using search
21   engines.  (R. Holmes First Decl. ¶¶ 63-66, Ex. 21).  By TradeKey entering
22   keywords and meta data relating to counterfeiting, it directs any one searching on
23   the Internet for counterfeit goods, including manufacturers, exporters or supplies
24   from or in China, to TradeKey.com and its member listings. (*Id.* ¶ 67).

25        TradeKey also advises its members to "re-post" or refresh their offers every
26   couple of days to make the listing appear brand new, and will guide the member
27   through the process.  (R. Holmes First Decl. ¶¶ 20, 70).  TradeKey upgraded this
28   option to allow the member to elect automatic reposting which make sell offers

Memo. Re: *Ex Parte* App. for TRO, Seizure Order, & Substitute Custodian

1    appear more recent and cause them to appear higher in search engine search results.
2    (R. Holmes Third Decl. ¶ 18, Ex. 66).  To optimize the member listings, TradeKey
3    also advises its members to post as many brand names as they can and as many
4    images as they can.  (*Id.* ¶ 21).

5        Additional services are available for extra fees, such as a "Featured Products"
6    banner that TradeKey advised could get a member an additional 100 visitors a
7    week.  (R. Holmes First Decl. ¶ 47).  This feature adds a listing to the front page of
8    the TradeKey website for $500 per week.  (R. Holmes Third Decl. ¶¶ 28-29).  The
9    investigator signed up for this feature, paying $520 through PayPal, selecting a
10   listing titled "Chloe Paddington Red Handbags."  (*Id.* ¶¶ 28-30).  TradeKey advised
11   the investigator that the listing was approved, but instructed him not to change any
12   product information or image of the product.  Soon thereafter, the listing appeared
13   on the TradeKey homepage with a new title selected by TradeKey of "Fashion
14   Handbags."  (*Id.* ¶¶ 31).  In addition to changing the title, TradeKey had also
15   removed the word "replica" from the description of the product listing, but rather
16   than removing the listing, now featured it prominently on the homepage.  (*Id.*)

17       **3.    TradeKey's Active Replica Industry**

18       TradeKey is fully aware of and encourages the wholesale trade of counterfeit
19   luxury goods on TradeKey.com, stating that "replicas" and "mirror image"
20   (common terms for counterfeit)[4] is ". . . one of our main industries" as well as
21   acknowledging that it is ". . . one of the few sites that still allow our clients to sell
22   replica goods."  (R. Holmes First Decl. ¶ 6).  And on other occasions advised that:

23       • "the word replica is perfectly legal on our website."  (R. Holmes First
24          Decl. ¶ 24).

25

26

27       [4] *See* J. Holmes Decl. ¶ 11

28

- "Less than ten percent of the brand products on here are genuine." (*Id.* ¶ 42).
- "As far as the replica industry is concerned, it is one of our main industries – it's one of the businesses that we rely on to get us a whole lot of revenue." (*Id.* ¶ 78).
- "We basically work under Internet laws and there is no such law . . . as far as . . . the IPR [intellectual property rights] rules and everything are concerned, there is always a way to sort of work around them. And that's what we do." (*Id.* ¶ 73).
- ". . . there is no such thing as a copyright. A copyright is a right to copy." (*Id.* ¶ 72).

### 4. Replica Goods Rampant on TradeKey

Investigators hired by Plaintiffs signed up as "GoldKey" and "SilverKey" members of TradeKey and posted multiple listings blatantly using the term "replica" and "mirror image" in the title and description of fake products for the marks Chloé, Panerai, Alfred Dunhill, without any objection from TradeKey. (R. Holmes First Decl. ¶¶ 15, 29, 30, 54, Exs. 7, 11, 12, 16, 17, 18; J. Holmes Decl. ¶¶ 24, 28, Exs. 10, 13.) Multiple listings were posted with the word "replica" in the title of the Sell Offer. (R. Holmes Third Decl. ¶ 37, Ex. 86). TradeKey removed the word "replica" from the titles of some product listings, but allowed the product to remain posted. (*Id.* ¶ 38, Ex. 87). The Company Profile for the SilverKey membership even advertises that "[a]ll of our products are 100% genuine replicas." (J. Holmes Decl. ¶¶ 21, 48, Exs. 7, 39).

### 5. TradeKey Provides Legitimacy to Counterfeiters

TradeKey awards "Trust Points" to its members for simply supplying business documents for a company (including the investigator's undercover identity). (R. Holmes First Decl. ¶¶ 32-35, Exs. 14-15). Further, TradeKey informed Plaintiffs' investigator that most GoldKey members are China-based

- 8 -

1  sellers that use the benefits of a GoldKey membership to help the fact that they
2  mostly sell items that are not genuine.  (J. Holmes Decl. ¶ 10).

