1  LAURENCE F. PULGRAM (CSB NO. 115163)
   lpulgram@fenwick.com
2  TYLER G. NEWBY (CSB NO. 205790)
   tnewby@fenwick.com
3  LESLIE A. KRAMER (CSB NO. 253313)
   lkramer@fenwick.com
4  FENWICK & WEST LLP
   555 California Street, 12th Floor
5  San Francisco, California 94104
   Telephone:  (415) 875-2300
6  Facsimile:   (415) 281-1350

7  Attorneys for Defendants and Counterclaimants
   Sawabeh Information Services Co. and
8  TradeKey (Pvt) Ltd.

FILED
CLERK, U.S. DISTRICT COURT

OCTOBER 15, 2012

CENTRAL DISTRICT OF CALIFORNIA
BY: _____RF_____ DEPUTY

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                   WESTERN DIVISION

12

13  CHLOE SAS, a French Corporation;          Case No. 11-cv-4147 GAF (MANx)
    ALFRED DUNHILL LIMITED, a UK
14  Corporation; OFFICINE PANERAI AG,         SAWABEH INFORMATION
    a Swiss Corporation; and                  SERVICES CO. AND TRADEKEY
15  MONTBLANC-SIMPLO GMBH, a                   (PVT) LTD'S SECOND
    German Corporation; CARTIER               AMENDED COUNTERCLAIMS
16  INTERNATIONAL A.G., a Swiss               FOR DAMAGES AND
    Corporation; and LANGE UHREN              INJUNCTIVE RELIEF
17  GMBH, a German Limited Liability
    Company,                                  1) STORED COMMUNICATIONS
18                                               ACT, 18 U.S.C. § 2701
                     Plaintiffs,
19                                            2) COMPUTER FRAUD AND
             v.                                  ABUSE ACT, 18 U.S.C. § 1030
20
    SAWABEH INFORMATION                       3) WRONGFUL SEIZURE,
21  SERVICES CO. (d/b/a "SISCOM",                15 U.S.C. § 1116
    Tradekey.com, saudicommerce.com, and
22  B2Bfreezone.com), a Saudi Arabian
    Corporation; TRADEKEY (PVT) LTD, a
23  Pakistani Corporation; WALEED
    ABALKHAIL; JUNAID MANSOOR;
24  BOSUN INTERNATIONAL TRADE
    CO.; CCTRUE INTERNATIONAL
25  TRADE CO., LTD.; EUROMED
    INTERNATIONAL TRADING CO.,
26  LTD.; FANCYSALER TRADING CO.;
    FUZHOU SUNSHINE TRADE CO.,
27  LTD; HENGTAI INTERNATIONAL;
    JAMILAH MROUEH; KK FASHION

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   LOVE ZONE; LOVE IN APPAREL
TRADE CO., LTD.; MELCHIC
2   INTERNATIONAL TRADE CO., LTD;
MYSTOCKWATCH CO., LTD; ;
3   ORIENT-ONLINE CO., LTD; PARK
CO. LTD; RICHEN-ONLINE CO., LTD;
4   SEASON-ONLINE CO., LTD;
SEASONS-ONLINE CO. LTD-ELAINE;
5   SEVEN STAR REPLICASS;
SHANGHAI TAOLAN
6   INTERNATIONAL TRADE LIMITED
COMPANY; SINOESTAR CO., LTD;
7   SUPEROCEANS CO., LTD.; V52
INTERNATIONAL TRADE CO., LTD;
8   VERTEX ONLINE CO., LTD.; WIN
INTERNATIONAL TRADE; WIN-WIN
9   TRADE CO., LTD.;
WWW.ECWATCH.NET;
10  YONGCHUANG TRADE CORP;
ZHONGSHENG TRADE CO., LTD; and
11  DOES 1 through 20 inclusive,

12              Defendants.

13

SAWABEH INFORMATION
14  SERVICES CO., a Saudi Arabian
Corporation; TRADEKEY (PVT) LTD, a
15  Pakistani Corporation,

16              Counterclaimants,

17      v.

18  RICHEMONT INTERNATIONAL
LIMITED a UK Corporation; CHLOÉ
19  SAS, a French Corporation; ALFRED
DUNHILL LIMITED, a UK Corporation;
20  OFFICINE PANERAI AG, a Swiss
Corporation; and MONTBLANC-
21  SIMPLO GMBH, a German Corporation;
LANCE ELIOT SLOVES, an individual,
22  COMPUTER FORENSIC SERVICES,
INC., a Texas corporation, JONES DAY,
23  and Does 1 Through 10 Inclusive,

24              Counterclaim Defendants.

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Defendants/Counterclaimants TradeKey (PVT) Ltd. ("TradeKey") and

Sawabeh Information Services Company ("SISCOM"), hereby submit their First

Amended Counterclaims as follows, making the allegations as to their own conduct

based on their knowledge, and the allegations as to the Counterclaim Defendants'

intent based on information and belief and reasonable inferences from their conduct

and the circumstances:

1.      TradeKey and SISCOM bring this counterclaim to recover for

Counterclaim Defendants' wrongful execution of an *Ex Parte* Seizure Order to shut

down TradeKey's e-commerce website for more than 60 hours, and SISCOM's

website and IT outsourcing business for an entire business day in Saudi Arabia,

while simultaneously seizing large quantities of stored electronic communications

as expressly prohibited by federal law.[1]  Counterclaim Defendants' execution of the

Court's May 17, 2011 *Ex Parte* Seizure Order ("May 17 Order") went beyond

preserving the specified evidence it authorized be obtained, damaging SISCOM's

and TradeKey's businesses by taking them offline for an extended and

unreasonable period of time, thereby interfering with TradeKey's customer

relationships, damaging its goodwill, and causing irreparable damage to its rankings

in search engine algorithms which severely penalize even a few hours offline.

2.      Counterclaim Defendants' wrongful conduct included, without

limitation:

(a)     Their failure, prior to seizing the data from the TradeKey and

SISCOM servers, to notify the Court or obtain its approval for their seizure of data

beyond that authorized in the May 17 Order;

(b)     Their failure, prior to seizing the data from the TradeKey and

SISCOM servers, to notify the Court of or obtain its approval for the shutdown of

---

[1] This Counterclaim is brought without waiver of objections to personal jurisdiction
over Counterclaimants.  *See Dragor Shipping Corp. v. Union Tank Car Co.*, 378
F.2d 241, 244 (9th Cir.1967);  *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1330
(9th Cir. 1984).

the TradeKey and SISCOM websites in their entirety, much less for multiple days;
and

(c)     Their wrongful conduct in shutting down, seizing and copying
SISCOM's servers at SISCOM's web hosting facility for approximately twenty
hours, including an entire business day in Saudi Arabia, despite the fact that those
servers were separate from the TradeKey servers and did not operate the
TradeKey.com website purportedly subject to the claims in the action;

