LAURENCE F. PULGRAM (CSB No. 115163)
lpulgram@fenwick.com
TYLER G. NEWBY (CSB No. 205790)
tnewby@fenwick.com
SEBASTIAN E. KAPLAN (CSB No. 248206)
skaplan@fenwick.com
DAVID C. MARTY (CSB No. 273417)
dmarty@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone:   415.875.2300
Facsimile:   415.281.1350

Attorneys for Defendants and Counterclaimants
Sawabeh Information Services Co. and
TradeKey (Pvt) Ltd., and Defendants Waleed
Abalkhail and Junaid Mansoor

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

CHLOE SAS, a French Corporation;
ALFRED DUNHILL LIMITED, a UK
Corporation; OFFICINE PANERAI AG,
a Swiss Corporation; and
MONTBLANC-SIMPLO GMBH, a
German Corporation; CARTIER
INTERNATIONAL A.G., a Swiss
Corporation; and LANGE UHREN
GMBH, a German Limited Liability
Company,

                    Plaintiffs,

          v.

SAWABEH INFORMATION
SERVICES CO. (d/b/a "SISCOM",
Tradekey.com, saudicommerce.com, and
B2Bfreezone.com), a Saudi Arabian
Corporation; TRADEKEY (PVT) LTD, a
Pakistani Corporation; WALEED
ABALKHAIL; JUNAID MANSOOR;
BOSUN INTERNATIONAL TRADE
CO.; CCTRUE INTERNATIONAL
TRADE CO., LTD.; EUROMED
INTERNATIONAL TRADING CO.,
LTD.; FANCYSALER TRADING CO.;

Case No. 11-cv-4147 GAF (MANx)

**SAWABEH INFORMATION
SERVICES CO. AND TRADEKEY
(PVT) LTD'S THIRD AMENDED
COUNTERCLAIM FOR
DAMAGES AND INJUNCTIVE
RELIEF**

**1)  COMPUTER FRAUD AND
     ABUSE ACT, 18 U.S.C. § 1030**

**2)  WRONGFUL SEIZURE,
     15 U.S.C. § 1116**

TRADEKEY (PVT) LTD AND SISCOM'S THIRD
AMENDED COUNTERCLAIMS

CASE NO. 11-CV-04147 GAF (MANx)

FUZHOU SUNSHINE TRADE CO., LTD; HENGTAI INTERNATIONAL; JAMILAH MROUEH; KK FASHION LOVE ZONE; LOVE IN APPAREL TRADE CO., LTD.; MELCHIC INTERNATIONAL TRADE CO., LTD; MYSTOCKWATCH CO., LTD; ; ORIENT-ONLINE CO., LTD; PARK CO. LTD; RICHEN-ONLINE CO., LTD; SEASON-ONLINE CO., LTD; SEASONS-ONLINE CO. LTD-ELAINE; SEVEN STAR REPLICASS; SHANGHAI TAOLAN INTERNATIONAL TRADE LIMITED COMPANY; SINOESTAR CO., LTD; SUPEROCEANS CO., LTD.; V52 INTERNATIONAL TRADE CO., LTD; VERTEX ONLINE CO., LTD.; WIN INTERNATIONAL TRADE; WIN-WIN TRADE CO., LTD.; WWW.ECWATCH.NET; YONGCHUANG TRADE CORP; ZHONGSHENG TRADE CO., LTD; and DOES 1 through 20 inclusive,

Defendants.

SAWABEH INFORMATION SERVICES CO., a Saudi Arabian Corporation; TRADEKEY (PVT) LTD, a Pakistani Corporation,

Counterclaimants,

v.

RICHEMONT INTERNATIONAL LIMITED a UK Corporation; CHLOÉ SAS, a French Corporation; ALFRED DUNHILL LIMITED, a UK Corporation; OFFICINE PANERAI AG, a Swiss Corporation; and MONTBLANC-SIMPLO GMBH, a German Corporation; LANCE ELIOT SLOVES, an individual, COMPUTER FORENSIC SERVICES, INC., a Texas corporation, JONES DAY, and Does 1 Through 10 Inclusive,

Counterclaim Defendants.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Defendants/Counterclaimants TradeKey (PVT) Ltd. ("TradeKey") and

Sawabeh Information Services Company ("SISCOM"), hereby submit their Third

Amended Counterclaims as follows, making the allegations as to their own conduct

based on their knowledge, and the allegations as to the Counterclaim Defendants'

intent based on information and belief and reasonable inferences from their conduct

and the circumstances:

1.      TradeKey and SISCOM bring this counterclaim to recover for

Counterclaim Defendants' wrongful execution of an invalid *Ex Parte* Seizure Order

to shut down TradeKey's e-commerce website for more than 60 hours, and

SISCOM's website and IT outsourcing business for an entire business day in Saudi

Arabia, while simultaneously seizing large quantities of stored electronic

communications as expressly prohibited by federal law.[1]  The Court's May 17,

2011 *Ex Parte* Seizure Order ("May 17 Order") and the Counterclaim Defendants'

conduct in executing the May 17 Order went beyond preserving records

documenting the manufacture, sale, or receipt of counterfeit goods, instead

indiscriminately seizing more than 40 servers of data, the vast majority of which

was unrelated to alleged counterfeiting of Plaintiffs' marks.  Counterclaim

defendants' conduct damaged SISCOM's and TradeKey's businesses by taking

them offline for an extended and unreasonable period of time, thereby interfering

with TradeKey's customer relationships, damaging its goodwill, and causing

irreparable damage to its rankings in search engine algorithms which severely

penalize even a few hours offline.

---

[1] This Counterclaim is brought without waiver of objections to personal jurisdiction over Counterclaimants. *See Dragor Shipping Corp. v. Union Tank Car Co.,* 378 F.2d 241, 244 (9th Cir.1967);  *Gates Learjet Corp. v. Jensen,* 743 F.2d 1325, 1330 (9th Cir. 1984).  Counterclaimants do not include in this pleading their claims under the Stored Communications Act or their claims based on "exceeding authorized access" under the Computer Fraud and Abuse Act, as such claims were pleaded in the Second Amended Counterclaim, because those claims were ordered dismissed by the Court's prior orders without leave to amend.  Counterclaimants do not intend by failing to repeat claims that were dismissed without leave to amend to waive such claim or any rights therein. *USS-POSCO Industries v. Contra Costa County Bldg. & Const. Trades Council, AFL–CIO,* 31 F. 3d 800, 812 (9th Cir. 1994).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2.     Counterclaim Defendants' wrongful conduct included, without limitation:

(a)     Their seeking, obtaining, and purporting to execute an *ex parte* seizure order that failed to satisfy the requirements of the Fourth Amendment of the United States Constitution for ex parte seizure orders issued under the Lanham Act, therefore rendering the May 17 Order  invalid as a purported authorization for their conduct;