3          **6.    TradeKey Is Not A B2C Site,**
4                  **Nor Legitimate Platform Such As Ebay**

5          TradeKey does not target individual consumers.  It is not a business-to-
6  consumer ("B2C") website or auction site targeted at consumers, such as eBay.  In
7  every way, TradeKey is different than eBay.   TradeKey knowingly assists its
8  wholesale, supplier and exporter members to list buy and sell offers for replica
9  goods.  (*See* R. Holmes First Decl. ¶¶ 16-26).   Further, TradeKey controls the
10  listings blatantly advertising "replica" or "counterfeit" goods.  Multiple sell offer
11  listings including the term "replica" were allowed to post on TradeKey (with titles
12  such as "Replica Chloe Handbags" and "Factory Direct Chloe Handbags – China
13  Source!!!!!!"), and remained on TradeKey for months, still appearing on TradeKey
14  within days prior to this filing.  (R. Holmes Third Decl. ¶ 37, Ex. 86; J. Holmes
15  Decl. ¶ 48, Exs. 38-39).

16          To the contrary, when Plaintiff's investigator attempted to list some of its
17  TradeKey offers on eBay, eBay, took immediate action and removed the listings.
18  (R. Holmes Second Decl. ¶¶ 3-17, Exs. 29-44).  *A mere twelve minutes* after the
19  investigator posted his last of five items on eBay matching his TradeKey listings,
20  *eBay removed all items*.  (*Id.* ¶¶ 17-19, Exs. 45-48).

21          Other notable differences between eBay and TradeKey is that TradeKey has
22  a "product group" for "Replica Chloe" – eBay did not have any similar "replica"
23  category.  (R. Holmes Second Decl. ¶ 3).  All of the corresponding Sell Offers on
24  TradeKey still remain posted, with one notable difference – TradeKey has removed
25  the word "replica" in the title (but not the description), and the listing was still live
26  and active on TradeKey.com.  (*Id.* ¶¶ 20-22, Exs. 49-50).

27          **7.    Sellers on TradeKey**
28          Plaintiffs' investigator ran a search of the TradeKey website to create a list of

Memo. Re: *Ex Parte* App. for TRO, Seizure Order, & Substitute Custodian

1    purported sellers of each of the Plaintiffs' goods using the following principal

2    trademarks of each Plaintiff: "Chloe," "Dunhill," "Panerai," and "Montblanc"

3    which returned a list of all sellers with a "Sell Offer" or "Product listing" using

4    Plaintiffs' trademarks. (R. Holmes Third Decl. ¶¶ 15-16). Those lists were then

5    provided to each respective Plaintiff to analyze whether any of the listed sellers

6    were authorized sellers, manufacturers, suppliers, dealers, or distributors. (*Id.* ¶ 16;

7    Lebrun Decl. ¶ 6, Ex. 1; King Decl. ¶ 6, Ex. 1; Gerondeau Decl. ¶ 6, Ex. 1; Huber

8    Decl. ¶ 6, Ex. 1; Hillebrand Decl. ¶ 6, Ex. 1).

9         Each Plaintiff confirmed that  none of the sellers on Tradekey.com were

10   authorized by Chloé, Alfred Dunhill, Panerai or Montblanc, or their related

11   companies to sell CHLOÉ, ALFRED DUNHILL, PANERAI or MONTBLANC

12   branded goods or are otherwise authorized sellers, manufacturers, suppliers,

13   dealers, or distributors of genuine CHLOÉ, ALFRED DUNHILL, PANERAI or

14   MONTBLANC branded goods. (Lebrun Decl. ¶¶ 7-8, Ex. 1; King Decl. ¶¶ 7-8,

15   Ex. 1; Gerondeau Decl. ¶¶ 7-8, Ex. 1; Huber Decl. ¶¶ 7-8, Ex. 1; Hillebrand

16   Decl. ¶¶ 7-8, Ex. 1).

17         **8.    Counterfeit Products Sold Through TradeKey**

18        Plaintiffs' investigators made a series of purchases from sellers on

19   Tradekey.com offering alleged CHLOÉ, ALFRED DUNHILL, PANERAI and/or

20   MONTBLANC goods.  On March 14, 2011, Plaintiffs' investigator purchased a

21   blue face PANERAI watch from Defendant Win-Win Trade Co., Ltd. through

22   Tradekey.com. (R. Holmes Third Decl. ¶ 32, Ex. 81). Plaintiff Panerai reviewed

23   detailed photographs taken by the investigator of the blue face PANERAI watch

24   and confirmed that the watch is a counterfeit reproduction of its product made from

25   inferior materials. (Ficarelli Decl. ¶¶ 6-7, Ex. 1).