(d)     Their wrongful conduct in shutting down, seizing, and copying all 42
TradeKey servers at TradeKey's web hosting facility over more than 60 hours, even
when Counterclaim Defendants knew or should have known they could copy the
data authorized by the May 17 Order from a small number of servers with minimal
impact to the TradeKey website due to the redundant architecture of TradeKey's
web servers;

(e)     Their wrongful conduct in delaying the return to service of the key
servers necessary to restore the TradeKey website to operation, despite being
advised of the identity of those servers, and instead, contrary to their false
representations to TradeKey that they would expedite the copying and restoration of
those essential servers, holding those servers offline while first copying others of
their preference;

(f)     Their obtaining unauthorized access to a vast amount of statutorily
protected stored communications in electronic storage, and their interference with
the ability of TradeKey, SISCOM, and their respective customers to access stored
communications in electronic storage; and

(g)     Their representations, as purported justification for seizing data *ex
parte* from SISCOM and TradeKey, that the Counterclaimants were untrustworthy
and would destroy evidence, when Jones Day—counsel of record who led the
seizure—practices law in the Kingdom of Saudi Arabia through association with
SISCOM's outside counsel, AlSulaim Alwaji & Partners Law Firm, providing

access to SISCOM's upstanding reputation and legitimate business operations, if reasonable inquiry had been made.

3.      As alleged more fully below, Counterclaimants SISCOM and TradeKey (together, "Counterclaimants") seek injunctive and monetary relief from Counterclaim Defendants Chloé SAS; Alfred Dunhill Limited ("Dunhill"), Officine Panerai AG ("Panerai"), Montblanc-Simplo GMBH ("Montblanc") (collectively, the "Brandowner Defendants"), Richemont International Limited ("Richemont" or "RIL"), Computer Forensic Services, Inc. ("CFSI"), Lance Eliot Sloves, and Jones Day (collectively, "Counterclaim Defendants") for violations of the Stored Communications Act, the Computer Fraud and Abuse Act, and Wrongful Seizure.

## THE PARTIES

4.      SISCOM is a leading full-service Information Technology (IT) Services company that provides a range of consulting and hosted IT services to Saudi Arabian government agencies, educational institutions and Saudi Arabian Gulf Region (the "Gulf Region") companies.  SISCOM is a Saudi Arabian company, and its headquarters and principal place of business are in Riyadh, Saudi Arabia.  At all times relevant to this Counterclaim, SISCOM's IT infrastructure, including the www.siscom.com.sa website, SISCOM's email servers, and the websites SISCOM manages for its clients were located on computer servers operated by Liquid Web, Inc., which is located in Lansing, Michigan.

5.      TradeKey is a privately held Pakistani company with its principal place of business and headquarters located in Karachi, Pakistan.  TradeKey is a majority-owned subsidiary of SISCOM, and, since 2006 has operated a leading Internet-based portal for business-to-business commerce at its website, www.tradekey.com.  At all times relevant to this Counterclaim, the TradeKey website, as well as TradeKey's email server, were located on computer servers operated by Liquid Web, Inc., which is located in Lansing, Michigan.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6.     Upon information and belief, Chloé is a corporation organized under the laws of France with its principal place of business in Paris, France.  Upon information and belief, Chloé and its licensees and affiliates distribute luxury goods, including handbags, clothing, and jewelry.

7.     Upon information and belief, Alfred Dunhill Limited is a corporation organized under the laws of England and Wales, with its principal place of business in London, United Kingdom.  Upon information and belief Dunhill and its licensees and affiliates distribute luxury goods, including leather goods, men's clothing, and accessories.

8.     Upon information and belief, Officine Panerai AG is a corporation organized under the laws of Switzerland, with its principal place of business located at Steinhausen, Switzerland.  Upon information and belief, Panerai and its licensees and affiliates distribute luxury watches.

9.     Upon information and belief, Montblanc-Simplo GmbH is a corporation organized under the laws of Germany, with its principal place of business located in Hamburg, Germany.  Upon information and belief, Montblanc and its licensees and affiliates distribute luxury pens, watches, and jewelry.

10.     Chloé, Dunhill, Panerai and Montblanc are all Plaintiffs in this action that procured the May 17 Order in question.  On information and belief, all are subsidiaries of the luxury goods holding company, Compagnie Financiere Richemont S.A., which is incorporated under the laws of Switzerland, and is the ultimate parent of what is referred to and operated as the "Richemont Group."

11.     Upon information and belief, RIL provides and directs legal services, including trademark and brand enforcement, on behalf of the Brandowner Defendants and others in Richemont Group.  In legal pleadings in the United States, Montblanc has identified RIL as its parent company, and has requested transfer of websites purportedly infringing Montblanc's trademarks to RIL to act on behalf of Montblanc in policing its marks.  RIL employs the Senior Digital and IP Counsel

for the Richemont Group, who has responsibility for internet IP rights enforcement in this judicial District, has participated and directed IP enforcement strategies of Richemont Group brands in and for this judicial District, and has overseen and directed the conduct of this action on behalf of the Richemont Group and its Brandowner members.  On information and belief, at all times relevant to this Counterclaim, RIL, through its authorized agents and employees, coordinated, directed and approved the activities of the Brandowner Defendants and the Brandowner Defendants' agents and counsel with respect to the wrongful conduct described herein, including the manner in which the May 17, 2011 *Ex Parte* Seizure Order obtained from this Court was executed.  On information and belief, RIL has contracted with and managed Jones Day, including offices of Jones Day located in the Central District of California, and authorized its conduct and the conduct of the Brandowner Defendants with respect to the conduct alleged herein and the filing of the Supplemental Complaint in this Action.  RIL's representative travelled to California as the sole client representative of the Richemont Group and the Brandowner Defendants in an unsuccessful attempt to mediate this action. In addition, after the seizure, additional brands within the Richemont Group, whose internet enforcement strategies were also directed and implemented by RIL, joined this litigation in order to take advantage of the seizure described herein.

12.    Upon information and belief, Defendant Computer Forensics Services, Inc. ("CFSI") is a Texas corporation, with its principal place of business at 4514 Travis St., Suite 204, Dallas, TX 75205.  At all times relevant to this Counterclaim, CFSI was an agent authorized to act on behalf of the Brandowner Defendants.