(b)     Their failure to comply with the requirements imposed by the Fourth Amendment  for the execution of ex parte seizure orders issued under the Lanham Act when executing the May 17 Order by indiscriminately accessing and copying all of the TradeKey and SISCOM servers and all of the files on those servers without limiting their seizure of servers or files to those for which they had cause to believe contained records relating to the manufacture, sale or receipt of counterfeits of Brandowner Defendants' registered marks;

(c)     Their wrongful conduct in shutting down, seizing and copying SISCOM's servers at SISCOM's web hosting facility for approximately twenty hours, including an entire business day in Saudi Arabia, despite the fact that those servers were separate from the TradeKey servers and did not operate the TradeKey.com website purportedly subject to the claims in the action;

(d)     Their wrongful conduct in accessing, shutting down, seizing, and copying all 42 TradeKey servers at TradeKey's web hosting facility over more than 60 hours, even when Counterclaim Defendants knew or should have known they could copy the data authorized by the May 17 Order from a small number of servers with minimal impact to the TradeKey website due to the redundant architecture of TradeKey's web servers;

(e)     Their wrongful conduct in delaying the return to service of the key servers necessary to restore the TradeKey website to operation, despite being advised of the identity of those servers, and instead, contrary to their false

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

representations to TradeKey that they would expedite the copying and restoration of those essential servers, holding those servers offline while first copying others of their preference;

(f)     Their representations, as purported justification for seizing data *ex parte* from SISCOM and TradeKey, that the Counterclaimants were untrustworthy and would destroy evidence, when Jones Day—counsel of record who led the seizure—practices law in the Kingdom of Saudi Arabia through association with SISCOM's outside counsel, AlSulaim Alwaji & Partners Law Firm, providing access to SISCOM's upstanding reputation and legitimate business operations, if reasonable inquiry had been made.

3.     As alleged more fully below, Counterclaimants SISCOM and TradeKey (together, "Counterclaimants") seek injunctive and monetary relief from Counterclaim Defendants Chloé SAS; Alfred Dunhill Limited ("Dunhill"), Officine Panerai AG ("Panerai"), Montblanc-Simplo GMBH ("Montblanc") (collectively, the "Brandowner Defendants"), Richemont International Limited ("Richemont" or "RIL"), Computer Forensic Services, Inc. ("CFSI"), Lance Eliot Sloves, and Jones Day (collectively, "Counterclaim Defendants") for violations of the Computer Fraud and Abuse Act and Wrongful Seizure.

## THE PARTIES

4.     SISCOM is a leading full-service Information Technology (IT) Services company that provides a range of consulting and hosted IT services to Saudi Arabian government agencies, educational institutions and Saudi Arabian Gulf Region (the "Gulf Region") companies.  SISCOM is a Saudi Arabian company, and its headquarters and principal place of business are in Riyadh, Saudi Arabia.  At all times relevant to this Counterclaim, SISCOM's IT infrastructure, including the www.siscom.com.sa website, SISCOM's email servers, and the websites SISCOM manages for its clients were located on computer servers operated by Liquid Web, Inc., which is located in Lansing, Michigan.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5.      TradeKey is a privately held Pakistani company with its principal place of business and headquarters located in Karachi, Pakistan.  TradeKey is a majority-owned subsidiary of SISCOM, and, since 2006 has operated a leading Internet-based portal for business-to-business commerce at its website, www.tradekey.com.  At all times relevant to this Counterclaim, the TradeKey website, as well as TradeKey's email server, were located on computer servers operated by Liquid Web, Inc., which is located in Lansing, Michigan.

6.      Upon information and belief, Chloé is a corporation organized under the laws of France with its principal place of business in Paris, France.  Upon information and belief, Chloé and its licensees and affiliates distribute luxury goods, including handbags, clothing, and jewelry.

7.      Upon information and belief, Alfred Dunhill Limited is a corporation organized under the laws of England and Wales, with its principal place of business in London, United Kingdom.  Upon information and belief Dunhill and its licensees and affiliates distribute luxury goods, including leather goods, men's clothing, and accessories.

8.      Upon information and belief, Officine Panerai AG is a corporation organized under the laws of Switzerland, with its principal place of business located at Steinhausen, Switzerland.  Upon information and belief, Panerai and its licensees and affiliates distribute luxury watches.

9.      Upon information and belief, Montblanc-Simplo GmbH is a corporation organized under the laws of Germany, with its principal place of business located in Hamburg, Germany.  Upon information and belief, Montblanc and its licensees and affiliates distribute luxury pens, watches, and jewelry.

10.     Chloé, Dunhill, Panerai and Montblanc are all Plaintiffs in this action that procured the May 17 Order in question.  On information and belief, all are subsidiaries of the luxury goods holding company, Compagnie Financiere

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Richemont S.A., which is incorporated under the laws of Switzerland, and is the ultimate parent of what is referred to and operated as the "Richemont Group."

11.     Upon information and belief, RIL provides and directs legal services, including trademark and brand enforcement, on behalf of the Brandowner Defendants and others in Richemont Group.  In legal pleadings in the United States, Montblanc has identified RIL as its parent company, and has requested transfer of websites purportedly infringing Montblanc's trademarks to RIL to act on behalf of Montblanc in policing its marks.  At all times relevant to this Counterclaim, RIL employed the Senior Digital and IP Counsel for the Richemont Group, who has responsibility for internet IP rights enforcement in this judicial District, has participated and directed IP enforcement strategies of Richemont Group brands in and for this judicial District, and has overseen and directed the conduct of this action on behalf of the Richemont Group and its Brandowner members.  On information and belief, at all times relevant to this Counterclaim, RIL, through its authorized agents and employees, coordinated, directed and approved the activities of the Brandowner Defendants and the Brandowner Defendants' agents and counsel with respect to the wrongful conduct described herein, including the manner in which the May 17, 2011 Ex Parte Seizure Order was obtained from this Court and executed.  On information and belief, RIL has contracted with and managed Jones Day, including offices of Jones Day located in the Central District of California, and authorized its conduct and the conduct of the Brandowner Defendants with respect to the conduct alleged herein and the filing of the Supplemental Complaint in this Action.  RIL's representative travelled to California as the sole client representative of the Richemont Group and the Brandowner Defendants in an unsuccessful attempt to mediate this action. In addition, after the seizure, additional brands within the Richemont Group, whose internet enforcement strategies were also directed and implemented by RIL, joined this litigation in order to take advantage of the seizure described herein.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12.     Upon information and belief, Defendant Computer Forensics Services, Inc. ("CFSI") is a Texas corporation, with its principal place of business at 4514 Travis St., Suite 204, Dallas, TX 75205.  At all times relevant to this Counterclaim, CFSI was an agent authorized to act on behalf of the Brandowner Defendants.