26        On March 16, 2011, Plaintiffs' investigator purchased a red CHLOÉ

27   handbag, a DUNHILL belt, and a PANERAI watch from Defendant Fuzhou

28   Sunshine Trade Co, Ltd. through Tradekey.com.  (R. Holmes Third Decl. ¶ 33, Ex.

Memo. Re: *Ex Parte* App. for TRO, Seizure Order, & Substitute Custodian

82).  Plaintiff Chloé reviewed detailed photographs taken by the investigator of the red "CHLOÉ" handbag and confirmed that the handbag is a counterfeit reproduction of its product made from inferior materials. (Lebrun Decl. ¶¶ 18-20, Ex. 2).   Plaintiff Alfred Dunhill reviewed detailed photographs taken by the investigator of the DUNHILL belt and confirmed that the belt is a counterfeit reproduction of its product made from inferior materials.  (Summerskill Decl. ¶¶ 11-13, Ex. 1).  Plaintiff PANERAI reviewed detailed photographs taken by the investigator of the PANERAI watch and confirmed that the watch is a counterfeit reproduction of its product made from inferior materials. (Ficarelli Decl. ¶ 10-11, Ex. 3).

On March 21, 2011, Plaintiffs' investigator purchased a white series PANERAI LUMINOR DAYLIGHT watch and a  black DUNHILL dress watch from Defendant Vertex Online Co., Ltd. through Tradekey.com. (R. Holmes Third Decl. ¶ 34, Ex. 83).  Plaintiff Panerai reviewed detailed photographs taken by the investigator of the PANERAI LUMINOR DAYLIGHT watch and confirmed that the watch is a counterfeit reproduction of its product made from inferior materials. (Ficarelli Decl. ¶¶ 8-9, Ex. 2).   Plaintiff Alfred Dunhill reviewed detailed photographs taken by the investigator of the black DUNHILL dress watch and confirmed that the watch is a counterfeit reproduction of its product made from inferior materials. (Pierce Decl. ¶¶ 11-13, Ex. 1).

On April 22, 2011, Plaintiffs' investigator purchased a black MONTBLANC watch from Defendant Win Trade Co., Ltd. through Tradekey.com.  (R. Holmes Third Decl. ¶ 35, Ex. 84).  On the same day Plaintiffs' investigator also purchased a MONTBLANC watch from Fuzhou Sunshine Trade Co, Ltd. through Tradekey.com.  (Id. ¶ 36, Ex. 85).  Plaintiff Montblanc has confirmed that the MONTBLANC watches offered by Defendants Win Trade Co., Ltd. and Fuzhou Sunshine Trade Co, Ltd. are counterfeit reproductions of their product made from inferior materials. (Milde-Rümke Decl. ¶¶ 6-10, Exs. 1-2).

Memo. Re: *Ex Parte* App. for TRO, Seizure Order, & Substitute Custodian

1    Plaintiffs also purchased a "CHLOÉ" olive green handbag through their

2    investigator from Defendant Moureh, identified as being with the company "The

3    Bag Lady," on Tradekey.com.  (J. Holmes Decl. ¶¶ 45-47, Exs. 34-37).  Plaintiff

4    Chloé has confirmed that the "CHLOÉ" olive green handbag the investigator

5    purchased from Defendant Moureh is a counterfeit reproduction of its product made

6    from inferior materials. (Lebrun Decl. ¶¶ 16-17, Ex. 1).

7         **9.    Targeting the United States**

8         As of May 11, 2011, there are currently 31,190 sell offers and 211,801 buy

9    offers posted on TradeKey.com in the USA region.  (R. Holmes Fourth Decl. ¶ 4,

10   Ex. 90).  TradeKey.com advertises in the Premium Services section of its website

11   that 31% of its business comes from the United States, the highest percentage of

12   any country. (*Id.*, Ex. 91).

13       TradeKey.com's main page includes a link titled "USA" which brings the

14   viewer to a new site at us.countrysearch.tradekey.com which provides information

15   about United States trade categories, and US cities including Los Angeles and San

16   Jose. (R. Holmes Third Decl. ¶ 26, Ex. 74).  The Los Angeles page included a list

17   of products available in Los Angeles including a listing entitled "Los Angeles

18   Watches Brands" that took the investigator to a page featuring his replica Dunhill

19   watches. (*Id.* ¶ 26, Ex. 75).  TradeKey.com also includes a directory of tradeshows

20   which can be sorted by country.  Selecting tradeshows in the US revealed more than

21   fifteen pages of trade show listings. (R. Holmes Third Decl. ¶ 23-24, Ex. 72).

22   **III.   LEGAL ARGUMENT**

23       Tradekey.com recommends to its members to use and itself uses Plaintiffs'

24   valuable trademarks, as key terms to drive traffic to member's counterfeit listings

25   on Tradekey.com.  Tradekey.com intentionally induces its members to promote and

26   sell counterfeit luxury goods in bulk and infringe Plaintiffs' valuable and well-

27   known trademarks CHLOÉ, ALFRED DUNHILL, PANERAI and MONTBLANC.