13.    Upon information and belief, Defendant Lance Eliot Sloves is an individual residing in the state of Texas.  Defendant Sloves is employed as the Director of Forensics at Computer Forensics Services, Inc., and, upon information and belief, the sole shareholder of CFSI. At all times relevant to this Counterclaim, Sloves was an agent authorized to act on behalf of the Brandowner Defendants.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    14.    Upon information and belief, Defendant Jones Day is a global law firm

2 with offices in federal judicial districts throughout the United States, including in

3 Los Angeles, California.  Jones Day also practices in the Kingdom of Saudi Arabia

4 in association with AlSulaim Alwaji & Partners Law Firm, which has been

5 SISCOM's outside counsel of record in Saudi Arabia since SISCOM was formed

6 some twenty years ago.  At all times relevant to this Counterclaim, Jones Day was

7 an agent authorized to act on behalf of the Brandowner Defendants, acting at the

8 direction of and as an agent for RIL, and directing, authorizing, and managing the

9 activities of the "Seizure Team," which consisted of at least Jones Day, Sloves,

10 CFSI, and non-parties David Corder Kovar, Robert McKinnon, Robert Holmes and

11 IPCybercrime.com LLC.

12    15.    The Defendants sued herein as John Doe Defendants 1 through 10

13 (Doe Defendants) are persons or entities who materially participated in the

14 wrongdoings alleged herein but whose specific roles and identifies are not presently

15 known and who are therefore sued by fictitious names.  On information and belief,

16 each of the Doe Defendants acted as agents for, or authorized or directed the

17 conduct of, other Counterclaim Defendants in this action.  Counterclaimants will

18 amend their Counterclaims to specify the actual names of the Doe Defendants at

19 such time as their roles and responsibilities become known.

20    **JURISDICTION AND VENUE**

21    16.    Counterclaimants bring the claims for relief set forth herein for

22 violation of federal law under 18 U.SC. §§ 1030 and 2701, and 15 U.S.C.

23 § 1116(d).  Counterclaimants also bring closely related claims under applicable

24 state laws.

25    17.    This Court has subject matter jurisdiction over these claims for relief

26 pursuant to 28 U.S.C. §§ 1331 and 1338(a).  The Court has supplemental

27 jurisdiction over all other claims asserted herein under 28 U.S.C. § 1367(a).  The

28 parties are diverse and the value of the matter in controversy exceeds $75,000.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18. This Court has personal jurisdiction over Counterclaim Defendants by virtue of the facts alleged herein and of record in this action, including, *inter alia*, their submission to the jurisdiction of this Court through their direction and participation in the captioned litigation as alleged herein; their submission of declarations to this Court in connection with the captioned litigation; their procurement and execution of the May 17 Order issued under the authority of this Court; their obtaining and ongoing possession and control of the materials seized pursuant to this Court's orders and their affirmative invocation of the power and authority of this Court in executing the seizure.

19. This Counterclaim arises out of the same transaction and occurrence that is the subject matter of the Brandowner Defendants' Supplement to the First Amended Complaint.

20. In the absence of joinder of the Counterclaim Defendants other than the Brandowner Defendants, this Court cannot accord complete relief among the existing parties hereto, in that, *inter alia*, Sloves and CSFI, under the direction and management of Jones Day and RIL, have possession and custody of materials, including stored communications, wrongfully seized from Counterclaimants.

21. All other Counterclaim Defendants, in addition to the Brandowner Defendants, are proper parties in this action because the rights asserted against them jointly, severally or in the alternative are with respect to and arise out of the same transaction and occurrence as raised against the Brandowner Defendants in this Counterclaim, and because there are questions of law and fact common to all Counterclaim Defendants in this action.

## FACTUAL ALLEGATIONS

### TradeKey's Business to Business Portal Website

22. Since 2006, TradeKey has operated one of the world's largest business-to-business Internet portals at www.tradekey.com. Like other business-to-business portals, TradeKey is a site on which suppliers can advertise their ability to

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

supply goods and materials to other businesses.  The products offered by vendors on the TradeKey site include everything from raw materials to machinery to finished goods.  In addition to providing members with a searchable website on which suppliers can advertise their materials, TradeKey also provides email and chat communications services for its members, which enable potential buyers and sellers to communicate with each other about potential transactions.

23.     From 2006 to May 23, 2011, more than 5.3 million users had registered as members of the TradeKey site.  The number of visitors to its site had also steadily increased during that time period, and prior to Counterclaim Defendants' intentional and wrongful conduct in May 2011, TradeKey experienced an average in the range of 250,000 visitors per day.

24.     Prior to May 23, 2011, TradeKey's members listed more than one million products on the site.  Product listings were organized into more than 32,000 different categories, which included products ranging from raw materials, machinery, and manufacturing components to a variety of other finished and unfinished goods.  As of May 23, 2011, the top tier product categories on TradeKey were:  Agriculture; Apparel & Fashion; Automobile; Business Services; Chemicals; Computer Hardware and Software; Construction & Real Estate; Electronics and Electrical; Energy; Environment; Excess Inventory; Food & Beverage; Gifts & Crafts; Health & Beauty; Home Appliances; Home Supplies; Industrial Supplies; Minerals, Metals & Materials; Office Supplies; Packaging & Paper; Printing & Publishing; Security & Protection; Sports & Entertainment; Telecommunications; Textiles & Leather Products; Toys; and Transportation.  Among TradeKey's members who paid membership fees, no single top tier product category accounted for more than 16% of TradeKey's membership revenue.

25.     The existence of these categories and listings completely unrelated to the Brandowner Defendants' businesses was readily apparent on the TradeKey site and was well known to all the Counterclaim Defendants.  The listings on TradeKey

8

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

that mentioned any of the Brandowner Defendants' products was only a small fraction of a percent. The overwhelming majority of products offered on the TradeKey site had nothing to do with luxury goods.

26. Like many Internet e-commerce sites that depend on site traffic, the ranking of TradeKey's website and its members' product listings in response to queries on popular search engines like Google and Bing is a critical competitive differentiator. That is, TradeKey is better able to attract and retain fee-paying members when its members' TradeKey product listing pages appear high in the list of results on search engines. TradeKey has invested millions of dollars since 2006 to develop algorithms and technology that help the TradeKey website and members' products listing pages appear prominently in search engine results. Before May 23, 2011, on an average day, Google's software crawled over 1 million pages of SISCOM Websites, and more than 5.5 million TradeKey.com pages were listed on Google, more than 1.7 million of them on the first page of searches – 935,000 in the first three items.

27. A major factor in developing and maintaining a high search engine ranking is the continuity of a website's operations. A history of stability and website uptime influences a site's search engine ranking positively, leading to higher placement in search engine results. Conversely, taking a website offline for any extended period may reduce search rankings; more than a day will drastically lower a website's search ranking and may even stop search engines from reporting the website at all. Prior to Counterclaim Defendants' wrongful conduct on May 23, 2011, the TradeKey.com website had not experienced any significant downtime in more than five years of operation.

28. As a result of TradeKey's long history of website uptime and its extensive engineering investments in making its site more visible to search engines, TradeKey had achieved a "PageRank" of 8 out of possible 10 prior to May 23, 2011. Upon information and belief, PageRank is a reference to Google's algorithm

in assessing how high a page web site should appear in response to a search on Google's search engine.  TradeKey's PageRank put TradeKey's search engine visibility on par with other best-known websites and above many competitors.