13.     Upon information and belief, Defendant Lance Eliot Sloves is an individual residing in the state of Texas.  Defendant Sloves is employed as the Director of Forensics at Computer Forensics Services, Inc., and, upon information and belief, the sole shareholder of CFSI. At all times relevant to this Counterclaim, Sloves was an agent authorized to act on behalf of the Brandowner Defendants.

14.     Upon information and belief, Defendant Jones Day is a global law firm with offices in federal judicial districts throughout the United States, including in Los Angeles, California.  Jones Day also practices in the Kingdom of Saudi Arabia in association with AlSulaim Alwaji & Partners Law Firm, which was SISCOM's outside counsel of record in Saudi Arabia since SISCOM was formed some twenty years ago.  At all times relevant to this Counterclaim, Jones Day was an agent authorized to act on behalf of the Brandowner Defendants, acting at the direction of and as an agent for RIL, and directing, authorizing, and managing the activities of the "Seizure Team," which consisted of at least Jones Day, Sloves, CFSI, and non-parties David Corder Kovar, Robert McKinnon, Robert Holmes and IPCybercrime.com LLC.

15.     The Defendants sued herein as John Doe Defendants 1 through 10 (Doe Defendants) are persons or entities who materially participated in the wrongdoings alleged herein but whose specific roles and identifies are not presently known and who are therefore sued by fictitious names.  On information and belief, each of the Doe Defendants acted as agents for, or authorized or directed the conduct of, other Counterclaim Defendants in this action.  Counterclaimants will amend their Counterclaims to specify the actual names of the Doe Defendants at such time as their roles and responsibilities become known.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## JURISDICTION AND VENUE

16.   Counterclaimants bring the claims for relief set forth herein for violation of federal law under 18 U.SC. §§ 1030 and 2701, and 15 U.S.C. § 1116(d).

17.   This Court has subject matter jurisdiction over these claims for relief pursuant to 28 U.S.C. §§ 1331 and 1338(a).

18.   This Court has personal jurisdiction over Counterclaim Defendants by virtue of the facts alleged herein and of record in this action, including, *inter alia*, their submission to the jurisdiction of this Court through their direction and participation in the captioned litigation as alleged herein; their submission of declarations to this Court in connection with the captioned litigation; their procurement and execution of the May 17 Order issued under the authority of this Court; their obtaining and ongoing possession and control of the materials seized pursuant to this Court's orders and their affirmative invocation of the power and authority of this Court in executing the seizure.

19.   This Counterclaim arises out of the same transaction and occurrence that is the subject matter of the Brandowner Defendants' Supplement to the First Amended Complaint.

20.   In the absence of joinder of the Counterclaim Defendants other than the Brandowner Defendants, this Court cannot accord complete relief among the existing parties hereto, in that, *inter alia*, Sloves and CSFI, under the direction and management of Jones Day and RIL, have possession and custody of materials, including stored communications, wrongfully seized from Counterclaimants.

21.   All other Counterclaim Defendants, in addition to the Brandowner Defendants, are proper parties in this action because the rights asserted against them jointly, severally or in the alternative are with respect to and arise out of the same transaction and occurrence as raised against the Brandowner Defendants in this

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

TRADEKEY (PVT) LTD AND SISCOM'S THIRD
AMENDED COUNTERCLAIMS

7

CASE NO. 11-CV-04147 GAF (MANx)

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Counterclaim, and because there are questions of law and fact common to all Counterclaim Defendants in this action.

## FACTUAL ALLEGATIONS

### TradeKey's Business to Business Portal Website

22.     Since 2006, TradeKey has operated one of the world's largest business-to-business Internet portals at www.tradekey.com.  Like other business-to-business portals, TradeKey is a site on which suppliers can advertise their ability to supply goods and materials to other businesses.  The products offered by vendors on the TradeKey site include everything from raw materials to machinery to finished goods.  In addition to providing members with a searchable website on which suppliers can advertise their materials, TradeKey also provides email and chat communications services for its members, which enable potential buyers and sellers to communicate with each other about potential transactions.

23.     From 2006 to May 23, 2011, more than 5.3 million users had registered as members of the TradeKey site.  The number of visitors to its site had also steadily increased during that time period, and prior to Counterclaim Defendants' intentional and wrongful conduct in May 2011, TradeKey experienced an average in the range of 250,000 visitors per day.

24.     Prior to May 23, 2011, TradeKey's members listed more than one million products on the site.  Product listings were organized into more than 32,000 different categories, which included products ranging from raw materials, machinery, and manufacturing components to a variety of other finished and unfinished goods.  As of May 23, 2011, the top tier product categories on TradeKey were:  Agriculture; Apparel & Fashion; Automobile; Business Services; Chemicals; Computer Hardware and Software; Construction & Real Estate; Electronics and Electrical; Energy; Environment; Excess Inventory; Food & Beverage; Gifts & Crafts; Health & Beauty; Home Appliances; Home Supplies; Industrial Supplies; Minerals, Metals & Materials; Office Supplies; Packaging & Paper; Printing &

Publishing; Security & Protection; Sports & Entertainment; Telecommunications; Textiles & Leather Products; Toys; and Transportation.  Among TradeKey's members who paid membership fees, no single top tier product category accounted for more than 16% of TradeKey's membership revenue.

25.    The existence of these categories and listings completely unrelated to the Brandowner Defendants' businesses was readily apparent on the TradeKey site and was well known to all the Counterclaim Defendants.  The listings on TradeKey that mentioned any of the Brandowner Defendants' products was only a small fraction of a percent.  The overwhelming majority of products offered on the TradeKey site had nothing to do with luxury goods.

26.    Like many Internet e-commerce sites that depend on site traffic, the ranking of TradeKey's website and its members' product listings in response to queries on popular search engines like Google and Bing is a critical competitive differentiator.  That is, TradeKey is better able to attract and retain fee-paying members when its members' TradeKey product listing pages appear high in the list of results on search engines.  TradeKey has invested millions of dollars since 2006 to develop algorithms and technology that help the TradeKey website and members' products listing pages appear prominently in search engine results. Before May 23, 2011, on an average day, Google's software crawled over 1 million pages of SISCOM Websites, and more than 5.5 million TradeKey.com pages were listed on Google, more than 1.7 million of them on the first page of searches – 935,000 in the first three items.

27.    A major factor in developing and maintaining a high search engine ranking is the continuity of a website's operations.  A history of stability and website uptime influences a site's search engine ranking positively, leading to higher placement in search engine results.  Conversely, taking a website offline for any extended period may reduce search rankings; more than a day will drastically lower a website's search ranking and may even stop search engines from reporting

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

the website at all.  Prior to Counterclaim Defendants' wrongful conduct on May 23, 2011, the TradeKey.com website had not experienced any significant downtime in more than five years of operation.