28   TradeKey knowingly allows and assists in listings for "replicas" (R. Holmes First

Memo. Re: *Ex Parte* App. for TRO, Seizure Order, & Substitute Custodian

1    Decl. ¶ 19); edits member listings to conceal counterfeit goods (R. Holmes Second

2    Decl. ¶¶ 21-22, Ex. 50); cross-posts counterfeiters' listings on tradekey.com to

3    other websites (J. Holmes ¶¶ 37-39, Exs. 22-24); and uses sophisticated search

4    engine optimization ("SEO") and common terms for counterfeit goods to drive

5    Internet traffic to Tradekey.com and members' counterfeit listings.  (R. Holmes

6    First Decl. ¶¶ 62-67, Ex. 21).  TradeKey also supplies and continues to supply its

7    website services to members it knows or has reason to know are infringing

8    Plaintiffs' trademarks and offering for sale counterfeit luxury goods.  (*See* R.

9    Holmes First Decl. ¶ 41).

### A.   Plaintiffs Are Entitled To Immediate Injunctive Relief Against All Defendants

12    Plaintiffs are entitled to a temporary restraining order and preliminary

13    injunction[5] if it can demonstrate (1) it is likely to succeed on the  merits, (2) it is

14    likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance

15    of equities tips in favor of the party requesting the preliminary relief, and (4) an

16    injunction is in the public interest.   *See Toyo Tire Holdings of Ams. Inc. v. Cont'l*

17    *Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010) (citing *Winter v. Natural Res.*

18    *Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008)).

19    In the present case, Plaintiffs have requested, *inter alia*, that this Court grant

20    a temporary restraining order without notice, pending the hearing on the

21    preliminary injunction.   In view of the virtual identity between the Plaintiffs'

22    trademarks and the marks used by Defendants, and the substantially similar nature of

23    the goods of the parties, if the TradeKey Defendants are allowed to continue to use

---

25    [5]  The standard for granting a temporary restraining order is the same as
26    preliminary injunction.  *See Lavan v. City of Los Angeles*, 2011 WL 1533070, *1
     (C.D.Cal. 2011) ("an application for a temporary restraining order must satisfy the
27    same legal standard governing the issuance of a preliminary injunction.").

Memo. Re: *Ex Parte* App. for TRO, Seizure Order, & Substitute Custodian

Plaintiffs' trademarks to drive business to its website focused on counterfeit goods and the Individual Defendants are allowed to continue to sell or otherwise dispose of counterfeit goods bearing Plaintiffs' trademarks, Plaintiffs will continue to suffer irreparable harm.

As demonstrated below, and as supported by the declarations submitted herewith, Plaintiffs are likely to succeed on its infringement claims as to all Defendants by showing a likelihood of confusion, which establishes irreparable harm. *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1074 (C.D.Cal. 2004) ("Irreparable harm to reputation and goodwill is presumed as a matter of law where, as here, the plaintiff has demonstrated a likelihood of confusion arising from the infringement."); *Sony Computer Entertainment America Inc. v. GameMasters*, 87 F. Supp. 2d 976, 984, 54 U.S.P.Q.2d (BNA) 1401, 1407 (N.D.Cal. 1999) ("once plaintiff establishes a likelihood of confusion, 'it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief does not issue.' ") (citing *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1220 (9th Cir. 1987)).

### 1.    Plaintiff Is Likely To Succeed On The Merits

Under the Federal Trademark Act, 15 U.S.C. §§ 1114, a plaintiff in a trademark infringement action must show that a defendant without consent used in commerce, a reproduction, counterfeit, copy, or colorable imitation of plaintiff's registered mark, in connection with distributing goods and that such use is likely to cause confusion, or to cause mistake, or to deceive. *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178, 6 U.S.P.Q.2d 2034, 2035 (9th Cir. 1988).

In a counterfeiting case such as this one, courts have held that the plaintiff must show: (1) that it has a valid mark that is entitled to protection under the Federal Trademark Act, and (2) that the defendant's actions are likely to cause confusion as to the origin or sponsorship of its goods. *E.g.*, *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1072-73 (C.D.Cal. 2004); *Phillip Morris USA Inc. v. Liu*, 489 F. Supp. 2d 1119, 1122 (C.D.Cal. 2007).  The same elements apply to counterfeiting

Memo. Re: *Ex Parte* App. for TRO, Seizure Order, & Substitute Custodian

1    claims brought under § 43(a), of unregistered trademarks used in commerce. *Phillip*

2    *Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d at 1072 n.6.

3         Plaintiff can easily show that marks CHLOÉ, ALFRED DUNHILL,

4    PANERAI and MONTBLANC are valid and numerous registrations have been pled

5    in the Verified Complaint and that Defendants' actions are likely to cause

6    confusion. While many sellers on TradeKey purport to sell Plaintiffs' goods, none

7    were authorized to do so. And every single item purchased by the investigation was

8    confirmed counterfeit by the brand.

9         While courts in this Circuit generally apply the eight-factor test set forth in

10   *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), the Court need

11   not do so in a counterfeiting case because " 'in cases involving counterfeit marks, it

12   is unnecessary to perform the step-by-step examination . . . because counterfeit

13   marks are inherently confusing.' " *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp.