29.    In addition to positively influencing TradeKey's PageRank and search engine placement, TradeKey's website uptime is also an important component of its customer goodwill.  Unexpected and lengthy website downtime damages TradeKey's reputation among potential and existing customers who use the site to advertise their products.

## TradeKey's Notice and Takedown Procedure

30.    As the operator of its B2B Internet listing service, TradeKey does not sell, store or ship any of the products its members advertise on its site, nor is it involved in any sales transactions between sellers and buyers.  In most circumstances, TradeKey never knows when its members conduct sales transactions for goods advertised on the TradeKey site.  TradeKey therefore is not able to verify that a good that one of its members is advertising is, in fact, the good that member sells to buyers.

31.    Nevertheless, at all times relevant to this dispute, TradeKey has provided intellectual property owners with a method to notify TradeKey and request the removal of allegedly infringing material posted by TradeKey members on the www.tradekey.com site.  By clicking a link on TradeKey's homepage, visitors are taken to a page explaining TradeKey's notice and takedown procedure, and provided with a notice and takedown form to be completed and submitted to TradeKey in order to deactivate listings claimed to be infringing.  Many intellectual property owners have used TradeKey's notice and takedown procedure, and, as of May 23, 2011, TradeKey had removed thousands of product listings from its website.

32.    Tradekey has further created and implemented the "Tradekey Expedite" removal service that allows bulk removal of infringing products for

Fenwick & West LLP
Attorneys at Law
San Francisco

brand owners that choose to use it.  Numerous intellectual property rights owners have elected to use the expedited removal service to remove allegedly infringing TradeKey member listings.

33.     On information and belief, as alleged in the First Amended Complaint in this action, Counterclaim Defendants believed, at least as early as May 2010, that TradeKey members were listing products that infringed Counterclaim Defendants' trademarks.  At no point prior to May 23, 2011 had any of the Counterclaim Defendants used TradeKey's notice and takedown procedure or expedited removal tool.  Rather than using these readily accessible methods to limit purported infringement of their brands, the Counterclaim Defendants silently planned to take the websites offline and seize their stored communications instead, in furtherance of their plan to damage TradeKey and SISCOM, .

## SISCOM'S IT OUTSOURCING BUSINESS

34.     Operating from its headquarters in Riyadh in the Kingdom of Saudi Arabia, SISCOM has been a leading provider of information technology ("IT") services in the Gulf Region since 1989.  SISCOM provides a range of technology solutions and services to its clients in the banking, securities, education and government sectors.  SISCOM's customer base includes the premier corporate and government clientele in the Gulf Region, including:  The Saudi Arabian Monetary Agency, Saudi Arabia's central bank, the Saudi Arabian Food and Drug Administration, Saudi Public Pension Authority, Bravo Telecom, Ericsson, and ArabSat.  The IT services SISCOM provides these clients and others include technology consulting, design, development, software re-engineering, maintenance, technology, package evaluation, implementation, infrastructure management services and outsourcing.

35.     Among the IT services provided by SISCOM are outsourced IT management services, which include remote data storage, website hosting, email hosting and data processing.  Rather than building and maintaining the

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

infrastructure and support staff to manage these functions themselves, SISCOM's outsourcing clients contract with SISCOM to provide these services.

36.     In SISCOM's web hosting service agreements, SISCOM generally guarantees its customers 99.7% uptime and, in case of downtime, may have to pay all resulting damages from discontinuity of service.  Among the web sites hosted by SISCOM are those serving major Saudi Arabian financial, manufacturing and energy companies, and educational institutions.

## STORED SISCOM AND SISCOM CUSTOMER DATA AND COMMUNICATIONS

37.     SISCOM contracted with Liquid Web, a data and web hosting company and Internet Service Provider in Lansing, Michigan, to provide the Internet connectivity, data storage, computer infrastructure and computer processing necessary to run SISCOM's IT outsourcing business.  Upon information and belief, Liquid Web offers these services to the general public.

38.     Liquid Web owns the computer infrastructure, including the computer servers and networking equipment, upon which SISCOM and its customers' data are stored.  Although the principals of SISCOM and its technical staff are located in Riyadh, Saudi Arabia, the data and computer processing that SISCOM uses to run its IT outsourcing business are located at SISCOM's facilities in Michigan. SISCOM chose to use a U.S.-based hosting service because of the reputation of U.S. hosts and ISPs for reliability, security, and performance.

39.     The email servers for SISCOM's own business were located at Liquid Web's data centers in Lansing, Michigan and were leased on a monthly basis by SISCOM.  Messages sent to a @siscom.com.sa domain were stored on the Liquid Web servers in Lansing, Michigan before they are opened by the recipient, and were maintained in electronic storage on those servers even after the message was opened.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

40.     In addition to hosting SISCOM's own email content, Liquid Web hosted web sites and email content for SISCOM's outsourcing customers, including a number of major Saudi Arabian companies and educational institutions.

41.     SISCOM also provides email service for some of its outsourcing clients.  At all times relevant to this Complaint, the email servers used for SISCOM's outsourced email service were hosted on Liquid Web servers in Liquid Web's Lansing, Michigan data centers.  Liquid Web's servers performed all of the processing functions required to send and receive email messages from and to SISCOM's customers' company email accounts, and SISCOM's customers' sent and received email communications were stored on the email servers hosted by Liquid Web.  For example, when a person sent a message to USER@SISCOMcustomer.com, that message is received and stored on the email server hosted at Liquid Web.  After emails were opened by TradeKey employees, they were maintained in electronic storage for backup purposes on Liquid Web servers.

## STORED TRADEKEY AND TRADEKEY MEMBER DATA AND COMMUNICATIONS

42.     Like SISCOM, TradeKey contracted with Liquid Web to provide web hosting, email hosting, data storage and Internet connectivity on Liquid Web's servers located in Lansing, Michigan, and has done so since 2006.  Liquid Web owned all of the computer servers that performed the computer processing necessary to run the TradeKey.com website and store all of the data related to the site and its customers.  Liquid Web leased the use of those servers, along with Internet connectivity, to TradeKey, whose employees accessed them remotely from Karachi, Pakistan.   Content for the www.tradekey.com website and the email servers for TradeKey corporate email accounts were stored on Liquid Web's servers, the use of which were leased to TradeKey.  Emails sent to a TradeKey employee at his "@tradekey.com" address were received by an email server at

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Liquid Web and stored there prior to being opened by the recipient.  In addition, when a TradeKey employee sent an email from his "@tradekey.com" email account, the email was sent from a Liquid Web server. After emails were opened by TradeKey employees, they were maintained in electronic storage for backup purposes on Liquid Web servers.

43.    In May 2011, TradeKey was leasing the use of approximately 42 servers from Liquid Web to operate its business and to provide email communications to TradeKey employees and email and chat communications services for users of the TradeKey.com site.  Among these servers were servers used to store data on behalf of Tradekey members, such as image files, video files and customer brochures.  Those servers also hosted confidential and trade secret TradeKey source code relating to the operation of its site as well as attorney client privileged information.