28.     As a result of TradeKey's long history of website uptime and its extensive engineering investments in making its site more visible to search engines, TradeKey had achieved a "PageRank" of 8 out of possible 10 prior to May 23, 2011.  Upon information and belief, PageRank is a reference to Google's algorithm in assessing how high a page web site should appear in response to a search on Google's search engine.  TradeKey's PageRank put TradeKey's search engine visibility on par with other best-known websites and above many competitors.

29.     In addition to positively influencing TradeKey's PageRank and search engine placement, TradeKey's website uptime is also an important component of its customer goodwill.  Unexpected and lengthy website downtime damages TradeKey's reputation among potential and existing customers who use the site to advertise their products.

### TradeKey's Notice and Takedown Procedure

30.     As the operator of its B2B Internet listing service, TradeKey does not sell, store or ship any of the products its members advertise on its site, nor is it involved in any sales transactions between sellers and buyers.  In most circumstances, TradeKey never knows when its members conduct sales transactions for goods advertised on the TradeKey site.  TradeKey therefore is not able to verify that a good that one of its members is advertising is, in fact, the good that member sells to buyers.

31.     At all times relevant to this dispute, TradeKey has provided intellectual property owners with a method to notify TradeKey and request the removal of allegedly infringing material posted by TradeKey members on the www.tradekey.com site.  By clicking a link on TradeKey's homepage, visitors are taken to a page explaining TradeKey's notice and takedown procedure, and

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

provided with a notice and takedown form to be completed and submitted to TradeKey in order to deactivate listings claimed to be infringing.  Many intellectual property owners have used TradeKey's notice and takedown procedure, and, as of May 23, 2011, TradeKey had removed thousands of product listings from its website.

32.     TradeKey has further created and implemented the "Tradekey Expedite" removal service that allows bulk removal of infringing products for brand owners that choose to use it.  Numerous intellectual property rights owners have elected to use the expedited removal service to remove allegedly infringing TradeKey member listings.

33.     On information and belief, as alleged in the First Amended Complaint in this action, Counterclaim Defendants believed, at least as early as May 2010, that TradeKey members were listing products that infringed Counterclaim Defendants' trademarks.  At no point prior to May 23, 2011 had any of the Counterclaim Defendants used TradeKey's notice and takedown procedure or expedited removal tool.  Rather than using these readily accessible methods to limit purported infringement of their brands, the Counterclaim Defendants silently planned to take the websites offline and seize their stored communications instead, in furtherance of their plan to damage TradeKey and SISCOM, .

### SISCOM'S IT OUTSOURCING BUSINESS

34.     Operating from its headquarters in Riyadh in the Kingdom of Saudi Arabia, SISCOM has been a leading provider of information technology ("IT") services in the Gulf Region since 1989.  SISCOM provides a range of technology solutions and services to its clients in the banking, securities, education and government sectors.  SISCOM's customer base includes the premier corporate and government clientele in the Gulf Region, including:  The Saudi Arabian Monetary Agency, Saudi Arabia's central bank, the Saudi Arabian Food and Drug Administration, Saudi Public Pension Authority, Bravo Telecom, Ericsson, and

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ArabSat.  The IT services SISCOM provides these clients and others include technology consulting, design, development, software re-engineering, maintenance, technology, package evaluation, implementation, infrastructure management services and outsourcing.

35.    Among the IT services provided by SISCOM are outsourced IT management services, which include remote data storage, website hosting, email hosting and data processing.  Rather than building and maintaining the infrastructure and support staff to manage these functions themselves, SISCOM's outsourcing clients contract with SISCOM to provide these services.

36.    In SISCOM's web hosting service agreements, SISCOM generally guarantees its customers 99.7% uptime and, in case of downtime, may have to pay all resulting damages from discontinuity of service.  Among the web sites hosted by SISCOM are those serving major Saudi Arabian financial, manufacturing and energy companies, and educational institutions.

### SISCOM'S USE OF THE LIQUID WEB SERVERS

37.    SISCOM contracted with Liquid Web, a data and web hosting company and Internet Service Provider in Lansing, Michigan, to provide the Internet connectivity, data storage, computer infrastructure and computer processing necessary to run SISCOM's IT outsourcing business.  Upon information and belief, Liquid Web offers these services to the general public.

38.    Liquid Web owns the computer infrastructure, including the computer servers and networking equipment, upon which SISCOM and its customers' data are stored.  Although the principals of SISCOM and its technical staff are located in Riyadh, Saudi Arabia, the data and computer processing that SISCOM uses to run its IT outsourcing business are located at SISCOM's facilities in Michigan. SISCOM chose to use a U.S.-based hosting service because of the reputation of U.S. hosts and ISPs for reliability, security, and performance.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

39.    The email servers for SISCOM's own business were located at Liquid Web's data centers in Lansing, Michigan and were leased on a monthly basis by SISCOM.  Messages sent to a @siscom.com.sa domain were stored on the Liquid Web servers in Lansing, Michigan before they are opened by the recipient, and were maintained in electronic storage on those servers.

40.    In addition to hosting SISCOM's email, Liquid Web hosted web sites and email content for SISCOM's outsourcing customers, including a number of major Saudi Arabian companies and educational institutions.

41.    SISCOM also provides email service for some of its outsourcing clients.  At all times relevant to this Complaint, the email servers used for SISCOM's outsourced email service were hosted on Liquid Web servers in Liquid Web's Lansing, Michigan data centers.  Liquid Web's servers performed all of the processing functions required to send and receive email messages from and to SISCOM's customers' company email accounts, and SISCOM's customers' sent and received email communications were stored on the email servers hosted by Liquid Web.

**TRADEKEY'S USE OF THE LIQUID WEB SERVERS**

42.    Like SISCOM, TradeKey contracted with Liquid Web to provide web hosting, email hosting, data storage and Internet connectivity on Liquid Web's servers located in Lansing, Michigan, and has done so since 2006.  Liquid Web owned all of the computer servers that performed the computer processing necessary to run the TradeKey.com website and store all of the data related to the site and its customers.  Liquid Web leased the use of those servers, along with Internet connectivity, to TradeKey, whose employees accessed them remotely from Karachi, Pakistan.   Content for the www.tradekey.com website and the email servers for TradeKey corporate email accounts were stored on Liquid Web's servers, the use of which were leased to TradeKey.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

43.     In May 2011, TradeKey was leasing the use of approximately 42 servers from Liquid Web to operate its business and to provide email communications to TradeKey employees and email and chat communications services for users of the TradeKey.com site.  Among these servers were servers used to store data on behalf of TradeKey members, such as image files, video files and customer brochures.  Those servers also hosted confidential and trade secret TradeKey source code relating to the operation of its site as well as attorney client privileged information.