14   2d at 1073 (citing *Phillip Morris USA Inc. v. Felizardo*, 2004 WL 1375277, 2004

15   U.S. Dist. LEXIS 11154, at *18 (S.D.N.Y. June 18, 2004) ("counterfeit marks are

16   inherently confusing"); *Gucci America, Inc. v. Duty Free Apparel, Ltd.*, 286

17   F.Supp.2d 284, 287 (S.D.N.Y. 2003) ("counterfeits, by their very nature, cause

18   confusion")). *See also Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457

19   F.3d 1062, 1076 (9th Cir. 2006) (*Sleekcraft* not applied mechanically; courts may

20   examine some or all of the factors, depending on their relevance and importance.);

21   *Cartier v. Faber*, 396 F. Supp. 2d 356, 359 (S.D.N.Y. 2005) (in counterfeiting

22   cases, the Court need only consider: (1) whether the defendant's goods are actually

23   counterfeit, and (2) whether the defendant distributes the goods at issue).

24        As demonstrated above, the TradeKey Defendants and Individual Defendants

25   are clearly offering for sale and selling Counterfeit CHLOÉ Handbags that are

26   neither made by nor endorsed by Plaintiff. It is likewise abundantly clear that the

27   reproductions of the mark CHLOÉ used by Defendants are identical to and

28   substantially indistinguishable from the mark CHLOÉ which is the subject of

- 15 -

Memo. Re: *Ex Parte* App. for TRO, Seizure Order, & Substitute Custodian

1    Plaintiffs' incontestable federal registrations.

2    Further, the TradeKey Defendants are intentionally inducing others to
3    infringe Plaintiffs' rights in its mark CHLOÉ by knowingly continuing to provide
4    its trading community to sellers of counterfeit goods.  Such conduct constitutes
5    contributory infringement.  *See Louis Vuitton Malletier, S.A. v. Akonoc Solutions,*
6    *Inc.,* 2010 U.S. Dist. LEXIS 85266 (N.D. Cal. 2010) (judgment awarding statutory
7    damages and permanent injunction against defendants offering web hosting services
8    to third party websites that sold counterfeit products). *See also GEICO v. Google,*
9    *Inc.,* 330 F. Supp. 2d 700, 705 (E.D. Va. 2004) (allegation that search engine
10    monitors and controls third-party advertisements is sufficient to plead actual or
11    constructive knowledge required to allege contributory trademark infringement);
12    *Inwood Labs. v. Ives Labs*, 456 U.S. 844, 854-55 (1982) (if a manufacturer or
13    distributor continues to supply its product to one whom it knows or has reason to
14    know is engaging in trademark infringement, the manufacturer or distributor is
15    contributory liable); *Polymer Tech. Corp. v. Mimran*, No. 92-7177, 1992 U.S. App.
16    LEXIS 32204, at *18 (2d Cir. Nov. 25, 1992) (same).  Further, the TradeKey
17    Defendants are liable for vicarious liability in that they have the right and ability to
18    supervise the infringing activity and a direct financial interest in such activities.
19    *See GEICO*, 330 F. Supp. 2d at 705.  TradeKey controls the member listings of the
20    site.  There is no question that TradeKey provide its services to individuals it knows
21    to be engaging in trademark infringement.

22    The TradeKey Defendants and Individual Defendants that use TradeKey's
23    services have intentionally used the Plaintiffs' marks CHLOÉ, ALFRED
24    DUNHILL, PANERAI, and MONTBLANC knowing that, or willfully blind to the
25    fact that, the marks are identical to Plaintiffs' registered trademarks.  The TradeKey
26    Defendants and Individual Defendants who employ TradeKey's services through its
27    website, have offered for sale their Counterfeit Goods intending to induce the
28    public to purchase said products as genuine products that have been made,

- 16 -

sponsored, or approved by the producers of Plaintiffs' products.  These postings are on their face counterfeit.

The sale of Counterfeit Goods facilitated by TradeKey is intended to cause and has caused confusion, mistake, or deception of the trade and public, and is intended to cause and is likely to cause the public to believe that counterfeit goods are authorized, sponsored, or approved by Plaintiffs.

Accordingly, Plaintiff is likely to succeed on the merits of this action against both the TradeKey Defendants and Individual Defendants.

### 2. Plaintiffs Will Continue To Suffer Irreparable Harm If Injunctive Relief Is Not Granted

In trademark cases, a showing of likelihood of confusion establishes not only likelihood of success on the merits, but also irreparable harm. *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d at 1074; *Sony Computer Entertainment America Inc. v. GameMasters*, 87 F. Supp. 2d at 984.

As the Second Circuit stated when it required the granting of an *ex parte* temporary restraining order in *In re Vuitton et Fils S.A.*, 606 F.2d 1, 4 (2d Cir. 1979): "In a trademark infringement case such as this, a substantial likelihood of confusion constitutes, in and of itself, irreparable injury sufficient to satisfy the requirements of Rule 65(b)(1)."  (Citations omitted.)

Where, as here, there is a strong likelihood of confusion arising from the sale of Defendants' counterfeit goods using a counterfeit mark, Plaintiffs have clearly demonstrated that it will suffer irreparable harm if injunctive relief is not granted.