44.    TradeKey, using Liquid Web's servers, provides two communications services that allow users to engage in electronic communications with each other: an email message service and a chat service.  The software and data storage used to operate both of these services are hosted on servers at Liquid Web.  The email message service operates much like a web-based email service.  When a member of the TradeKey site sees a product listing in which he is interested, he can click on a hyperlink button labeled "Send Email."  Upon clicking this button, the user is taken to a page in which he can type a subject line and message to the seller.  When the user clicks the "Send Message" button, the message is then sent to the seller's TradeKey mailbox. When the recipient visits his TradeKey "Member Area", he will see a notification that he has an unread message.

45.    TradeKey provides the service for sending and receiving these email messages, and the content of the messages is stored on the servers TradeKey leases at Liquid Web.  After six months, messages will disappear from a TradeKey member's mailbox, but they remain in storage on the Liquid Web servers for

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

backup purposes.  As of May 23, 2011, approximately 9 million messages sent to sellers using this messaging service were stored on the Liquid Web servers.

46.     TradeKey also provides users with an electronic chat communication tool.  Chat allows nearly instantaneous communication between members, but is only available when both members are signed into TradeKey.  As with the email service, all of the software that operates the TradeKey chat service is located on three chat servers hosted by Liquid Web.  At all times relevant to this Complaint, TradeKey maintained a log of chat communication content between users for archival purposes, which were stored on servers at Liquid Web.  As of May 23, 2011, approximately 71,000 member chat logs were in electronic storage for backup purposes on Liquid Web servers for TradeKey's members.

## COUNTERCLAIM DEFENDANTS' DISRUPTION OF SISCOM AND TRADEKEY'S BUSINESSES AND ACCESS TO STORED COMMUNICATIONS

47.     Without prior notice to SISCOM or TradeKey, on May 23, 2011 Counterclaim Defendants, through their agents CFSI, Lance Eliot Sloves and one or more lawyers from Jones Day ("the Seizure Team") entered Liquid Web's facilities accompanied by armed United States Marshalls.  They entered under the premise of executing an *Ex Parte* Seizure Order the Brandowner Defendants and Jones Day had obtained on or about May 17, 2011 from a U.S. District Judge in the Central District of California (the "May 17 Order") by reference to 15 U.S.C. § 1116(d).  The Order, which upon information and belief, was written and submitted to the Court as a Proposed Order by Counterclaim Defendant Jones Day, purported to permit Counterclaim Defendants to seize from Liquid Web data relating to TradeKey members' alleged use of TradeKey to offer to sell goods bearing counterfeit versions of the Brandowner Defendants' marks.  The May 17 Order did not authorize seizure of information unrelated to the Brandowner Defendants' marks.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

48.    On information and belief, at no time prior to seizing the data from the TradeKey and SISCOM servers did the Counterclaim Defendants notify the Court or seek its approval of seizure and copying of more information than what was authorized by 15 U.S.C. § 1116(d).  On information and belief, at no time prior to seizing the data from the TradeKey and SISCOM servers did the Counterclaim Defendants notify the Court or seek its approval of taking the TradeKey website offline for an extended period of time to the significant damage of the company.  Neither the May 17 Order nor the Brandowner Defendants' *ex parte* motion seeking the May 17 Order notified the Court of the potential to shut down the servers used to operate a commercial website, much less for a period of days.  Nor did the Brandowner Defendants' *ex parte* motion notify the Court of the potential copying of the entirety of those servers, the majority of which did not pertain to the alleged infringement of the Brandowner Defendants' trademarks.  On information and belief, at no time prior to seizing the data from the TradeKey and SISCOM servers did the Counterclaim Defendants notify the Court or seek its approval to prevent SISCOM and its clients as well as TradeKey and its members from accessing their stored communications at Liquid Web while Counterclaim Defendants accessed and copied those communications.

49.    Brandowner Defendants' *ex parte* motion suggested to the Court that they would not use the seizure order it sought in a way that would significantly interfere with TradeKey or SISCOM's businesses.  In their *Ex Parte* Application For Leave To Conduct Expedited Discovery, For an Asset Freeze Order, And For A Domain Name Transfer, Brandowner Defendants and Jones Day stated that they had posted or would post a bond in the amount of $20,000 in support of both the Seizure Order, Temporary Restraining Order and Asset Freeze Order they sought.  This amount suggested that the requested seizure would cause only minimal interference with Counterclaimants' businesses and was inconsistent with and

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

insufficient to protect against a complete shutdown of SISCOM and TradeKey's business operations.

50. Title 15, U.S.C. § 1116(d)(1)(A) permits a trademark owner, upon the issuance of a Court order, to seize "goods and counterfeit marks involved in [using a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services] and the means of making such marks, and records documenting the manufacture, sale, or receipt of things involved in such violation." The statute does not authorize the seizure of documents or data unrelated to the distribution of the movant's trademarks, nor did the May 17 Order. The statute also does not authorize the movant to shut down aspects of a business unrelated to the alleged counterfeiting of the movant's marks, nor did the May 17 Order.

51. As required by 15 U.S.C. § 1116(d)(5)(C), the Court's May 17 Order stated that the seizure "shall not end later than seven (7) days after this order is issued." Therefore, any seizure pursuant to the May 17, 2011 Order was required to end no later than May 24, 2011.

52. Throughout the period from the service of the May 17 Order on May 23, 2011 until May 26, 2011—well beyond the date upon which the seizure was required to conclude—all TradeKey and SISCOM personnel were excluded from access to their own web hosting sites, pursuant to the direction of Counterclaim Defendants to the U.S. Marshalls and Liquid Web in purported exercise of the process of this Court.

53. Upon information and belief, after entering Liquid Web's facilities by use of armed Marshalls, Counterclaim Defendants identified 42 servers used to provide an electronic communications service, remote computing service and host all data, email communications, chat communications and website for TradeKey.com, the overwhelming majority of which had no relation to the Brandowner Defendants' trademarks. Upon information and belief, none of the Counterclaim Defendants who was present had experience collecting the volume of

data stored on the 42 servers, generally containing two to three hard drives each, that were involved in the operation of multiple websites. Brandowner Defendants' private investigator, Rob Holmes, who partook in the seizure, had no formal training as a computer forensic examiner and is not certified as a computer examiner.  Upon information and belief, Counterclaim Defendants had grossly insufficient human and technical resources to perform the seizure expeditiously, but they proceeded forward in any event, knowing of the huge and irreparable damage their conduct would cause.

54.     The Seizure Team also became aware when it arrived at Liquid Web's facility that four servers used to host SISCOM's business and the www.siscom.com.sa website were hosted on different servers than those that hosted the www.tradekey.com website and were located in a separate Liquid Web facility.