44.     TradeKey, using Liquid Web's servers, provides two communications services that allow users to engage in electronic communications with each other: an email message service and a chat service.  The email message service operates much like a web-based email service.  When a member of the TradeKey site sees a product listing in which he is interested, he can click on a hyperlink button labeled "Send Email."  Upon clicking this button, the user is taken to a page in which he can type a subject line and message to the seller.  When the user clicks the "Send Message" button, the message is then sent to the seller's TradeKey mailbox. When the recipient visits his TradeKey "Member Area", he will see a notification that he has an unread message.  As of May 23, 2011, approximately 9 million messages sent to sellers using this messaging service were stored on the Liquid Web servers.

45.     TradeKey also provides users with an electronic chat communication tool.  Chat allows nearly instantaneous communication between members, but is only available when both members are signed into TradeKey.  As with the email service, all of the software that operates the TradeKey chat service is located on three chat servers hosted by Liquid Web.  As of May 23, 2011, approximately 71,000 member chat logs were stored on Liquid Web servers for TradeKey's members.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## COUNTERCLAIM DEFENDANTS' UNAUTHORIZED ACCESS AND SHUTDOWN OF THE TRADEKEY AND SISCOM SERVERS

46.     Without prior notice to SISCOM or TradeKey, on May 23, 2011 Counterclaim Defendants, through their agents CFSI, Lance Eliot Sloves and one or more lawyers from Jones Day ("the Seizure Team") entered Liquid Web's facilities accompanied by armed United States Marshals.  They entered under the premise of executing the May 17 Order the Brandowner Defendants, RIL and Jones Day had obtained from a U.S. District Judge in the Central District of California (the "May 17 Order") by reference to 15 U.S.C. § 1116(d).  The Order, which upon information and belief, was written and submitted to the Court as a Proposed Order by Counterclaim Defendant Jones Day, purported to permit Counterclaim Defendants to seize from Liquid Web data relating to TradeKey members' alleged use of TradeKey to offer to sell goods bearing counterfeit versions of the Brandowner Defendants' marks.

47.     Title 15, U.S.C. § 1116(d)(1)(A) permits a trademark owner, upon the issuance of a Court order, to seize "goods and counterfeit marks involved in [using a counterfeit registered trademark in connection with the sale, offering for sale, or distribution of goods or services] and the means of making such marks, and records documenting the manufacture, sale, or receipt of things involved in such violation." The statute does not authorize the seizure of documents or data unrelated to the manufacture, sale or receipt of the movant's registered trademarks.  The statute also does not authorize the movant to shut down aspects of a business unrelated to the alleged counterfeiting of the movant's marks.

48.     Ex parte seizure orders issued under Title 15, U.S.C. § 1116(d)(1)(A) must comply with the Fourth Amendment of the United States Constitution's protections against unreasonable intrusions, searches and seizures of property, including its requirements that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

searched, and the persons or things to be seized." Therefore, seizure orders issued under Title 15, U.S.C. § 1116(d)(1)(A) must make a showing that the places to be searched and items to be seized contain goods bearing counterfeits of the applicant's registered marks, or records relating to the manufacture, sale and receipt of such goods. Further, the seizure order must identify the places to be searched and items to be seized with particularity and must explain how the persons carrying out the seizure order will identify the items to be seized.

49.     The May 17 Order did not comply with the probable cause or particularity requirements of the Fourth Amendment to the extent it is construed as having authorized the search and seizure of all TradeKey and SISCOM servers located within Liquid Web's facilities and all files on those servers.[2] The Counterclaim Defendants did not make a showing, let alone a showing based on probable cause, that every TradeKey and SISCOM server contained records relating to the manufacture, sale or receipt of counterfeits of Brandowner Defendants' registered marks. Brandowner Defendants, Jones Day and RIL knew, or through a reasonably diligent investigation should have known, the server architecture for heavily trafficked e-commerce websites typically includes infrastructure servers, such as load balancers, caching servers and failover servers, and redundant servers that do not store the content appearing on the web site, and that would not contain records subject to seizure under 15 U.S.C. § 1116(d)(A).

50.     Nor did the Brandowner Defendants, Jones Day and RIL provide a basis, let along probable cause, that all files on all of the TradeKey and SISCOM servers were related to the manufacture, sale and receipt of counterfeits of Brandowner Defendants' registered marks. Nor could they have provided such

---

[2] The Court on January 31, 2013, ruled that the "Seizure Order provided for Brandowner Defendants to seize the servers" in their entirety. While Counterdefendants respectfully disagree with this interpretation of the language of the Seizure Order, without waiver, they assume that interpretation in the alternative for the purpose of this pleading.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

probable cause, as a reasonable investigation would have revealed, and on information and belief they knew, that the vast majority of products listed by members on the TradeKey site were unrelated to Brandowner Defendants' registered marks.  Moreover, the Brandowner Defendants, Jones Day and RIL provided no basis whatsoever for a finding that any records relating to the manufacture, sale or receipt of counterfeits of their registered marks would be found on SISCOM's servers.

51.    On information and belief, at no time prior to seizing the TradeKey and SISCOM servers did the Counterclaim Defendants notify the Court or seek its approval to access and copy discrete servers they knew or should have known would not contain records relating to the manufacture, sale or receipt of counterfeits of Brandowner Defendants' registered marks.  The May 17 Order did not describe with any particularity how the U.S. Marshal or Counterclaim Defendants would identify for seizure records relating to the manufacture, sale or receipt of counterfeits of the Brandowner Defendants' registered marks once on site at Liquid Web.  On information and belief, at no time prior to seizing all of the TradeKey and SISCOM servers did the Counterclaim Defendants notify the Court that they intended to disconnect all TradeKey and SISCOM servers and copy all of the servers in their entirety.

52.    Brandowner Defendants' ex parte motion suggested to the Court that they would not use the seizure order in a way that would significantly interfere with TradeKey or SISCOM's businesses.  In their Ex Parte Application For Leave To Conduct Expedited Discovery, For an Asset Freeze Order, And For A Domain Name Transfer, Brandowner Defendants and Jones Day stated that they had posted or would post a bond in the amount of $20,000 in support of both the Seizure Order, Temporary Restraining Order and Asset Freeze Order they sought.  This amount suggested that the requested seizure would cause only minimal interference with Counterclaimants' businesses and was inconsistent with and insufficient to

protect against a complete shutdown of SISCOM and TradeKey's business operations.

53.     Throughout the period from the service of the May 17 Order on May 23, 2011 until May 26, 2011—well beyond the date upon which the seizure was required to conclude—all TradeKey and SISCOM personnel were excluded from access to their own web hosting sites, pursuant to the direction of Counterclaim Defendants to the U.S. Marshals and Liquid Web in purported exercise of the process of this Court.