### 3. The Balance Of Equities Is Decidedly In Favor Of Plaintiffs

Defendants' flagrant use of counterfeit reproductions of Plaintiffs' mark CHLOÉ, ALFRED DUNHILL, PANERAI and MONTBLANC in conjunction with goods similar or identical to those made by Plaintiffs, when balanced against the goodwill symbolized by the marks CHLOÉ, ALFRED DUNHILL, PANERAI and MONTBLANC resulting from the quality of Plaintiffs' products and its extensive

1   efforts over the years to maintain its enviable reputation, unquestionably tips the

2   equities in favor of Plaintiffs.

3        There is serious doubt that this Court should even consider any alleged

4   commercial interests that Defendants may assert, inasmuch as Defendants are

5   deliberately trading upon Plaintiffs' goodwill. *See Phillip Morris USA Inc. v.*

6   *Shalabi*, 352 F. Supp. 2d at 1075 ("if the Court assess the relative hardships imposed

7   by an injunction, the balance tips in favor of issuance. Plaintiff is only seeking to

8   enjoin illegal activity. The injunction will not adversely affect any of Defendants'

9   legitimate business operations, nor will they suffer any cognizable hardship as a

10   result of its issuance. Conversely, Plaintiff will suffer harm in the form of disfavor

11   from clients if Defendants' activities continue."); *Microsoft Corp. v. Marturano*,

12   2009 WL 1530040 , *8 (E.D.Cal. 2009) (court perceived no harm to Defendant since

13   injunction merely required compliance with the Copyright and Lanham Acts.).

14        Accordingly, Plaintiffs are entitled to an *ex parte* Temporary Restraining

15   Order as to Defendants TradeKey and the Individual Defendants.

16       **B.**    **An *Ex Parte* Seizure Order is Fully Warranted**

17        In addition to a Temporary Restraining Order, Plaintiffs also seek the *ex parte*

18   issuance of an order under §34(d) of the Federal Trademark Act, 15 U.S.C. § 1116(d)

19   as amended, directing the U.S. Marshal, assisted by Plaintiffs' counsel, to seize and

20   impound all data, documents and information relating to the electronic or otherwise

21   relating to: the identity (including contact names, phone numbers, and email

22   addresses or other forms of contact) of the TradeKey members offering for sale any

23   counterfeit goods bearing the trademarks CHLOÉ, MONTBLANC, ALFRED

24   DUNHILL or PANERAI; the services provided by TradeKey to said members and

25   design, manufacture, purchase, importation, distribution, offering for sale and/or

26   sale of products under counterfeit reproductions of said trademarks on

27   Tradekey.com, b2bfreezone.com, and saudicommerce.com, traffic logs; bank

28   account information, and other information in the possession, custody or control of

Memo. Re: *Ex Parte* App. for TRO, Seizure Order, & Substitute Custodian

1  the TradeKey Defendants, including the servers for Tradekey.com,

2  B2BfreeZone.com. Saudicommerce.com, and Siscom.com.sa and USA Box

3  mailboxes.   The proposed Order would permit Plaintiffs' attorneys and agents to

4  participate in the seizure and immediately inspect, photograph, videotape, photocopy

5  and inventory all such goods and related documents, records and material, including

6  electronic files. [6]

7      This Court is expressly authorized to issue *ex parte* orders directing the seizure

8  and sequestration of counterfeit merchandise and documents relating to such

9  goods.[7] Absent such *ex parte* relief, willful counterfeiters could invariably avoid an

10  equitable reckoning with trademark owners by concealing their bogus wares and any

11  records documenting their unlawful business transactions.[8] *See Reebok Int'l, Ltd. v.*

12  *Marnatech Enterprises, Inc.*, 970 F.2d 552 (9th Cir. 1992) (affirming issuance of

13  Seizure Order, Temporary Restraining Order, and subsequent Preliminary

14  Injunction and Asset Freeze against defendants' alleged sale of footwear bearing

15  counterfeits of plaintiff's registered trademark).

16  

17      [6]  While the Counterfeiting Act provides for the execution of the *ex parte*
18  seizure order by "a United States Marshal or other law enforcement officer" (15 U.S.C. § 1116(d)(9)), analysis of the legislative history reveals that Congress anticipated that due to the inability of the marshals to identify counterfeit
19  merchandise, it would be "desirable for the court to permit a representative of the applicant, such as its counsel, to accompany the U.S. Marshal to assist in making
20  these determinations." 130 Cong. Rec. H12082 (daily ed. October 10, 1984).