55.     Without notifying the Court of their intent to disable TradeKey and SISCOM's businesses and copy far more content than authorized by the May 17 Order, the Counterclaim Defendants Sloves and CFSI, acting at the direction of and as the agents for Counterclaim Defendants RIL, Jones Day and the Brandowner Defendants, powered down all 46 servers used to operate the TradeKey and SISCOM businesses and began copying them in their entirety.  On information and belief, Sloves and CFSI still retain the copies of these servers and their contents. Once the servers were taken offline, anyone who tried to visit the www.tradekey.com website received error messages indicating that the host server was unavailable or not responding.

56.     Before powering down all servers used to operate the SISCOM, TradeKey and SISCOM customer businesses, Counterclaim Defendants deliberately, and without justification, disregarded less disruptive alternatives that would have allowed them to preserve evidence without gratuitously damaging the SISCOM and TradeKey businesses by taking their servers offline for extended periods of time.  Despite the lack of any evidence that Counterclaimants would

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

destroy evidence, Counterclaim Defendants did not copy the servers one by one, so as to maintain the websites online.  Alternatively, even if multiple servers "needed" to be taken offline at once to avoid the "risk" that Counterclaimants would "destroy evidence," (a risk that in fact did not exist) the majority of the TradeKey servers taken offline and seized by Plaintiffs contained duplicate copies of the TradeKey website data.  This redundant architecture, which serves the purposes of both load balancing and fault tolerance in the event that one of the servers fails, is commonly implemented for high-traffic web sites like TradeKey and was known or should have been known to the Seizure Team, particularly Defendants CFSI and Sloves, a certified computer examiner.  Counterclaim Defendants could have seized and copied a small number of servers in a short period of time with only a minor impact on TradeKey's uptime.  Instead, Counterclaim Defendants deliberately chose to power down all 42 servers and kept the TradeKey website offline for approximately 64 hours.

57.    The Seizure Team copied all of the data in the servers, including trade secret processes, attorney client privileged information, confidential business information, account data and stored communications of tens of thousands of users, financial information, and vast amounts of other information not contemplated in the May 17 Order.

58.    Counterclaim Defendants kept the SISCOM servers for almost a full day, including the business day in the Gulf region, thereby damaging SISCOM's business from an extended outage.  During that time, the SISCOM website and its hosted services customers' websites were offline, damaging both SISCOM and its customers businesses.  In addition, SISCOM employees and SISCOM's outsourcing clients could not send or receive email or access unread and undelivered email messages that were stored on SISCOM's email server at Liquid Web.  Among other things, this outage prevented SISCOM from receiving and

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

responding to technical support service requests for its IT services clients for nearly an entire day.

59.     Upon learning that the TradeKey and SISCOM websites had gone offline late on May 23, 2011, TradeKey and SISCOM's technical personnel contacted their host, Liquid Web, to determine the cause of the outage.  Upon learning that the outage was due to a purported court order, SISCOM and TradeKey's outside counsel contacted Liquid Web, who, upon information and belief, provided counsel's contact information to Jones Day.  Jones Day then contacted TradeKey and SISCOM's outside counsel, who, at approximately 5:00 p.m. Eastern Time on May 23 identified four specific SISCOM servers and six specific TradeKey servers that were mission critical to the operation of SISCOM and TradeKey's businesses.  TradeKey and SISCOM's counsel requested that those 10 servers should be prioritized to reduce the disruption to the SISCOM and TradeKey businesses due to being completely offline.  Jones Day told TradeKey and SISCOM's counsel that the Counterclaim Defendants would prioritize the forensic imaging of the identified servers, which it estimated would take approximately four hours.

60.     Contrary to Jones Day's May 23, 2011 statements to TradeKey and SISCOM's counsel, the Counterclaim Defendants did not prioritize the imaging or return to operation the six mission critical TradeKey servers.  By the next day, May 24, the servers were still not released.   Throughout the day on May 24, 2011, TradeKey and SISCOM's outside counsel implored Jones Day to return to operation the mission critical servers so the website could re-launch.  The Seizure Team failed to do so.

61.     When asked by Counterclaimants on May 24 to disclose who was collecting the terabytes of information being vacuumed out of their servers, Counterclaim Defendants refused to identify the entities obtaining unfettered access to all of Counterclaimants' most confidential business materials.  Counterclaimants

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

also asked Counterclaim Defendants to sequester the seized information in order to preserve its private, proprietary and confidential nature, and to ensure it would not be viewed or used by Counterclaim Defendants or anyone else prior to further court order.  Counterclaim Defendants refused to do so, notwithstanding the requirement of Section 1116(d)(7) that a protective order "shall" be entered in connection with any seizure, and that such an order "shall provide for appropriate procedures to ensure that confidential, private, proprietary, or privileged information from such records is not improperly disclosed or used."  15 U.S.C. Section 1116(d)(7).  On information and belief, Counterclaim Defendants did not advise the Court of the necessity of such a protective order when they applied for the May 17 Order.  On May 24, when Counterclaimants asked Counterclaim Defendants what they intended to do with the data they collected and were refusing to sequester, Jones Day, acting on behalf of all Counterclaim Defendants responded:  "Anything we want.  Read the Court's order."

62.    The six mission critical control servers housed operations technology of relatively small volume.  Therefore, to the extent there was any reason to copy them at all (and there was none), they could have been copied rapidly.  The Seizure Team knew or should have known this.  But the Counterclaim Defendants refused to copy them and return them to service, not only in the four hours promised on May 23, but throughout the entirety of May 24.  Instead, Counterclaim Defendants deliberately chose to copy other servers first, including the "business intelligence" and "chat" servers, which housed the contents of stored communications in electronic storage.  The Counterclaim Defendants did not release the six mission critical servers to Liquid Web until after 12:00 a.m. on May 25, 2011.  Even at that time, they did not restore several key servers to service, and the website did not become operative until more than a day later.

63.     Counterclaim Defendants knew or should have known that the longer the servers were kept offline, the more the impact TradeKey would suffer in page rank and search engine optimization, which was the core of TradeKey's business.

64.     The Counterclaim Defendants continued to keep the TradeKey servers offline even after the May 17 Order expired at the close of business on May 24, 2011.  In doing so, the Counterclaim Defendants exercised exclusive dominion over the servers housing all of TradeKey's data and communications, the vast majority of which were not related to the alleged counterfeiting of Brandowner Defendants' trademarks, in contravention to the May 17 Order and 15 U.S.C. § 1116(d)(5)(C). The Counterclaim Defendants did not release custody of all of the last of the TradeKey servers, and the TradeKey website was kept offline, until May 26, 2011, more than a day after the Court's May 17 Order had expired.

65.     During the time TradeKey's website was offline, its employees could not send or receive email or access email stored on the Liquid Web servers.  In addition, TradeKey's members could not access the TradeKey.com website or access email messages that were in their in-boxes, including unread messages concerning sales transactions, or engage in chat communications with other members.  TradeKey members who attempted to access the website received error messages for three days that the host was not available, giving the impression to all that visited that the website's operators were not technically competent and that the service lacked the fundamental capability of staying online.