54.     Counterclaim Defendants also executed the May 17 Order in a manner that violated the Fourth Amendment of the United States Constitution.  Upon information and belief, after entering Liquid Web's facilities by use of armed U.S. Marshals, Counterclaim Defendants identified 42 servers used to host the TradeKey.com websites, email servers and other internal TradeKey processes, the overwhelming majority of which had no relation to the Brandowner Defendants' trademarks and did not contain records relating to the alleged manufacture, sale, or receipt of counterfeits of Brandowner Defendants' registered marks.  Despite this knowledge, the Brandowner Defendants did not return to the Court to seek a more particular ex parte seizure order identifying the procedure by which records relating to the manufacture, sale and receipt of counterfeits of the Brandowner Defendants' registered marks would be identified and seized.  Instead, on information and believe, acting without direction from the accompanying U.S. Marshal, Counterclaim Defendants accessed, disabled and copied without authorization or in excess of their authorization discrete servers which they knew or should have known did not contain records relating to the manufacture, sale and receipt of counterfeits of Brandowner Defendants' registered marks, including:  load balancer servers; reporting servers; an enterprise resource planning server; a pre-deployment testing server; a cache server, and back office operations servers.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

55.     Upon information and belief, none of the Counterclaim Defendants who was present had experience collecting the volume of data stored on the 42 servers, generally containing two to three hard drives each, that were involved in the operation of multiple websites. Brandowner Defendants' private investigator, Rob Holmes, who partook in the seizure, had no formal training as a computer forensic examiner and is not certified as a computer examiner.  Upon information and belief, Counterclaim Defendants had grossly insufficient human and technical resources to perform the seizure expeditiously, but they proceeded forward in any event, knowing of the huge and irreparable damage their conduct would cause.

56.     The Seizure Team also became aware when it arrived at Liquid Web's facility that four servers used to host SISCOM's business and the www.siscom.com.sa website were hosted on different servers than those that hosted the www.tradekey.com website and were located in a separate Liquid Web facility. The Counterclaim Defendants accessed, disabled and copied these servers in their entirety without establishing probable cause that they contained records relating to the manufacture, sale or receipt of counterfeits of Brandowner Defendants' registered marks.

57.     On information and belief, Sloves and CFSI still retain the copies of these servers and their contents.  Once the servers were taken offline, anyone who tried to visit the www.tradekey.com website received error messages indicating that the host server was unavailable or not responding.

~~58.~~     Before powering down all servers used to operate the SISCOM, TradeKey and SISCOM customer businesses, Counterclaim Defendants deliberately, and without justification, disregarded less disruptive alternatives that would have allowed them to preserve evidence without gratuitously damaging the SISCOM and TradeKey businesses by taking their servers offline for extended periods of time.  Despite the lack of any evidence that Counterclaimants would destroy evidence, Counterclaim Defendants did not copy the servers one by one, so

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

as to maintain the websites online.  Alternatively, even if multiple servers "needed" to be taken offline at once to avoid the "risk" that Counterclaimants would "destroy evidence," (a risk that in fact did not exist) the majority of the TradeKey servers taken offline and seized by Plaintiffs contained duplicate copies of the TradeKey website data.  This redundant architecture, which serves the purposes of both load balancing and fault tolerance in the event that one of the servers fails, is commonly implemented for high-traffic web sites like TradeKey and was known or should have been known to the Seizure Team, particularly Defendants CFSI and Sloves, a certified computer examiner.  Counterclaim Defendants could have seized and copied a small number of servers in a short period of time with only a minor impact on TradeKey's uptime.  Instead, Counterclaim Defendants deliberately chose to power down all 42 servers and kept the TradeKey website offline for approximately 64 hours.  The Seizure Team copied all of the data in the servers, including trade secret processes, attorney client privileged information, confidential business information, account data and stored communications of tens of thousands of users, financial information, and vast amounts of other information not related to potential counterfeiting of Plaintiffs' registered trademarks

59.     Counterclaim Defendants kept the SISCOM servers for almost a full day, including the business day in the Gulf region, thereby damaging SISCOM's business from an extended outage.  During that time, the SISCOM website and its hosted services customers' websites were offline, damaging both SISCOM and its customers businesses, and SISCOM employees and SISCOM's outsourcing clients could not send, receive or access email.  Among other things, this outage prevented SISCOM from receiving and responding to technical support service requests for its IT services clients for nearly an entire day.

60.     Upon learning that the TradeKey and SISCOM websites had gone offline late on May 23, 2011, TradeKey and SISCOM's technical personnel contacted their host, Liquid Web, to determine the cause of the outage.  Upon

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

learning that the outage was due to a purported court order, SISCOM and TradeKey's outside counsel contacted Liquid Web, who, upon information and belief, provided counsel's contact information to Jones Day. Jones Day then contacted TradeKey and SISCOM's outside counsel, who, at approximately 5:00 p.m. Eastern Time on May 23 identified four specific SISCOM servers and six specific TradeKey servers that were mission critical to the operation of SISCOM and TradeKey's businesses. TradeKey and SISCOM's counsel requested that those 10 servers should be prioritized to reduce the disruption to the SISCOM and TradeKey businesses due to being completely offline. Jones Day told TradeKey and SISCOM's counsel that the Counterclaim Defendants would prioritize the forensic imaging of the identified servers, which it estimated would take approximately four hours.

61. Contrary to Jones Day's May 23, 2011 statements to TradeKey and SISCOM's counsel, the Counterclaim Defendants did not prioritize the imaging or return to operation the six mission critical TradeKey servers. By the next day, May 24, the servers were still not released. Throughout the day on May 24, 2011, TradeKey and SISCOM's outside counsel implored Jones Day to return to operation the mission critical servers so the website could re-launch. The Seizure Team failed to do so.

62. When asked by Counterclaimants on May 24 to disclose who was collecting the terabytes of information being vacuumed out of their servers, Counterclaim Defendants refused to identify the entities obtaining unfettered access to all of Counterclaimants' most confidential business materials. Counterclaimants also asked Counterclaim Defendants to sequester the seized information in order to preserve its private, proprietary and confidential nature, and to ensure it would not be viewed or used by Counterclaim Defendants or anyone else prior to further court order. Counterclaim Defendants refused to do so, notwithstanding the requirement of Section 1116(d)(7) that a protective order "shall" be entered in connection with

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

any seizure, and that such an order "shall provide for appropriate procedures to ensure that confidential, private, proprietary, or privileged information from such records is not improperly disclosed or used." 15 U.S.C. Section 1116(d)(7). On information and belief, Counterclaim Defendants did not advise the Court of the necessity of such a protective order when they applied for the May 17 Order. On May 24, when Counterclaimants asked Counterclaim Defendants what they intended to do with the data they collected and were refusing to sequester, Jones Day, acting on behalf of all Counterclaim Defendants responded: "Anything we want. Read the Court's order."