21      [7]  The Counterfeiting Act effectively codifies prior judicial practice. Prior to the enactment of this legislation, the courts -- relying upon *In re Vuitton et*
22  *Fils S.A., supra*, 15 U.S.C. § 1118 and the All Writs Act (28 U.S.C. § 1651) and recognizing that "'dumping' of counterfeit goods or transfer of counterfeit goods to unknown third parties, is a common practice in the counterfeiting industry,"
23  *FimabFinanziaria Maglificio Biellese Fratelli Fila S.P.A. v. Kitchen*, 548 F. Supp. 248, 250 (D.C. Fla. 1982) – routinely granted trademark owners *ex parte* seizure
24  orders to preclude infringers from concealing their counterfeit wares, means of production and business records.
25      [8]  While notice has traditionally been considered an element of
26  procedural due process, *Fuentes v. Shevin*, 407 U.S. 67 (1972), the Supreme Court of the United States has recognized that "there may be cases in which [plaintiff]
27  could make a showing of immediate danger that [defendants] will destroy or conceal disputed goods." *Id.* at 93.

28  

Memo. Re: *Ex Parte* App. for TRO, Seizure Order, & Substitute Custodian

The Counterfeiting Act requires the District Court to make the following findings in order to issue an *ex parte* seizure order:

(i)     a determination that any order other than an *ex parte* seizure order is not adequate to achieve the purposes of § 32 of this Act (15 U.S.C. § 1114);

(ii)    the applicant has not publicized the requested seizure;

(iii)   the applicant is likely to succeed in showing that the person against whom seizure would be ordered used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services;

(iv)    an immediate and irreparable injury will occur if such seizure is not ordered;

(v)     the matter to be seized will be located at the place identified in the application;

(vi)    the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application; and

(vii)   the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person.

Federal Trademark Act, § 34(d)(4)(B), 15 U.S.C. § 1116(d)(4)(B).

As detailed below, the declarations submitted herewith and this memorandum demonstrate that Plaintiffs clearly are entitled to issuance of an *ex parte* seizure order.

> **1.     A Seizure Order Is The Only Relief That Will Adequately Protect Plaintiffs' Trademark Rights**

Experience has taught that once a counterfeiter realizes that she or he is

Memo. Re: *Ex Parte* App. for TRO, Seizure Order, & Substitute Custodian

about to be apprehended, the counterfeiter will invariably conceal or destroy any relevant business records and transfer her or his inventory to another counterfeiter or some hidden location for safekeeping. Restraining orders have proven largely ineffectual. Lured by the prospect of substantial cash profits, counterfeiters have evinced little, if any, respect for court orders. The ease and speed with which data can be destroyed on a computer makes it even more critical for Plaintiffs to have the seizure order.

The TradeKey Defendants and the Individual Defendants similarly can be expected to divest themselves of records and data of counterfeiting activity and any relevant business records absent the issuance of a seizure order without notice. Accordingly, a seizure order without notice to the TradeKey Defendants or the Individual Defendants is the only means of insuring that additional evidence of counterfeiting activities will be procured and preserved.

### 2. Plaintiff Has Not Publicized the Requested Seizure

Plaintiff has not publicized the filing of this civil action or this application for an *ex parte* seizure order. The publication of an application for such relief would be considered anathema because it would defeat Plaintiffs' principal objective – the retrieval and maintenance of evidence of Defendants' counterfeiting activities.

### 3. Plaintiff Has Shown the Sale of Counterfeit Goods, Irreparable Injury Without the Seizure, and that Defendant Will Destroy Evidence if Provided Notice

As demonstrated *supra*, Plaintiffs have proven that the TradeKey Defendants and the Individual Defendants are selling Counterfeit Goods, and thus has used a Counterfeit CHLOE, ALFRED DUNHILL, PANERAI AND MONTBLANC marks in connection with identical goods as Plaintiffs', thereby meeting the requirement of § 34(d)(4)(B)(iii).

Section 34(d)(4)(B)(iv) requires that Plaintiffs demonstrates that "immediate

Memo. Re: *Ex Parte* App. for TRO, Seizure Order, & Substitute Custodian

1   and irreparable injury will occur" if the seizure application is denied.  Plaintiffs will

2   clearly incur immediate and irreparable injury absent the issuance of a seizure order

3   without notice because:  (i) the distribution of counterfeit merchandise has been held

4   consistently to constitute irreparable injury, *In re Vuitton et Fils, S.A.*, 606 F.2d at

5   4, and (ii) the Defendants will surely dispose, destroy or hide the counterfeit goods

6   and means of making and distributing the receipt templates and related records if

7   afforded notice of this action, thus meeting the requirements of subsection (iv).

8          As the Explanatory Statement to the Counterfeiting Act observed with

9   respect to this requirement:

10         **The fourth required finding,** derived from both the Senate and House

11         bills, **is that an "immediate and irreparable injury" will occur if a**

12         **seizure is not ordered.   This will not ordinarily be a difficult**

13         **showing in a counterfeiting case.**  If the mark in question is likely to

14         be found to be counterfeit, then the applicant will ordinarily be able to

15         show irreparable harm that the goods are likely to be distributed if

16         their seizure is not ordered.  **The courts have repeatedly held that**

17         **the distribution of infringing goods constitutes irreparable injury**

18         **sufficient to order preliminary relief.**

19   130 Cong. Rec. H12081 (daily ed. October 10, 1984) (emphasis added).