66.     On information and belief, when Counterclaim Defendants accessed and copied all of the Liquid Web servers that hosted the TradeKey site and services, they accessed approximately 9 million stored electronic communications between Tradekey members, and approximately 71,000 log files of stored chat communications between TradeKey members who had used the electronic communications services offered through the TradeKey site and services.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## HARM TO TRADEKEY AND SISCOM RESULTING FROM COUNTERCLAIM DEFENDANTS' WRONGFUL SEIZURE

67.     Counterclaim Defendants' misconduct in taking the TradeKey.com site offline for more than 64 hours has harmed and continues to harm TradeKey in the form of lower PageRank, reduced site traffic, and decreased membership. Following the 64 hour outage cause by Counterclaim Defendants' wrongful and malicious acts, TradeKey's daily site traffic dropped.  As a further result of the outage, TradeKey has not been able to attract and sign-up new paying customers as it had before Counterclaim Defendants' wrongful acts.

68.     TradeKey had invested millions of dollars to achieve a PageRank of 8, which, following Counterclaim Defendants' actions, declined to 6.  TradeKey's reduced PageRank has translated to dramatically reduced visibility in search engine results, of TradeKey's customer listings, nearly all of which have no connection to Counterclaim Defendants' brands.  This, in turn, has resulted in fewer businesses visiting TradeKey.com, which has deflated demand for memberships and ads. Counterclaim Defendants' intentional and wrongful acts have already caused a decline in visits to TradeKey.com of 47% and a decline in revenue of approximately 30%.

## FIRST CAUSE OF ACTION
## VIOLATION OF THE STORED COMMUNICATIONS ACT
## AGAINST ALL COUNTERCLAIM DEFENDANTS
## (18 U.S.C. § 2701(a); 18 U.S.C. § 2707)

### Against All Counterclaim Defendants

69.     Counterclaimants reallege each and every allegation set forth in Paragraphs 1 through 68 inclusive, and incorporate them by reference herein.

70.     At all times relevant to this Counterclaim, Liquid Web's data center that hosted SISCOM and TradeKey's data, web, email and chat servers was a facility that provides an electronic communications service as that term is defined by 18 U.S.C. § 2510.  SISCOM used the Liquid Web facilities to provide electronic

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

communications services to its own customers, including hosting email, websites and remote storage for its IT services customers.  In addition, TradeKey provided an electronic communications service to its members, in the form of email and chat services that allowed members to communicate with one another, on computer servers located in the Liquid Web facility.

71.     Counterclaim Defendants, through their authorized agents, intentionally accessed the Liquid Web, SISCOM, and TradeKey electronic communications service facilities without authorization, in violation of 18 U.S.C. § 2701(a)(1).  Counterclaim Defendants' access was not in good faith reliance on a court order. Counterclaim Defendants procured the May 17 Order without informing the issuing Court that they intended to seize stored communications covered by the act or that the Stored Communications Act does not, and has never been construed to, authorize the compelled disclosure of stored communications from a provider of an electronic communications service in civil litigation.

72.     Counterclaim Defendants intentionally exceeded authorization to access the Liquid Web, SISCOM, and TradeKey electronic communications service facilities and thereby obtained, altered, or prevented authorized access to electronic communications that were in electronic storage in violation of 18 U.S.C. § 2701(a)(2).  Counterclaim Defendants' conduct was not in good faith reliance on the May 17 Order because that order did not authorize Counterclaim Defendants to access communications in electronic storage, particularly communications in electronic storage that were completely unrelated to infringements of the Brandowner Defendants' trademarks, nor did it authorize Counterclaim Defendants to take the SISCOM and TradeKey electronic communications services offline or prevent access to stored communications. Indeed, Counterclaim Defendants' wholesale and indiscriminate vacuuming of millions of communications is exactly contrary to the strictures of the Act that

24

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

communications be protected against such access, as they well knew or should have known when they procured and effectuated the seizure of those communications. Despite this lack of authorization, Counterclaim Defendants' wrongful conduct:

a.  accessed and copied the contents of Counterclaimants' and Counterclaimants' customers communications in electronic storage;

b.  prevented SISCOM employees from accessing email and other electronic communications in electronic storage on the Liquid Web servers for a period of more than twelve hours;

c.  prevented TradeKey employees from accessing email and other electronic communications in electronic storage on the Liquid Web servers in excess of 60 hours; and

d.  prevented TradeKey members from accessing email and chat communications in electronic storage on the Liquid Web servers for in excess of 60 hours.

73.    Furthermore, Counterclaim Defendants, through their authorized agent Jones Day, procured the May 17 Order without informing the issuing Court that the Stored Communications Act does not authorize the compelled disclosure of stored communications from a provider of an electronic communications service in civil litigation.

74.    Counterclaimants are entitled to recover from Counterclaim Defendants the damages they have suffered, including punitive damages for Counterclaim Defendants' willful conduct, as well as their reasonable attorney fees and court costs.

75.    Counterclaim Defendants continue to retain custody of the unlawfully accessed and copied stored communications and threaten to continue to engage in the unlawful actions alleged herein, including ongoing or further access to the stored communications, and unless restrained and enjoined will continue to do so, causing irreparable harm to Counterclaimants.  It is also difficult to ascertain the

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

amount of compensation that could afford Counterclaimants adequate relief for Counterclaim Defendants' unlawful acts.  Counterclaimants' remedy at law is, therefore, inadequate to compensate for the injuries threatened.  Counterclaimants are entitled to a preliminary and permanent injunction restraining Counterclaim Defendants, and their officers, agents and employees, and all persons acting in concert with them, from engaging in any further acts constituting a violation of 18 U.S.C. § 2701, and compelling return of the communications wrongfully accessed and obtained.

**SECOND CAUSE OF ACTION**
**COMPUTER FRAUD AND ABUSE AGAINST ALL COUNTERCLAIM DEFENDANTS**
**(18 U.S.C. § 1030)**
**Against All Counterclaim Defendants**

76.     Counterclaimants reallege each and every allegation set forth in Paragraphs 1 through 75 inclusive, and incorporate them by reference herein.

77.     Counterclaimants' data was stored on servers located on computer servers leased from and hosted by Liquid Web that are "protected computers" as the term is defined in 18 U.S.C. § 1030(e)(2)(B).  The data stored on the Liquid Web computers included SISCOM's stored email communications, its email server, SISCOM's web server for the www.siscom.sa.com site, customer data, and data stored on behalf of SISCOM's Gulf Region IT services clients, including web servers for those clients' web sites.  The data also included the web server for the www.tradekey.com website, databases for the TradeKey service, TradeKey's email server, and TradeKey members' stored communications from the TradeKey chat and email service.