63. The six mission critical control servers housed operations technology of relatively small volume. Therefore, to the extent there was any reason to copy them at all (and there was none), they could have been copied rapidly. The Seizure Team knew or should have known this. But the Counterclaim Defendants refused to copy them and return them to service, not only in the four hours promised on May 23, but throughout the entirety of May 24. Instead, Counterclaim Defendants deliberately chose to copy other servers first, including the "business intelligence" and "chat" servers, which housed the contents of stored communications in electronic storage. The Counterclaim Defendants did not release the six mission critical servers to Liquid Web until after 12:00 a.m. on May 25, 2011. Even at that time, they did not restore several key servers to service, and the website did not become operative until more than a day later.

64. Counterclaim Defendants knew or should have known that the longer the servers were kept offline, the more the impact TradeKey would suffer in page rank and search engine optimization, which was the core of TradeKey's business.

65. The Counterclaim Defendants continued to keep the TradeKey servers offline even after the May 17 Order expired at the close of business on May 24, 2011. The Counterclaim Defendants did not release custody of all of the last of the

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

TRADEKEY (PVT) LTD AND SISCOM'S THIRD
AMENDED COUNTERCLAIMS

22

CASE NO. 11-CV-04147 GAF (MANx)

TradeKey servers, and the TradeKey website was kept offline, until May 26, 2011, more than a day after the Court's May 17 Order had expired.

66.     During the time TradeKey's website was offline, its employees could not send or receive email or access email stored on the Liquid Web servers.  In addition, TradeKey's members could not access the TradeKey.com website or access email messages that were in their in-boxes, including unread messages concerning sales transactions, or engage in chat communications with other members.  TradeKey members who attempted to access the website received error messages for three days that the host was not available, giving the impression to all that visited that the website's operators were not technically competent and that the service lacked the fundamental capability of staying online.

67.     On information and belief, when Counterclaim Defendants accessed and copied all of the Liquid Web servers that hosted the TradeKey site and services, they accessed approximately 9 million stored electronic communications between TradeKey members, and approximately 71,000 log files of stored chat communications between TradeKey members who had used the electronic communications services offered through the TradeKey site and services.

### HARM TO TRADEKEY AND SISCOM RESULTING FROM COUNTERCLAIM DEFENDANTS' WRONGFUL SEIZURE

68.     Counterclaim Defendants' misconduct in taking the TradeKey.com site offline for more than 64 hours has harmed and continues to harm TradeKey in the form of lower PageRank, reduced site traffic, and decreased membership. Following the 64 hour outage cause by Counterclaim Defendants' wrongful and malicious acts, TradeKey's daily site traffic dropped.  As a further result of the outage, TradeKey has not been able to attract and sign-up new paying customers as it had before Counterclaim Defendants' wrongful acts.

69.     TradeKey had invested millions of dollars to achieve a PageRank of 8, which, following Counterclaim Defendants' actions, declined to 6.  TradeKey's

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

reduced PageRank has translated to dramatically reduced visibility in search engine results, of TradeKey's customer listings, nearly all of which have no connection to Counterclaim Defendants' brands.  This, in turn, has resulted in fewer businesses visiting TradeKey.com, which has deflated demand for memberships and ads. Counterclaim Defendants' intentional and wrongful acts have already caused a decline in visits to TradeKey.com of 47% and a decline in revenue of approximately 30%.

### FIRST CAUSE OF ACTION
### COMPUTER FRAUD AND ABUSE / FOURTH AMENDMENT OF THE UNITED STATES CONSTITUTION AGAINST ALL COUNTERCLAIM DEFENDANTS
### (18 U.S.C. § 1030)

**Against All Counterclaim Defendants**

70.    Counterclaimants reallege each and every allegation set forth in Paragraphs 1 through 69 inclusive, and incorporate them by reference herein.

71.    Counterclaimants' data was stored on servers located on computer servers leased from and hosted by Liquid Web that are "protected computers" as the term is defined in 18 U.S.C. § 1030(e)(2)(B).  The data stored on the Liquid Web computers included SISCOM's stored email communications, its email server, SISCOM's web server for the www.siscom.sa.com site, customer data, and data stored on behalf of SISCOM's Gulf Region IT services clients, including web servers for those clients' web sites.  The data also included the web server for the www.tradekey.com website, databases for the TradeKey service, TradeKey's email server, trade secret algorithms and processes, confidential financial information, attorney client privileged information, and TradeKey members' stored communications from the TradeKey chat and email service, among other information used for operation of the TradeKey business.

72.    Counterclaim Defendants, through their authorized agents, intentionally accessed Counterclaimants' protected computers without authorization

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

or in excess of their authorization, and used such access to obtain information from the Liquid Web protected computers that Counterclaim Defendants were not entitled to obtain in violation of 18 U.S.C. § 1030(a)(2)(C).

73.     The May 17 Order did not authorize Counterclaim Defendants' access to Counterclaimants' servers because it did not satisfy the probable cause or particularity requirements of the Fourth Amendment of the United States Constitution to the extent it is construed to authorized the search and seizure of all TradeKey and SISCOM servers.[3]  Instead, as construed and enforced by the Counterclaim Defendants, the May 17 Order purported to authorize the access, seizure and copying of all TradeKey and SISCOM servers located in Liquid Web's facilities, including servers for which no probable cause existed or was provided by the Counterclaim Defendants that they contained records relating to the manufacture, sale or receipt of counterfeits of Brandowner Defendants' registered marks.  In addition, as construed and enforced by the Counterclaim Defendants, the, the May 17 Order purported to authorize the access, seizure and copying of all files located on the TradeKey and SISCOM servers where no probable cause existed or was provided by the Counterclaim Defendants that all such files contained records relating to the manufacture, sale or receipt of counterfeits of Brandowner Defendants' registered marks. Because the May 17 Order, as construed by the Counterclaim Defendants, was not limited in its scope to authorizing the seizure of servers and/or files thereon relating to the manufacture, sale or receipt of counterfeits of Brandowner Defendants' registered marks, it was not limited or constrained to particular items, exceeded the limits of Section 1116(d) and the constitution, was null and void, and provided no authorization for Brandowner Defendants' access to the TradeKey and SISCOM servers.

---

[3]Counterclaimants do not waive for appeal their contentions, articulated in the Second Amended Counterclaim, that the Seizure Order should be construed to not have authorized seizure of the entire servers.  They plead here in the alternative, given the construction of the Seizure Order by the Court in its January 31, 2013, Order.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

74.     In addition, the May 17 Order violated the Fourth Amendment because it did not identify with particularity how the U.S. Marshal or Counterclaim Defendants would identify records relating to manufacture, sale or receipt of counterfeits of Brandowner Defendants' registered marks once on site at Liquid Web.  Instead, it effectively vested complete discretion in the Counterclaim Defendants to choose what to copy and how, rendering it an improper general warrant .