20         **4.     The Location of the Counterfeit Goods to be Seized**

21         In compliance with § 34(d)(4)(B)(v), Plaintiffs have demonstrated that "the

22   matter to be seized will be located at the place identified in the application."  The

23   declaration of Plaintiffs' investigator identifies the locations of servers providing the

24   means for the counterfeiting activity, the IP addresses for the domain names at issue,

25   and the location of the postal office boxes.  (R. Holmes Decl. 2-7, 10-11).

26         **5.     The Equities Weigh in Favor of Plaintiff**

27         Finally, § 34(d)(4)(B)(vi) requires a finding that Plaintiffs' equitable interests

28   are more substantial than those of Defendants.  Because Defendants are trafficking in

- 22 -

1  counterfeit CHLOÉ, ALFRED DUNHILL, PANERAI and MONTBLANC
2  merchandise, Plaintiffs' interest in removing this illegitimate merchandise from the
3  marketplace clearly dictates the issuance of the requested seizure order. *See also*
4  discussion of equities, *supra*. Accordingly, the equitable considerations outlined in §
5  34(d)(4)(B) clearly mandate the issuance of an *ex parte* seizure order.

6       **C.    Service of Process By E-mail is Warranted in This Case**

7       Plaintiffs request the Court's permission to serve process by electronic mail
8  on Defendants listed in Exhibit 97 of the Fourth Declaration of Rob Holmes.
9  Serving process via electronic mail is consistent with Fed. R. Civ. P. 4(f)(3) and, in
10 accordance with Ninth Circuit precedent, may be used in the first instance. *See Rio*
11 *Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002) (noting
12 the availability of alternate service of process under Rule 4(f)(3) "is neither a 'last
13 resort' nor 'extraordinary relief' . . . It is merely one means among several which
14 enables services of process on an international defendant.").

15      Service of process by electronic mail is necessary as to the TradeKey
16 Defendants who use the Internet in an attempt to operate outside the reach of the
17 United States courts, all the while conducting a hugely profitable counterfeiting
18 business with consumers in the United States. Service of process by electronic mail
19 is also necessary as to the Individual Defendants who willfully conceal their true
20 identities, making it virtually impossible for Plaintiffs to serve process by any other
21 means. Plaintiffs' investigators have confirmed that the e-mail addresses for the
22 Defendants listed in Exhibit 97 of Fourth Declaration of Rob Holmes are valid and
23 have every reason to believe these addresses are correct and monitored regularly.
24 (*See* R. Holmes Fourth Decl. ¶ 10.)   Thus, under the circumstances, service of
25 process by electronic mail is reasonably calculated to apprise Defendants of the
26 pending action and afford them the opportunity to respond in accordance with due
27 process. *See id.* at 1016-17.

28      Accordingly, the Court should grant Plaintiffs leave to serve these defendants

Memo. Re: *Ex Parte* App. for TRO, Seizure Order, & Substitute Custodian

1   with the Summons and Complaint, along with the other papers filed in this action

2   via e-mail.

3   **D.    Request to Appoint Substitute Custodian**

4   Plaintiffs also request an order appointing Plaintiffs' counsel, Mark A.

5   Finkelstein, Susan M. Kayser, Jessica D. Bradley, Eric M. Kennedy, and Jason

6   Wright as substitute custodian(s) to take custody of all items seized by the Office of

7   the United States Marshal pursuant to the Seizure Order entered by the Court

8   concurrently herewith.   Good cause exists for granting this application as it will

9   relieve the Office of the United States Marshal from the burden and responsibility

10  of storing the items seized pursuant to the Seizure Order.

11  **IV.   CONCLUSION**

12  For all of the reasons stated above, Plaintiffs submit that the *ex parte*

13  issuance of a Temporary Restraining Order and Seizure Order is the only way to

14  both to preserve evidence and to grant effective relief against the irreparable injury

15  Plaintiffs are now suffering.   And Plaintiffs request that they be appointed

16  substitute custodians.

17  Further, Plaintiffs' request the Court's permission to serve process by

18  electronic mail on Defendants listed in Exhibit 97 of the Fourth Declaration of Rob

19  Holmes.

20

21

22

23

24

25

26

27

28

Memo. Re: *Ex Parte* App. for TRO, Seizure Order, & Substitute Custodian

1

Dated:  May 13, 2011

2

JONES DAY

By:

3

Mark A. Finkelstein
(State Bar No. 173851)

4

Jones Day
3161 Michelson Drive

5

Suite 800
Irvine, CA 92612-4408

6

949.851.3939
949.553.7539 (Facsimile)

7

8

Susan M. Kayser
(*pro hac vice* application pending)

9

Jessica D. Bradley
(*pro hac vice* application pending)

10

Jones Day
51 Louisiana Ave, NW

11

Washington, DC 20001
202.879.3939

12

202.626.1700 (Facsimile)

13

*Attorneys for Plaintiffs Chloé SAS,
Alfred Dunhill Limited, Panerai AG
and Montblanc-Simplo GmbH*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 25 -