78.     Counterclaim Defendants, through their authorized agents, intentionally accessed Counterclaimants' protected computers without authorization or in excess of their authorization, and used such access to obtain information from the Liquid Web protected computers that Counterclaim Defendants were not

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

entitled to obtain in violation of 18 U.S.C. § 1030(a)(2)(C).  Counterclaim Defendants accessed and obtained data beyond that authorized by the May 17 Order, and continued to access and obtain data beyond the time period authorized by the May 17 Order in violation of 18 U.S.C. § 1030(a)(2)(C).

79.     Counterclaim Defendants further intentionally accessed certain Liquid Web servers used by SISCOM and TradeKey without authorization, and as a result of such conduct, recklessly caused damage, in violation of 18 U.S.C. § 1030(a)(5)(b).

80.     By intentionally accessing Counterclaimant's protected computers without authorization or in access of their authorization, Counterclaim Defendants caused damage and loss to the protected computers aggregating at least $5,000 in value, all in violation of 18 U.S.C. § 1030(a)(5)(A)(iii), which damages and losses Counterclaimants are entitled to recover.  This damage included, among other things, lost advertising revenue from the TradeKey.com web site during the approximately 60 hours it was offline, lost revenue from declining new member signups on the TradeKey.com site, which averaged more than $5,000 in revenue per day, and lost revenue from cancelled TradeKey memberships due to the site having been offline for 64 hours.

81.     Counterclaimants are entitled to recover from Counterclaim Defendants the damages they have suffered, as a result of Counterclaim Defendants wrongful acts as hereinabove alleged.

82.     Counterclaim Defendants threaten to continue to engage in the unlawful actions alleged herein, including continued access to data from the protected computers, and unless restrained and enjoined will continue to do so, causing irreparable harm to Counterclaimants.  It is also difficult to ascertain the amount of compensation that could afford Counterclaimants adequate relief for Counterclaim Defendants' unlawful acts.  Counterclaimants' remedy at law is, therefore, inadequate to compensate for the injuries threatened.  Counterclaimants

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

are entitled to a preliminary and permanent injunction restraining Counterclaim Defendants, their officers, agents and employees, and all persons acting in concert with them, from engaging in any further acts constituting a violation of 18 U.S.C. § 1030 and compelling return of the information wrongfully accessed and obtained.

## THIRD CAUSE OF ACTION
### WRONGFUL SEIZURE
### (15 U.S.C. § 1116(d)(11))

### Against Brandowner Defendants and RIL

83.     Counterclaimants reallege each and every allegation set forth in Paragraphs 1 through 82 inclusive, and incorporate them by reference herein.

84.     In conducting the May 23, 2011 seizure, Counterclaim Defendants, through their authorized agents and under the direction and supervision and as agents of RIL, seized items not authorized by 15 U.S.C. § 1116(d)(1)(A) or by the May 17, 2011 Order, including:

a.     Seizing the entirety of SISCOM's and its IT outsourcing customers' business data from the four SISCOM servers the Counterclaim Defendants knew or should have known were not related to the Tradekey.com servers and were not records documenting the alleged manufacture, sale, or receipt of counterfeits of the Brandowner Defendants' marks;

b.     Seizing communications in electronic storage from the four SISCOM servers in violation of the Stored Communications Act, 18 U.S.C. § 2701;

c.     Taking SISCOM's and its IT outsourcing customers' network connectivity offline for approximately twenty hours, including an entire business day in Saudi Arabia;

d.     Shutting down all 42 of TradeKey's servers and keeping the TradeKey website offline for more than 60 hours, when Counterclaim Defendants knew or should have known they could copy and seize all relevant data authorized

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

by the May 17 Order with minimal impact on the TradeKey website by copying a small number of the redundant servers;

     e.     Seizing the entirety of TradeKey's business data and electronic communications, the vast majority of which the Counterclaim Defendants knew or should have known were not records documenting the alleged manufacture, sale, or receipt of counterfeits of the Brandowner Defendants' marks;

     f.     Keeping  TradeKey's business offline for more than 60 hours, the vast majority of which Counterclaim Defendants knew were not records documenting the manufacture, sale, or receipt of things involved in the alleged counterfeiting of Brandowner Defendants' trademarks;

     g.     Delaying the copying and returning to operation of servers which Defendants knew were necessary to bring the TradeKey website back online, in a manner that increased injury to Defendants; and

     h.     Continuing to seize TradeKey's servers and data, the vast majority of which were not records documenting the manufacture, sale, or receipt of things involved in the alleged counterfeiting of Brandowner Defendants' trademarks, more than seven days after the issuance of the Court's May 17 Order, in violation of that Order and 15 U.S.C. § 1116(d).

85.     As a result of Counterclaim Defendants' wrongful seizure, Counterclaimants have suffered damages in an amount to be proved at trial. Counterclaimants are therefore entitled to recover actual damages suffered, lost profits, and loss of good will.  Because Counterclaim Defendants acted in bad faith, Counterclaimants are entitled to recover punitive damages and their reasonable attorneys' fees.

## **COUNTERCLAIMANTS' PRAYER FOR RELIEF**

WHEREFORE, Sawabeh Information Services Co., and TradeKey (PVT) Ltd. pray for the following relief:

Fenwick & West LLP
Attorneys at Law
San Francisco

1        A.     A judgment for SISCOM and TradeKey against Counterclaim

2 Defendants;

3        B.     SISCOM and TradeKey's actual damages, to be proven a trial;

4        C.     Consequential damages;

5        D.     Exemplary and punitive damages;

6        E.     Attorneys' fees, expenses, and costs;

7        F.     An order preliminarily and permanently enjoining and restraining

8 Counterclaim Defendants, their officers, directors, agents, servants, employees,

9 licensees, attorneys, and all other persons acting under or through them, from

10 further interference with Counterclaim Defendants' rights and from further

11 accessing Counterclaimants' and their members' data and stored communications,

12 and compelling the return of the information wrongfully accessed and obtained; and

13        G.     Such further relief as the Court deems just and reasonable.

14

15 Dated:  October 11, 2012              FENWICK & WEST LLP

16

17

18                             By:   /s/ Laurence F. Pulgram

19                                Laurence F. Pulgram

20                                Attorneys for Counterclaimants
                                  SAWABEH INFORMATION SERVICES

21                                CO. and TRADEKEY (PVT) LTD.

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## JURY DEMAND

In accordance with Federal Rule of Civil Procedure 38(b), Sawabeh Information Services Co., and TradeKey (PVT) Ltd hereby demand a trial by jury on all issues so triable.

Dated: October 11, 2012          Respectfully,

FENWICK & WEST LLP

By: _/s/ Laurence F. Pulgram_
Laurence F. Pulgram
Attorneys for Counterclaimants
SAWABEH INFORMATION SERVICES CO. and TRADEKEY (PVT) LTD.

Fenwick & West LLP
Attorneys at Law
San Francisco