75.     Even if the May 17 Order did not violate the Fourth Amendment as written, Counterclaim Defendants executed it in a manner that violated the Fourth Amendment of the United States Constitution by treating it as a general warrant and engaging in an unreasonable search and seizure thereunder.  Counterclaim Defendants accessed, disabled and copied servers which they knew or should have known did not contain records relating to the manufacture, sale and receipt of counterfeits of Brandowner Defendants' registered marks, including discrete load balancer servers, reporting servers, a enterprise resource planning server, a pre-deployment testing server, a cache server, and back office operations servers.  Despite knowing these servers did not contain any records relating to the manufacture, sale or receipt of counterfeits of Brandowner Defendants' registered marks, but instead were infrastructure servers for TradeKey and SISCOM, Counterclaim Defendants accessed and disabled them without authorization, or exceeding their authorized access.

76.     Counterclaim Defendants' unauthorized access to certain Liquid Web servers used by SISCOM and TradeKey without authorization, and as a result of such conduct, recklessly caused damage, in violation of 18 U.S.C. § 1030(a)(5)(b).

77.     By intentionally accessing Counterclaimant's protected computers without authorization or in excess of their authorization, Counterclaim Defendants caused damage and loss to the protected computers aggregating at least $5,000 in value, all in violation of 18 U.S.C. § 1030(a)(5)(A)(iii), which damages and losses

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Counterclaimants are entitled to recover.  This damage included, among other things, lost advertising revenue from the TradeKey.com web site during the approximately 60 hours it was offline, lost revenue from declining new member signups on the TradeKey.com site, which averaged more than $5,000 in revenue per day, and lost revenue from cancelled TradeKey memberships due to the site having been offline for 64 hours.

78.     Counterclaimants are entitled to recover from Counterclaim Defendants the damages they have suffered, as a result of Counterclaim Defendants wrongful acts as hereinabove alleged.

79.     Counterclaim Defendants threaten to continue to engage in the unlawful actions alleged herein, including continued access to data from the protected computers, and unless restrained and enjoined will continue to do so, causing irreparable harm to Counterclaimants.  It is also difficult to ascertain the amount of compensation that could afford Counterclaimants adequate relief for Counterclaim Defendants' unlawful acts.  Counterclaimants' remedy at law is, therefore, inadequate to compensate for the injuries threatened.  Counterclaimants are entitled to a preliminary and permanent injunction restraining Counterclaim Defendants, their officers, agents and employees, and all persons acting in concert with them, from engaging in any further acts constituting a violation of 18 U.S.C. § 1030 and compelling return of the information wrongfully accessed and obtained.

### THIRD CAUSE OF ACTION
### WRONGFUL SEIZURE
### (15 U.S.C. § 1116(d)(11))

### Against Brandowner Defendants

80.     Counterclaimants reallege each and every allegation set forth in Paragraphs 1 through 79 inclusive, and incorporate them by reference herein.

81.     In conducting the May 23, 2011 seizure, Brandowner Defendants, through their authorized agents, including Jones Day, Lance Sloves and CSFI,

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

seized items not authorized by 15 U.S.C. § 1116(d)(1)(A) or by the May 17, 2011 Order, including:

      a.      Seizing the entirety of SISCOM's and its IT outsourcing customers' business data from the four SISCOM servers the Brandowner Defendants knew or should have known were not related to the Tradekey.com servers and were not records documenting the alleged manufacture, sale, or receipt of counterfeits of the Brandowner Defendants' marks;

      b.      Seizing communications in electronic storage from the four SISCOM servers;

      c.      Taking SISCOM's and its IT outsourcing customers' network connectivity offline for approximately twenty hours, including an entire business day in Saudi Arabia;

      d.      Shutting down all 42 of TradeKey's servers, including unrelated load balancer servers, reporting servers, a enterprise resource planning server, a pre-deployment testing server, a cache server, and back office operations servers, and keeping the TradeKey website offline for more than 60 hours;

      e.      Seizing the entirety of TradeKey's business data and electronic communications, the vast majority of which the Brandowner Defendants knew or should have known were not records documenting the alleged manufacture, sale, or receipt of counterfeits of the Brandowner Defendants' marks;

      f.      Keeping  TradeKey's business offline for more than 60 hours, the vast majority of which Brandowner Defendants knew were not records documenting the manufacture, sale, or receipt of things involved in the alleged counterfeiting of Brandowner Defendants' trademarks;

      g.      Delaying the copying and returning to operation of servers which Brandowner Defendants knew were necessary to bring the TradeKey website back online, in a manner that increased injury to Defendants; and

h.    Continuing to seize TradeKey's servers and data, the vast majority of which were not records documenting the manufacture, sale, or receipt of things involved in the alleged counterfeiting of Brandowner Defendants' trademarks, more than seven days after the issuance of the Court's May 17 Order, in violation of that Order and 15 U.S.C. § 1116(d).

82.    As a result of Brandowner Defendants' wrongful seizure, Counterclaimants have suffered damages in an amount to be proved at trial. Counterclaimants are therefore entitled to recover actual damages suffered, lost profits, and loss of good will.  Because Brandowner Defendants acted in bad faith, Counterclaimants are entitled to recover punitive damages and their reasonable attorneys' fees.

## COUNTERCLAIMANTS' PRAYER FOR RELIEF

WHEREFORE, Sawabeh Information Services Co., and TradeKey (PVT) Ltd. pray for the following relief:

A.    A judgment for SISCOM and TradeKey against Counterclaim Defendants;

B.    SISCOM and TradeKey's actual damages, to be proven a trial;

C.    Consequential damages;

D.    Exemplary and punitive damages;

E.    Attorneys' fees, expenses, and costs;

F.    An order preliminarily and permanently enjoining and restraining Counterclaim Defendants, their officers, directors, agents, servants, employees, licensees, attorneys, and all other persons acting under or through them, from further interference with Counterclaim Defendants' rights and from further accessing Counterclaimants' and their members' data and stored communications, and compelling the return of the information wrongfully accessed and obtained; and

G.    Such further relief as the Court deems just and reasonable.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Dated: February 15, 2013          FENWICK & WEST LLP

2

3                                      BY: /s/ Laurence F. Pulgram

4                                           Laurence F. Pulgram
                                            Attorneys for Counterclaimants
5                                           SAWABEH INFORMATION SERVICES
                                            CO. and TRADEKEY (PVT) LTD.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TRADEKEY (PVT) LTD AND SISCOM'S THIRD
AMENDED COUNTERCLAIMS                    30          CASE NO. 11-CV-04147 GAF (MANx)

## JURY DEMAND

In accordance with Federal Rule of Civil Procedure 38(b), Sawabeh Information Services Co., and TradeKey (PVT) Ltd hereby demand a trial by jury on all issues so triable.

Dated: February 15, 2013           Respectfully,

FENWICK & WEST LLP

BY:  /s/ Laurence F. Pulgram

Laurence F. Pulgram
Attorneys for Counterclaimants
SAWABEH INFORMATION SERVICES CO. and TRADEKEY (PVT) LTD.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO