MARK A. FINKELSTEIN (State Bar No. 173851)
mafinkelstein@jonesday.com
JONES DAY
3161 MICHELSON DRIVE, SUITE 800
IRVINE, CA 92612-4408
949.851.3939
949.553.7539 (Facsimile)

SUSAN M. KAYSER (admitted *pro hac vice*)
skayser@jonesday.com
JESSICA D. BRADLEY (admitted *pro hac vice*)
jbradley@jonesday.com
LUCY JEWETT WHEATLEY (admitted *pro hac vice*)
lwheatley@jonesday.com
JONES DAY
51 LOUISIANA AVE, NW
WASHINGTON, DC 20001
202.879.3939
202.626.1700 (Facsimile)

Attorneys for Plaintiffs Chloé SAS, Alfred Dunhill Limited, Officine Panerai AG, Montblanc-Simplo GmbH, Cartier International A.G., and Lange Uhren GmbH and Counterclaim Defendants

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHLOÉ SAS, *et al.*,<br><br>     Plaintiffs,<br><br>  vs.<br><br>SAWABEH INFORMATION SERVICES CO, *et al.*,<br><br>     Defendants.<br><br>SAWABEH INFORMATION SERVICES CO., TRADEKEY (PVT) LTD<br><br>     Counterclaimants,<br><br>  v.<br><br>CHLOE SAS; ALFRED DUNHILL LIMITED; OFFICINE PANERAI AG, and MONTBLANC-SIMPLO GMBH;<br><br>     Counterclaim Defendants. | Case No: 11-CV-04147 GAF(MANx)<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT FOR (1) CONTRIBUTORY COUNTERFEITING, (2) CONTRIBUTORY TRADEMARK INFRINGEMENT, (3) FEDERAL UNFAIR COMPETITION, (4) CALIFORNIA TRADEMARK INFRINGEMENT, AND (5) CALIFORNIA UNFAIR COMPETITION AGAINST SAWABEH INFORMATION SERVICES CO. AND TRADEKEY (PVT) LTD.**<br><br>Date:     **May 20, 2013**<br>Time:     **9:30 AM**<br>Courtroom:  **740 - Roybal**<br>Judge:    **Hon. Gary A. Feess** |

1

2

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ............................................................................ 1

II.    FACTUAL SUMMARY ................................................................. 1

       A.     PLAINTIFFS AND THEIR REGISTERED TRADEMARKS ........... 1

       B.     THE TRADEKEY.COM WEBSITE AND SERVICES ..................... 3

              1.     The TradeKey.com Website ..................................... 3

              2.     TradeKey's Control of Its Website and Member Listings ........ 5

              3.     TradeKey's Services for Premium Members ........................... 5

              4.     Rampant Counterfeit Listings for Luxury Branded Goods ........ 7

              5.     B2bfreezone and Saudicommerce.com Are Mirror
                     Websites ...................................................................... 9

       C.     DEFAULT JUDGMENT AGAINST 18 CO-DEFENDANTS ........... 9

III.   LEGAL ARGUMENT ...................................................................... 9

       A.     Standard for Summary Judgment ........................................ 9

       B.     TradeKey Defendants Are Liable for Contributory
              Counterfeiting ......................................................................... 10

              1.     Direct Counterfeiting by the TradeKey Members .................. 10

              2.     Contributory Trademark Counterfeiting by Defendants .......... 13

              3.     TradeKey Defendants Provided Services or Continued to
                     Provide Services With Actual and/or Constructive
                     Knowledge of Counterfeiting by its Members ........................ 14

              4.     TradeKey Defendants Controlled and Monitored the
                     Website Used to Offer for Sale Counterfeit Goods in Bulk ..... 17

       C.     The TradeKey Defendants Are Liable for Contributory
              Trademark Infringement ........................................................ 18

              1.     Direct Trademark Infringement by TradeKey Members ......... 19

              2.     TradeKey Defendants Are Contributorily Liable for
                     TradeKey Members' Direct Trademark Infringement ............. 21

       D.     Plaintiffs' Federal and State Unfair Competition Claims .................. 21

       E.     TradeKey Defendants' Conduct Was Willful ................................. 22

       F.     Relief Requested .................................................................... 22

              1.     Injunctive Relief ....................................................... 22

              2.     Statutory Damages .................................................... 23

IV.    CONCLUSION ............................................................................. 25

1

# TABLE OF AUTHORITIES

2

**Page**

3

CASES

4

*A & M Records, Inc. v. General Audio Video Cassettes, Inc.,*
5
    948 F.Supp. 1449 (C.D. Ca., 1996) .................................................. 16

6

*AMF Inc. v. Sleekcraft Boats,*
7
    599 F.2d 341 (9th Cir. 1979) ....................................................... 19, 21

8

*Anderson v. Liberty Lobby Inc.,*
9
    477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ...................... 9

10

*Au–Tomotive Gold, Inc. v. Volkswagen of Am., Inc.,*
11
    457 F.3d 1062 (9th Cir. 2006) ................................................ 10, 11, 20

12

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.,*
    174 F.3d 1036 (9th Cir. 1999) ...................................... 11, 19, 20, 21

13

*Century 21 Real Estate Corp. v. Sandlin,*
14
    846 F.2d 1175 (9th Cir. 1988) ................................................... 21, 22

15

*Chanel, Inc. v. Dudum,*
16
    2012 WL 5833562 (N.D. Cal. Oct 29, 2012) .................................... 22

17

*Chanel, Inc. v. Veronique Idea Corp.,*
18
    795 F. Supp.2d 262 (S.D. N.Y. 2011) ............................................. 13

19

*Church & Dwight Co., Inc. v. Kaloti Enterprises of Michigan, L.L.C.,*
20
    697 F.Supp.2d 287 (E.D.N.Y. 2009) .............................................. 23

21

*Coach, Inc. v. Zhou Hui Yin,*
22
    2011 WL 7268428 (N.D. Cal. Dec 09, 2011) .................................... 13

23

*Earthquake Sound Corp. v. Bumper Indus.,*
    352 F.3d 1210 (9th Cir. 2003) ...................................................... 22

24

*Eclipse Assoc. Ltd. v. Data Gen. Corp.,*
25
    894 F.2d 1114 (9th Cir. 1990) ................................................... 19, 21

26

*Entrepreneur Media, Inc. v. Smith,*
27
    279 F.3d 1135 (9th Cir. 2002) ...................................................... 20

28

**TABLE OF AUTHORITIES**
(continued)

Page

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
   76 F.3d 259 (9th Cir. 1996) ...................................................13, 17, 18

*Gucci America, Inc. v. Duty Free Apparel, Ltd.*,
   286 F. Supp. 2d 284 (S.D.N.Y. 2003) ........................................... 13

*Gucci America, Inc. v. Pieta*,
   No. CV 04-9626, 2006 WL 4725706 (C.D. Cal. Jan. 23, 2006) ....................... 10

*Intel Corp. v. Terabyte Int'l Inc.*,
   6 F.3d 614 (9th Cir. 1993) .................................................... 22

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
   456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) ...................................... 14

*Koninklijke Philips Electronics, N.V. v. KXD Technology, Inc.*,
   347 Fed. Appx. 275 (9th Cir. 2009) ............................................ 24

*Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Eastimpex*,
   2007 WL 328696 (N.D. Cal. 2007) ...........................................13, 24

*Levi Strauss & Co. v. Shilon*,
   121 F.3d 1309 (9th Cir. 1997) ................................................. 11

*Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*,
   149 F.3d 987 (9th Cir. 1998) .................................................. 25

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,
   2010 U.S. Dist. LEXIS 85266 (N.D. Cal. 2010) ................................. 25

*Louis Vuitton Malletier v. Akanoc Solutions*,
   658 F.3d 936 (9th Cir. 2011) ..............................................passim

*Louis Vuitton S.A. v. Pun Yang Lee*,
   875 F.2d 584 (7th Cir. 1989) .................................................. 17

*MGM Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005) .......................................................... 16

*New West Corp. v. NYM Co. of California, Inc.*,
   595 F.2d 1194 (9th Cir.1979) ................................................. 21

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Nissan Motor Co. v. Nissan Computer Corp.*,

4

    378 F.3d 1002 (9th Cir. 2004).................................................................... 10, 19

5

*Perfect 10, Inc. v. Amazon*,

6

    508 F.3d 1146 (9th Cir. 2007)............................................................................ 16

7

*Phillip Morris v. Shalabi*,

8

    352 F.Supp.2d 1067 (C.D. Cal. 2004)................................................... 10, 11, 12

9

*Playboy Enterprises, Inc. v. Baccarat Clothing Co.*,

    692 F.2d 1272 (9th Cir. 1982)............................................................................ 22

10

*Polo Fashions, Inc. v. Craftex, Inc.*,

11

    816 F.2d 145 (4th Cir. 1987).............................................................................. 12

12

*Power Balance LLC v. Power Force LLC*,

13

    2010 WL 5174957 (C.D. Cal. 2010).................................................................. 12

14

*Reno Air Racing Ass'n v. McCord*,

15

    452 F.3d 1126 (9th Cir. 2006)............................................................................ 23

16

*Roger Cleveland Golf Co. v. Prince*,

17

    2012 WL 1106775 (D.S.C. March 30, 2012)..................................................... 16

18

*Sealy v. Easy Living*,

19

    743 F.2d 1378 (9th Cir. 1984)............................................................................ 15

20

*Summit Entertainment, LLC v. B.B. Dakota, Inc.*,

    No. CV 10-04328 GAF, 2011 U.S. Dist. LEXIS 151582 (C.D. Cal. Nov.

21

    21, 2011)............................................................................................................. 10

22

*Tommy Bahama Group, Inc. v. Sexton*,

23

    2009 WL 4673863 (N.D. Cal. Dec. 3, 2009) .............................................. 10, 11

24

*Ubiquiti Networks, Inc. v. Kozumi USA Corp.*,

25

    2012 WL 2343670 (N.D. Cal. 2012)................................................................. 13

26

*Walter v. Mattel*,

    210 F.3d 1108 (9th Cir. 2000)............................................................................ 21

27

28

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Yurman Studio, Inc. v. Castaneda,*

4

    591 F.Supp.2d 471 (S.D.N.Y. 2008) ................................................................13

5

STATUTES

6

15 U.S.C. § 1057(b) ........................................................................................11

7

15 U.S.C. § 1065 ............................................................................................11

8

15 U.S.C. § 1114 ...............................................................................10, 11, 19

9

15 U.S.C. § 1115 ............................................................................................11

10

15 U.S.C. § 1116(a) .......................................................................................22

11

15 U.S.C. § 1117(c) .................................................................................11, 23

12

15 U.S.C. § 1125(a) .................................................................................19, 21

13

15 U.S.C. § 1127 ............................................................................................11

14

Cal. Bus. & Prof. Code § 17200 et seq. ........................................................25

15

Cal. Civ. Code § 3294 ....................................................................................25

16

17

OTHER AUTHORITIES

18

Fed. R. Civ. P. 56(a) ......................................................................................11

19

Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec.

20

    H12076 ......................................................................................................17

21

22

23

24

25

26

27

28

## I.   INTRODUCTION

Plaintiffs Chloé SAS, Alfred Dunhill Limited, Officine Panerai AG, Montblanc-Simplo GmbH, Cartier International A.G., and Lange Uhren GmbH (collectively, "Plaintiffs") seek partial summary judgment for contributory counterfeiting and contributory trademark infringement, as well as related claims, against Sawabeh Information Services Co. and TradeKey (Pvt) Ltd. (collectively, the "TradeKey Defendants" or "TradeKey").   The TradeKey Defendants have facilitated counterfeiting by knowingly supplying a safe haven on TradeKey.com for its members to offer counterfeits in bulk, and assisting its paying GoldKey and SilverKey Premium Members primarily from China in this unlawful enterprise.

Unlike eBay or Facebook, TradeKey directly involved itself in the advertising and promotion of counterfeit goods, knowingly allowed counterfeit listings on its website, took control of the listings, assisted Premium Members in their listings, added and removed keywords including the term "replica," changed the titles of member listings to remove obvious words indicating counterfeiting (while allowing such listings to remain on the site), and offered to find buyers for its premium members.

There is no dispute that thousands of members' listings on TradeKey.com used counterfeits of Plaintiffs' Marks, and that direct counterfeiting and trademark infringement is established through those members' listings.   There is also no dispute that the TradeKey Defendants own and operate TradeKey.com, had direct control and monitoring of their website and the member listings, and supplied, and continued to supply, website services with actual or constructive knowledge that its members were engaged in counterfeiting.

## II.   FACTUAL SUMMARY

### A.   PLAINTIFFS AND THEIR REGISTERED TRADEMARKS

Plaintiffs manufacture and sell luxury goods that are distributed and marketed in their own boutiques and through limited authorized distributors.

1   Plaintiff Chloé SAS ("Plaintiff Chloé") has long distributed its handbags,

2   clothing, and accessories under the mark CHLOÉ, and its success has increased in

3   the past five years as a result of the growing popularity of a number of its handbags.

4   (SUF ¶¶ 1-2, 5.) The mark CHLOÉ has garnered vast exposure in the marketplace

5   as a result of Plaintiff Chloe's significant investment in time and money to promote

6   the mark CHLOÉ worldwide.  (SUF ¶¶ 3, 6.)

7   Plaintiff Alfred Dunhill Limited ("Plaintiff Dunhill") has produced and

8   distributed its menswear, handcrafted leather goods, jewelry and timepieces, pens,

9   and accessories under the mark DUNHILL for well over a century.  (SUF ¶ 16.)

10  Plaintiff Dunhill has devoted considerable time and money to promote the mark

11  DUNHILL in the marketplace, resulting in tremendous exposure worldwide.  (SUF

12  ¶¶ 17, 19-23.)

13  Plaintiff Officine Panerai AG ("Plaintiff Panerai") has created and distributed

14  its high precision mechanisms and professional divers' instruments under the mark

15  PANERAI since 1860.  (SUF ¶ 28.)  Plaintiff Panerai has dedicated significant time

16  and substantial resources to promote the mark PANERAI in the marketplace,

17  providing tremendous exposure worldwide.  (SUF ¶¶ 29, 31.)

18  Since at least as early as 1913, Plaintiff MontBlanc-Simplo Gmbh ("Plaintiff

19  Montblanc") has manufactured and distributed its writing instruments under the

20  mark MONTBLANC, and has expanded its products offering under the mark

21  MONTBLANC to include leather goods, jewelry, and watches.   (SUF ¶ 42.)

22  Plaintiff Montblanc has invested significant time and money to promote the mark

23  MONTBLANC in the marketplace, resulting in tremendous exposure worldwide.

24  (SUF ¶¶ 43, 45-47.)

25  Plaintiff Cartier International A.G. ("Plaintiff Cartier") has expertly crafted

26  and distributed high quality artistic jewelry since 1859.  (SUF ¶¶ 52, 56.)  Plaintiff

27  Cartier has extensively advertised the mark CARTIER in connection with jewelry,

28  watches, leather goods, writing instruments and accessories, resulting in

1  tremendous exposure worldwide.  (SUF ¶¶ 53-55.)

2  Plaintiff Lange Uhren Gmbh ("Plaintiff Lange") watch-making tradition

3  dates back to 1845, and the A. LANGE & SÖHNE brand is well-known for

4  producing and distributing high quality and expertly crafted precision time pieces.

5  (SUF ¶ 66.)  Plaintiff Lange has extensively advertised the mark A. LANGE &

6  SÖHNE, and experienced significant sales as a result of demand for its highly

7  popular watches, including LANGE 1, SAXONIA, and "1815."  (SUF ¶¶ 67, 69.)

8  The marks CHLOÉ, DUNHILL, PANERAI, MONTBLANC, CARTIER,

9  and A. LANGE & SÖHNE have come to symbolize high quality products,

10  exclusively originating from Plaintiffs.  (SUF ¶¶ 4, 18, 30-32, 44, 54, 68, 70.)

11  Plaintiffs are the owner of numerous federally registrations for these trademarks,

12  including multiple registrations which have attained incontestable status.  (SUF ¶¶

13  7-15, 24-27, 33-41, 48-51, 57-65, 71-77.)

14  **B.     THE TRADEKEY.COM WEBSITE AND SERVICES**

15  **1.     The TradeKey.com Website**

16  Defendant TradeKey (Pvt) Ltd. is a subsidiary of, and owned by, Defendant

17  SISCOM, and operates the website www.TradeKey.com.  (SUF ¶ 78.)  Defendant

18  SISCOM owns the website www.tradekey.com, and  TradeKey.com is a division of

19  SISCOM.  (SUF ¶¶ 79-80.)

20  Counterfeiting plays an integral role on the TradeKey.com website, as

21  reflected in the "Replica Products" and "Replica Retention" divisions of

22  TradeKey's sales department, and TradeKey keyword reports for fake branded

23  products.  (SUF ¶¶ 108-109.)  Additionally, counterfeiting of Plaintiffs' goods, part

24  of the Apparel & Fashion category on TradeKey.com, factor prominently in

25  TradeKey's business, with a TradeKey employee representing to Plaintiffs'

26  investigator that it is one of the two biggest industries featured on TradeKey.com.

27  (SUF ¶¶ 106-107, 190, 249-250.)  TradeKey sales representatives told Plaintiffs'

28  investigators that counterfeit luxury goods is one of TradeKey's main industries,

that TradeKey is "one of the few sites that still allow our clients to sell replica goods," "the word replica is perfectly legal on our website," that the replica industry "is one of our main industries – it's one of the businesses that we rely on to get us a whole lot of revenue," and "less than ten percent of the brand products on [TradeKey.com] are genuine." (SUF ¶¶ 181-182, 192, 205, 210-215, 222, 231.)

The Apparel & Fashion category ranks third of the 27 "broad high-level categories" offered for sale on TradeKey.com, and TradeKey admits the Apparel & Fashion category is one of the categories with "the largest number of listings" on TradeKey.com with almost 200,000 products posted at any given time. (SUF ¶¶ 106-107.)   The counterfeiting occurs on a large scale as TradeKey solicits wholesale buyers and distributors worldwide to become paying premium members of TradeKey.com. (SUF ¶¶ 83-84.)  TradeKey makes its revenue by charging  for premium memberships and expanded services and benefits to its sellers that pay the annual   SilverKey membership fee of $519 and GoldKey membership fee of $3,000. (SUF ¶¶ 85-105.)

Multiple sell offer and product listings, as well as a company profiles, including the term "replica" in the title and/or the text were allowed to post on TradeKey (with titles such as "Replica Chloe Handbags" and "Factory Direct Chloe Handbags – China Source"), and remained on TradeKey for months (and in some instances an entire year) without any objection or communication from TradeKey, and were optimized by TradeKey during that time.[1]  (SUF ¶¶ 198-202, 206-209, 229, 240-241, 326.)  TradeKey has dozens of keywords for each particular industry that lead to product pages on TradeKey's website where applicable products are

---

[1] In contrast, when Plaintiffs' investigator attempted to list some of his TradeKey offers on eBay, eBay took immediate action removing the listings within a mere twelve minutes after posting in one instance, and in another sending an instantaneous warning when the investigator used the word "replica" in connection with a brand name in one of his eBay listings.  (SUF ¶¶ 318-326.)

displayed.  (SUF ¶¶ 219, 222.)  Product pages are optimized on Google, where, for example, a search for "nike wholesale" would list TradeKey as a top result, and a search for any particular replica brand and wholesale would list TradeKey in the results.  (SUF ¶¶ 220, 223.)  Sell offers are optimized on the TradeKey website itself. (SUF ¶ 223.)  "Replica," "knock-off," and "fake" are all keywords optimized by TradeKey.  (SUF ¶¶ 221-222.)

### 2.    TradeKey's Control of Its Website and Member Listings

TradeKey monitors and controls every aspect of its website and all of its members' listings.  (SUF ¶¶ 116-118, 120-131.)  TradeKey reviews all information posted on its website by any member (both free and premium), including the content of every product and sell offer.  (SUF ¶¶ 118.)  TradeKey retains control over listings on its website by preventing members from making any changes to listings.  (SUF ¶ 127.)  For premium members, TradeKey chooses and adds keywords to their products which drives TradeKey's search engine optimization of these listings.  (SUF ¶¶ 116-117.)  TradeKey also adds keywords associated with counterfeiting to the metadata on its website and automatically suggests keywords to its members associated with counterfeiting such as combinations of a brand name plus the word replica.  (SUF ¶¶ 120-126.)  TradeKey further assists members in masking counterfeit activity by removing the word "replica" from the titles of listings, and products featured on the homepage of TradeKey.com.  (SUF ¶¶ 128-131.)  A TradeKey employee even told Plaintiffs' investigator that he did not have to state that the replica products he was offering for sale were not genuine or identify them as replicas.  (SUF ¶ 230.)

### 3.    TradeKey's Services for Premium Members

TradeKey offers a range of extended services to its SilverKey and GoldKey premium members in return for the payment of annual fees.  (SUF ¶¶ 85-105.)  A key benefit are the Trust Points awarded by TradeKey to premium members (200 to SilverKey members, and 3,000 to GoldKey members) which represents to buyers

that the premium members are reliable and legitimate. (SUF ¶¶ 93-94, 99, 101, 119.) Many GoldKey members are China-based sellers that use the benefits of a GoldKey membership, and legitimacy from "Trust Points," to help them sell non-genuine products. (SUF ¶¶ 101, 191.) TradeKey also optimizes the search results of premium members and offers professional website services to increase traffic to its premium members' products and listings. (SUF ¶¶ 104-105, 111.)

GoldKey members of TradeKey.com receive the highest priority ranking in search results leading to more buyer inquiries, extensive search engine marketing, enhanced access to TradeKey's buyer directory, and the option to advertise on TradeKey's homepage. (SUF ¶¶ 87, 88, 92.) TradeKey actively filters GoldKey members' inquiries to identify genuine buyers, and provides GoldKey members with a dedicated relationship manager who both finds and connects GoldKey sellers directly with buyers. (SUF ¶¶ 89-91, 112-115.) TradeKey allows GoldKey members to post up to 20 products and 500 sell offers. (SUF ¶ 95.)

Plaintiffs' investigator paid the $3,000 fee for a GoldKey membership and was contacted by a TradeKey employee who confirmed the benefits of a GoldKey membership including higher priority listing and assistance in finding buyers. (SUF ¶¶ 178-180, 183-184, 196.) TradeKey employees contacted Plaintiffs' investigator to provide direct assistance with his GoldKey membership including recommending that he post as many products as possible, explaining search engine optimization, offering special packages, reviewing his listings and product postings. (SUF ¶¶ 203-205, 210-225, 228 and 239.) As a GoldKey member, Plaintiffs' investigator was able to post the maximum twenty products and to feature one of his products on TradeKey.com's homepage for an additional fee of $500 per week. (SUF ¶¶ 130, 227, 243-246.) TradeKey further removed the word "replica" from the title of his homepage advertisement before it was posted on the TradeKey.com homepage and simply re-titled it as "Fashion Handbag", helping to mask its counterfeit nature. (SUF ¶ 247.) Other services offered to Plaintiffs' investigator

as a GoldKey member for additional fees were a guarantee of top ranking on TradeKey.com's website for his keywords, and the option to automatically re-post sell offers after they expire.  (SUF ¶¶ 224-226, 242.)  The GoldKey membership expired when he failed to pay the annual fee, and his account was downgraded to a free membership, however his sell offers, product listings, and featured product posting on the homepage all still remained on TradeKey.com.  (SUF ¶ 248.)

SilverKey members of TradeKey.com receive higher priority ranking than free members (leading to more buyer inquiries), fax service, a mini website, a virtual office, and marketing on search engines like Google and Yahoo.  (SUF ¶¶ 96, 98, 100, 102-103, 119.)  TradeKey allows SilverKey members to post up to 15 products and 200 sell offers.   (SUF ¶ 97.)   Plaintiffs' investigator joined TradeKey as a free member under a separate undercover identity, and was contacted by a TradeKey employee in response to his SilverKey membership inquiry. (SUF ¶¶ 185-187.)  The TradeKey employee confirmed the key benefits of a SilverKey membership including search engine optimization and the use of keywords to attract buyers.   (SUF ¶¶ 188-189.)   Plaintiffs' investigator subsequently upgraded to a SilverKey membership, and was able to post a company profile, sell offers and products, all using the term "replica."  (SUF ¶¶ 193-195, 197-199, 209.)

### 4.     Rampant Counterfeit Listings for Luxury Branded Goods

Plaintiffs discovered over 6,000 sellers offering their branded products on TradeKey.com, including over 2,400 sellers with listings for CHLOÈ branded goods, over 200 sellers offering DUNHILL branded goods, over 850 sellers offering PANERAI branded goods, over 500 sellers offering MONTBLANC branded goods, over 1,900 sellers offering CARTIER branded goods, and at least two premium members offering A. LANGE & SÖHNE branded goods.  (SUF ¶¶ 132, 134, 136, 138, 140, 142.)  Each Plaintiff has confirmed that none of the sellers on Tradekey.com were authorized by Chloé, Alfred Dunhill, Panerai,

Montblanc, Cartier or Lange & Söhne, or their related companies to sell genuine goods bearing Plaintiffs' Marks, or were otherwise authorized sellers, manufacturers, suppliers, dealers, or distributors. (SUF ¶¶ 133, 135, 137, 139, 141, 143.)

The co-defendant individual TradeKey member sellers all offered for sale counterfeit products of at least one of Plaintiffs' brands. (SUF ¶¶ 144-177.) Many of the co-defendant sellers were premium GoldKey members of TradeKey.com, receiving extra services and optimization from TradeKey for the payment of the annual fee. (SUF ¶¶ 144, 146, 148, 152, 154, 160, 162, 164, 170, 172, 85, 86.) The co-defendant sellers used key words like "1:1," "A++," "AAA quality," and "replica," in their listings indicating to buyers that the products offered were counterfeit. (SUF ¶¶ 145, 147, 149, 151, 153, 155, 157, 159, 167, 169, 175, 177.) All of the co-defendant sellers offered their counterfeit products for sale in bulk quantities and encouraged large orders through listings advertising "no limit for quantity," "better price for large quantity!," "buy more, discout is more!," invited "Bulk order," touting a supply ability of 100,000 watches, and similar language. (SUF ¶¶ 145, 147, 149, 151, 153, 155, 157, 159, 161, 163, 165, 167, 169, 171, 173, 175, 177.) The co-defendant sellers also used the TradeKey.com platform to drive traffic to their individual websites where they listed a more expansive range of counterfeits of both Plaintiffs' and other branded products. (SUF ¶¶ 145, 147, 149, 155, 161, 165, 167, 169, 171, 173, 177.)

Plaintiffs' investigator purchased eight Chloé handbags (SUF ¶¶ 251-274), one Alfred Dunhill belt (SUF ¶¶ 275-276), one Alfred Dunhill dress watch (SUF ¶¶ 278-279), five Panerai watches (SUF ¶¶ 281-295), two Montblanc watches (SUF ¶¶ 296-301),  and four Cartier watches (SUF ¶¶ 302-313),  through sell offers posted by a variety of sellers on TradeKey.com.  Each of the Plaintiffs reviewed detailed photographs taken by the investigator of the purchased products and confirmed that each purchase was a counterfeit. (SUF ¶¶ 253, 256, 259, 262, 265,

268, 271, 274, 277, 280, 283, 286, 289, 292, 295, 298, 301, 304, 307, 310, 313.) Plaintiffs' investigator also found offers to sell two A. Lange & Söhne watches offered for sale by GoldKey members on TradeKey.com which Plaintiff Lange confirmed were counterfeit through a review of Internet screenshots of the offers. (SUF ¶¶ 314-317.)

### 5. B2bfreezone and Saudicommerce.com Are Mirror Websites

In addition to tradekey.com, TradeKey also operates the websites at saudicommerce.com and b2bfreezone.com and optimizes its member listings through these two additional websites. (SUF ¶¶ 81-82.) Specifically, searches performed on TradeKey.com, b2bfreezone.com and saudicommerce.com return identical, mirror results, including in a search for "replica handbags," which revealed identical counterfeit listings using the marks of Plaintiffs Chloé, Cartier and Montblanc on all three websites. (SUF ¶ 82.) A TradeKey "initiative" proposes moving its replica business from tradekey.com to b2bfreezone.com. (SUF ¶ 110.)

### C. DEFAULT JUDGMENT AGAINST 18 CO-DEFENDANTS

On April 6, 2012, the Court entered a Default Judgment against eighteen co-defendant individual TradeKey member sellers ("Defaulting Defendants"), finding that the Defaulting Defendants offered for sale counterfeit products of at least one of Plaintiffs' brands based on their listings indicating that the offered products were counterfeit. (SUF 327-28.)

## III. LEGAL ARGUMENT

### A. Standard for Summary Judgment

Summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

In the context of trademark infringement and counterfeiting claims, where the evidence is clear and tilts heavily in favor of a likelihood of confusion, courts have not hesitated to grant or affirm summary judgment. *See, e.g.*, *Au–Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1075 (9th Cir. 2006); *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1019 (9th Cir. 2004); *Summit Entm't, LLC v. B.B. Dakota, Inc.*, No. CV 10-04328 GAF, 2011 U.S. Dist. LEXIS 151582 (C.D. Cal. Nov. 21, 2011); *Phillip Morris v. Shalabi*, 352 F.Supp.2d 1067 (C.D. Cal. 2004); *Tommy Bahama Grp., Inc. v. Sexton*, 2009 WL 4673863 (N.D. Cal. Dec. 3, 2009).

**B.     TradeKey Defendants Are Liable for Contributory Counterfeiting**

Plaintiffs have established through uncontroverted evidence both the necessary predicate of underlying direct counterfeiting by TradeKey Members, and TradeKey Defendants contributory liability for the direct counterfeiting occurring on their website at TradeKey.com.

**1.     Direct Counterfeiting by the TradeKey Members**

In order to establish contributory trademark counterfeiting, a plaintiff must first establish underlying direct counterfeiting. *See Louis Vuitton Malletier v. Akanoc Solutions*, 658 F.3d 936, 943 (9th Cir. 2011). A plaintiff establishes a claim for direct trademark counterfeiting by showing (1) ownership of a valid trademark and (2) defendant's use of a counterfeit of that trademark in connection with the sale of goods, without authorization from the trademark owner, that is likely to cause confusion, deception, or mistake. 15 U.S.C. § 1114(1); *Tommy Bahama*, 2009 WL 4673863, at *4 (quotation omitted); *Gucci Am., Inc. v. Pieta*, No. CV 04-9626, 2006 WL 4725706, at *3 (C.D. Cal. Jan. 23, 2006).

**(a)     Plaintiffs' Trademarks are Valid and Protectable**

Plaintiffs own valid and protectable trademark registrations for their respective marks, including CHLOÉ, PADDINGTON, EDITH, DUNHILL, PANERAI, MONTBLANC, CARTIER, and A. LANGE & SÖHNE ("Plaintiffs'

Marks"). (SUF ¶¶ 7-14, 24-26, 33-40, 48-50.) Plaintiffs' registration of their marks on the Principal Register in the United States Patent and Trademark Office constitutes prima facie evidence of the ownership and validity of Plaintiffs' Marks, and of Plaintiffs' exclusive right to use their marks on the goods specified in their registrations. *See* 15 U.S.C. §§ 1057(b), 1115(a); *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999); *Phillip Morris*, 352 F. Supp. 2d at 1073. Further, many of the Plaintiffs' Marks have become incontestable through five years of consecutive use, and are therefore presumed valid. (SUF ¶¶ 15, 27, 41, 51.) *Au-Tomotive Gold*, 457 F.3d at 1072; 15 U.S.C. § 1065. Thus, there is no dispute that Plaintiffs have valid and exclusive rights to the marks at issue.

> **(b)   TradeKey Members Used Counterfeits of Plaintiffs' Marks**

"A 'counterfeit' is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. For purposes of § 1117(c) (statutory damages) a counterfeit mark is one "that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered.'" *Akanoc*, 658 F.3d at 945 (quoting § 1116(d)(1)(B)(i)).

An offer to sell a counterfeit good, without the consent of the trademark owner, is sufficient to establish trademark counterfeiting under the Lanham Act. 15 U.S.C. 1114(1)(a) (holding liable "[a]ny person who shall, without the consent of the registrant . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the . . . offering for sale . . . of any goods . . . [where] such use is likely to cause confusion, or to cause mistake."); *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1312 (9th Cir. 1997) ("An offer to sell without more will suffice to establish liability [under the Lanham Act]."); *Tommy*

*Bahama*, 2009 WL 4673863, at \*4 ("offer to sell is sufficient.").

Here, TradeKey Members used exact copies of Plaintiffs' valuable registered trademarks in connection with listings on Tradekey.com offering for sale counterfeit CHLOÉ handbags; counterfeit DUNHILL watches and belts; counterfeit PANERAI watches; counterfeit MONTBLANC watches; counterfeit CARTIER watches; and counterfeit A. LANGE & SÖHNE watches; the very goods for which Plaintiffs' Marks are registered.  (SUF ¶¶ 144-177, 249-317.)  Such use constitutes use of a counterfeit mark in connection with the sale of goods.

Further, TradeKey Members' use was unauthorized as not one of the over 6,000 members on TradeKey.com offering for sale goods bearing the Plaintiffs' Marks was an authorized seller, manufacturer, supplier, dealer or distributor. (SUF ¶¶ 133, 135, 137, 139, 141-143.)   And every item purchased from a TradeKey members' listing has been confirmed counterfeit.

Thus, it is undisputed that TradeKey Premium Members' used counterfeit marks in connection with their listings on TradeKey.com.

### (c)   TradeKey Members' Counterfeiting Caused Confusion

Counterfeits by their very nature, cause confusion and deceive as to source of the good.  While the good may bear Plaintiffs' Mark, it is not a genuine mark, nor a genuine good, and it is not from a genuine source.  Where, as here, it is established that the marks used by a defendant are counterfeit, likelihood of confusion is presumed, and it is unnecessary to analyze the *Sleekcraft* factors.  *See, e.g., Power Balance LLC v. Power Force LLC*, 2010 WL 5174957, at \*4 (C.D. Cal. 2010) ("'Where…one produces counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product, there is a presumption of likelihood of confusion.'") (quoting *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987)); *Phillip Morris*, 352 F. Supp. 2d at 1073 ("[I]n cases involving counterfeit marks, it is unnecessary to perform the step-by-step

1  [likelihood of confusion] examination because counterfeit marks are inherently
2  confusing.").[2]

3      The TradeKey Members' use of Plaintiffs' Marks constitutes direct
4  counterfeiting as such members used Plaintiffs' federally registered marks in
5  connection with offers for sale of non-genuine goods without authorization from the
6  Plaintiffs that caused confusion.[3]

7          **2.    Contributory Trademark Counterfeiting by Defendants**

8      The TradeKey Defendants are liable for contributory trademark
9  counterfeiting if they (1) either provided services with actual or constructive
10 knowledge that the users of services were engaging in trademark counterfeiting, or
11 continued to supply its services to one who it knew or had reason to know was
12 engaging in trademark counterfeiting; and (2) "had '[d]irect control and monitoring
13 of the instrumentality used by a third party to infringe'" Plaintiffs' Marks. *Akanoc*,
14 658 F.3d at 942-43 (affirming contributory liability for defendants that "had direct
15 control over the 'master switch' that kept the websites online and available" and
16 which were used as the "means of infringement"); *see also Fonovisa, Inc. v. Cherry*
17 *Auction, Inc.*, 76 F.3d 259, 296 (9th Cir. 1996) (noting "difficult[y] for the

18 _____

19 [2]  *See also Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, 2012 WL 2343670, at *14
20 (N.D. Cal. 2012) ("in cases involving counterfeiting, it is unnecessary to perform
   the eight-factor evaluation because counterfeit marks are inherently confusing.");
   *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Eastimpex*, 2007 WL 328696, at
21 *2 (N.D. Cal. 2007) (Where the mark used by defendant is "the same as or
   substantially indistinguishable" from plaintiff's trademark, "a likelihood of
22 confusion is established."); *Coach, Inc. v. Zhou Hui Yin*, 2011 WL 7268428, at *3
   (N.D. Cal. Dec 09, 2011) (presuming confusion where "Coach has shown that the
23 marks used on the products being sold by Defendant are identical to, or
   substantially indistinguishable from, Coach's registered marks."); *Gucci Am., Inc. v.*
24 *Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) ("[T]he Court
   need not undertake a factor-by-factor analysis under Polaroid because counterfeits,
25 by their very nature, cause confusion."); *Yurman Studio, Inc. v. Castaneda*, 591
   F.Supp.2d 471, 498 (S.D.N.Y. 2008) (same); *Chanel, Inc. v. Veronique Idea Corp.*,
26 795 F. Supp.2d 262, 267 (S.D.N.Y. 2011) (same).

27 [3]  Even without the presumption of confusion, however, an analysis of the
   likelihood of confusion factors results in likely confusion. *See* Section III.C.1.

28

1  infringing activity to take place in the massive quantities alleged without the

2  support services provided by the swap meet" and that defendant swap meet operator

3  "actively strives to provide the environment and the market for counterfeit

4  recording sales to thrive"); *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844,

5  854, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).

6      TradeKey Defendants operate a virtual "swap meet" where they knowingly

7  allow their members to engage in wholesale counterfeiting of Plaintiffs' marks.

8  Defendants not only controlled the "master switch" that allowed these member

9  counterfeiters to offer for sale unlimited quantities of counterfeits; TradeKey

10  Defendants were actively involved in the facilitation of counterfeiting by its

11  members.  They assisted Premium Members in the listing of those offers (SUF

12  ¶¶ 90, 203-204) removed the word "replica" from the title of listings (yet allowed

13  those listings to remain on the site to attract buyers) (SUF ¶¶ 128-131), optimized

14  the member listings (both Sell Offers and "Product" Listings) (SUF ¶¶ 220, 223),

15  suggested keywords that indicated replica goods, and controlled and monitored

16  each of the listings once posted by a member. (SUF 120-126)  The website was the

17  global platform used by the members to counterfeit Plaintiffs' valuable marks,

18  which was directly controlled and monitored by TradeKey Defendants.

19
20          **3.    TradeKey Defendants Provided Services or Continued to**
              **Provide Services With Actual and/or Constructive**
21            **Knowledge of Counterfeiting by its Members**

22      The undisputed facts establish that the TradeKey Defendants had actual or

23  constructive knowledge that its members were engaged in counterfeiting.  Indeed,

24  Defendants maintained "REPLICA PRODUCTS" and "REPLICA RETENTION"

25  sales divisions (SUF ¶ 108), clearly demonstrating their knowledge of the use of

26  TradeKey.com to offer for sale counterfeit goods.  Defendants knowingly supplied

27  the services of their B2B website to thousands of TradeKey members offering for

28  sale counterfeit goods in bulk bearing Plaintiffs' Marks and further assisted

Premium Members in offering for sale counterfeit goods bearing Plaintiffs' Marks, including choosing and adding keywords to their listings which drives TradeKey's search engine optimization of those listings (SUF ¶¶ 116-117), top ranking on TradeKey.com's website for keywords and the option to automatically re-post sell offers after they expire (SUF ¶¶ 224-226, 242), higher priority ranking than free members leading to more buyer inquiries (SUF ¶¶ 96, 98, 100, 102, 119, 178-180), and marketing on search engines (SUF ¶ 103).

Such evidence demonstrates that TradeKey Defendants foresaw and intended[4] that counterfeit goods would be sold on TradeKey.com.  *See Sealy v. Easy Living*, 743 F.2d 1378, 1382 (9th Cir. 1984) (affirming finding of contributory trademark infringement where "defendants foresaw and intended that Pacifica foundations would be passed off as Sealy products").

The record further establishes that Defendants knew or had reason to know that their members were offering for sale counterfeit goods on TradeKey.com. TradeKey Defendants reviewed and controlled all listings (SUF ¶¶ 116-118, 120-131), including GoldKey members' listings, many of which indicated on the face of the listing that they were offering for sale counterfeit goods bearing Plaintiffs' marks.  (SUF ¶¶ 145, 147, 149, 151, 153, 155, 157, 159, 167, 169, 175, 177.) (Listings including the terms "replica," "mirror image," "AAA," and multiple brand names).  TradeKey Defendants assisted its Premium Members with "keywords" and maximized members' reach on the Internet through search engine optimization of the keywords to drive traffic to their listings.  Many of these keywords clearly indicated that GoldKey members were engaged in the sale of counterfeit goods. TradeKey's sales employees stated to Plaintiffs' investigator that he should use the word "replica" and "as many brand names" as he could for keywords.  (SUF ¶ 204).

---

[4] "[A]n express finding of intent is not required" for liability.  *Akanoc* 658 F.3d at 943.

1  TradeKey Defendants were explicitly informed by Plaintiffs' investigators in their
2  undercover capacities as customers seeking to become a GoldKey or SilverKey
3  TradeKey member that they intended to list counterfeit luxury goods on their
4  website and TradeKey's representatives advised that it would not be a problem on
5  TradeKey.com, that selling replicas of branded goods was "one of [TradeKey's]
6  main industries," "the word replica is perfectly legal on [TradeKey Defendants']
7  website," that "replica" and "mirror quality" could be used in postings, and that
8  TradeKey was "one of the few sites that still allow [its] clients to sell replica
9  goods." (SUF ¶¶ 182, 192, 205).

10        TradeKey's knowledge of member listings offering for sale counterfeits on
11  TradeKey.com demonstrates *actual* knowledge of counterfeiting.  *See A & M*
12  *Records, Inc. v. Gen. Audio Video Cassettes, Inc.,* 948 F.Supp. 1449, 1454 (C.D.
13  Ca., 1996) (defendant had knowledge of illegal counterfeiting activities where his
14  customers informed him of the nature of their counterfeit operation and the
15  defendant assisted his customers in obtaining supplies for their counterfeit
16  operation, among other things); *Roger Cleveland Golf Co. v. Prince*, 2012 WL
17  1106775, at *7 (D.S.C. March 30, 2012) (defendant knew or had reason to know
18  that its website hosting services were being used by one of its customers to sell
19  counterfeit golf clubs where defendant was told that his customer was selling
20  "copied clubs," assisted in registering the domain name "copycatclubs.com," and
21  reviewed and advised his customer as to what content to add to his website, which
22  stated "Your one stop shop for the best COPIED and ORIGINAL golf equipment
23  on the internet."); *Perfect 10, Inc. v. Amazon*, 508 F.3d 1146, 1169 (9th Cir. 2007)
24  (a computer system operator can be held contributorily liable if it has actual
25  knowledge that specific infringing material is available using its system, and can
26  take simple measures to prevent further access).  The TradeKey Defendants' active
27  involvement in allowing its Premium GoldKey and SilverKey members to post
28  their counterfeit listings in the first place, and knowingly assisting and optimizing

the listings, establishes liability. *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 934-35 (2005) (actor contributorily liable for taking steps that are substantially certain to result in direct infringement).

A plaintiff is not required to show that a defendant provided its services with *actual* knowledge that the users of  its services were engaging in trademark infringement or counterfeiting, as constructive knowledge is sufficient. *Akanoc*, 658 F.3d at 943.  Further, while there is a plethora of evidence that the TradeKey Defendants had *actual* knowledge of counterfeiting, contributory liability can also be imposed based on the TradeKey Defendants being "willfully blind" to the thousands of listings of its members that openly offered replicas of "branded goods" in bulk. *Fonovisa*, 76 F.3d at 265 ("a swap meet cannot disregard its vendors' blatant trademark infringement with impunity."); *Louis Vuitton S.A. v. Pun Yang Lee*, 875 F.2d 584, 590 (7th Cir. 1989) ("willful blindness is knowledge enough"); *see also* Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. at H12076-77.

Plaintiffs have shown that the TradeKey Defendants had actual or constructive knowledge of their TradeKey Premium Members, and thousands of other members' listings, offering for sale counterfeit goods on TradeKey.com and with such knowledge supplied and continued to supply their website services to these counterfeiters.

### 4.    TradeKey Defendants Controlled and Monitored the Website Used to Offer for Sale Counterfeit Goods in Bulk

TradeKey Defendants controlled and monitored TradeKey.com, the instrumentality used by the TradeKey members to offer for sale counterfeit goods in bulk.  TradeKey Defendants provided a "safe haven" for these counterfeiters by supplying not only a venue for these transactions to occur, but also services targeted to driving internet traffic to the TradeKey website where these members can easily be found while bestowing "reliability" and legitimacy to its GoldKey and Silver

1    Key members through its Trust Points system.

2         Courts have found sufficient "control" in situations such as this, where the

3    defendants supply "the necessary marketplace" for the sale of counterfeits in

4    substantial quantities.  In *Fonovisa*, 76 F.3d at 261, the Ninth Circuit held that a

5    complaint stated a cause of action for contributory trademark infringement where a

6    swap meet proprietor supplied "the necessary marketplace" for the sale of

7    counterfeits in substantial quantities by having its vendors pay daily rental fees in

8    exchange for booth space, supplying parking, conducting advertising, and retaining

9    the right to exclude any vendor at any time, and thus could exclude vendors for

10   patent and trademark infringement.  TradeKey Defendants provide similar services

11   here in the Internet marketplace context and also control each members' listings

12   (members could not make changes to a listing once it posted), and had the ability to

13   terminate a listing or member at any time.

14        In *Akanoc*, 658 F.3d 936, the Ninth Circuit found that a webhosting company

15   demonstrated "control" over its hosted websites which were used to sell infringing

16   goods, where the defendants had direct control "over the 'master switch' that kept

17   the websites online and available." *Id.* at 943.   Like the *Akanoc* defendants,

18   TradeKey provides the means for a virtual marketplace for TradeKey members to

19   offer for sale counterfeit goods.  Even more direct and egregious that the defendants

20   in *Akanoc*, the TradeKey defendants *directly own and operate the website through*

21   *which the infringing goods are offered.*   Thus, the TradeKey Defendants control

22   and monitor the instrumentality (*i.e.*, TradeKey.com) through which counterfeit

23   goods were offered bearing the Plaintiffs' marks.

24   **C.    The TradeKey Defendants Are Liable for Contributory Trademark**
25   **Infringement**

26        The same standard for contributory counterfeiting set forth in Section III.B.

27   above applies for contributory trademark infringement, and the existence of an

28   underlying direct trademark infringement is a necessary predicate to establishing a

claim for contributory trademark infringement.  *See Akanoc*, 658 F.3d at 943.

### 1.    Direct Trademark Infringement by TradeKey Members

To prevail on their claim for infringement of a federally registered trademark under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), Plaintiffs must establish that (1) their federally registered marks are valid and protectable, and (2) Defendants used their marks in commerce without Plaintiffs' consent in a manner that is likely to cause confusion as the source, affiliation, connection or association of the defendant or its goods.  *Brookfield*, 174 F.3d at 1047; *Eclipse Assoc. Ltd. v. Data Gen. Corp.,* 894 F.2d 1114, 1118 (9th Cir. 1990); 15 U.S.C. § 1125(a)(1)(A).

#### (a)    Plaintiffs' Trademarks are Valid and Protectable

It is undisputed that Plaintiffs own valid and protectable trademarks.  *See* Section II.A. *supra*.

#### (b)    TradeKey Premium Members' Use of Plaintiffs' Mark Is Likely to Cause Confusion

The Ninth Circuit considers the following factors in determining whether confusion is likely:  (1) strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) degree of care customers are likely to exercise in purchasing goods; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion into other markets.  *Nissan Motor*, 378 F.3d at 1018-19 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)).   Application of these factors here demonstrates that the TradeKey members' listings using Plaintiffs' Marks directly infringed Plaintiffs' Marks.

##### (i)    Plaintiffs' Marks Are Strong and Defendants Used the Identical Marks on Identical Goods

The first three factors unequivocally weigh in favor of likelihood of confusion.  Plaintiffs' Marks are strong having been in use for decades (some for a century) and are each registered for a number of goods (SUF¶¶ 1-77).  Indeed, it

1  was because of the strength of Plaintiffs' mark that TradeKey Members could sell

2  counterfeits of their products.  It is well settled that "[t]he stronger a mark . . . the

3  greater the protection it is accorded by the trademark laws." *Brookfield*, 174 F.3d at

4  1058.

5      The marks being used by the TradeKey Premium Sellers are identical to

6  Plaintiffs' Marks and the goods offered for sale are identical to the type of goods

7  covered by Plaintiffs' trademark registrations.  (SUF ¶¶ 144-177, 249-317.)

8              **(ii)      TradeKey Premium Members' Intended to Profit**
9                          **from Plaintiffs' Goodwill**

10      Wrongful intent is not required to find an actionable likelihood of confusion.

11  Yet, "[w]hen the alleged infringer knowingly adopts a mark similar to another's,

12  reviewing courts presume that the defendant can accomplish his purpose: that is,

13  that the public will be deceived." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d

14  1135, 1148 (9th Cir. 2002).   "The law has long been established that if an infringer

15  adopts his designation with the intent of deriving benefit from the reputation of the

16  trade-mark [sic] or trade name, its intent may be sufficient to justify the inference

17  that there are confusing similarities."  *Brookfield*, 174 F.3d at 1059 (internal

18  quotations omitted).

19      The TradeKey Members offered for sale "knock-off" goods bearing

20  counterfeit copies of Plaintiffs' valuable marks, evidencing an intent to derive the

21  benefit of the reputation of Plaintiffs and their marks.  This factor heavily weighs in

22  favor of Plaintiffs.  *Id.* ( "This factor favors the Plaintiff where the alleged infringer

23  adopted his mark with knowledge, actual or constructive, that it was another's

24  trademark.").

25              **(iii)    Other Factors Are Neutral or Favor Plaintiffs**

26      The factors are not a scorecard, and the presence or absence of any particular

27  factor should not necessarily resolve whether there is a likelihood of confusion.

28  *Au–Tomotive Gold*, 457 F.3d at 1075 ("elements are not applied mechanically;

1   courts may examine some or all of the factors, depending on their relevance and

2   importance"); *Eclipse Assoc.,* 894 F.2d at 1118 (factors "not meant to be

3   requirements or hoops that a district court need jump through to make the

4   determination").  The remaining  factors either weigh in favor of Plaintiffs such as

5   marketing in similar channels by Defendants' use of the Internet to offer knock-offs

6   of Plaintiffs' genuine goods, or are neutral as actual confusion is not necessary to

7   show a likelihood of confusion.  *AMF*, 599 F.2d at 353.  The TradeKey Members'

8   use of the Plaintiffs' marks establishes direct trademark infringement as such use is

9   likely to cause confusion or deceive.

10              **2.      TradeKey Defendants Are Contributorily Liable for**
11                    **TradeKey Members' Direct Trademark Infringement**

12              As established in Sections III.B.3 and B.4 *supra*, the TradeKey Defendants

13   both knowingly provided and continued to supply services to their members that

14   were using TradeKey.com to offer for sale goods that infringed Plaintiffs' Marks,

15   and the TradeKey Defendants also controlled and monitored the TradeKey.com

16   website used by the TradeKey Members as the means of infringement.

17        **D.     Plaintiffs' Federal and State Unfair Competition Claims**

18              To prevail on its claims under Section 43(a) of the Lanham Act, 15 U.S.C.

19   Section 1125(a) Plaintiffs must prove the same elements as for federal trademark

20   infringement.  *Brookfield*, 174 F.3d at 1047 n.8 (analysis under Sections 32 and 43

21   of the Lanham Act is the same); *New West Corp. v. NYM Co. of California, Inc.*,

22   595 F.2d 1194, 1201 (9th Cir. 1979) ("Whether we call the violation infringement,

23   unfair competition or false designation of origin, the test is identical--is there a

24   'likelihood of confusion?'" ).  Similarly, trademark infringement under California

25   common law and unfair competition under the California statute also focus on the

26   likelihood of confusion and therefore can be evaluated under the same standards as

27   federal trademark infringement.  *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d

28   1175, 1180 (9th Cir. 1988); *Walter v. Mattel*, 210 F.3d 1108, 1111 (9th Cir. 2000).

By demonstrating they are entitled to partial summary judgment on their federal claims, Plaintiffs have necessarily established they are entitled to partial summary judgment on these claims.

### E.      TradeKey Defendants' Conduct Was Willful

Willful infringement occurs when the defendant knowingly and intentionally infringes on a trademark.  *See Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216-17 (9th Cir. 2003); *Playboy Enter., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1276 (9th Cir. 1982) ("readily acknowled[ing] that the defendants were guilty of willful trademark infringement" where "defendants deliberately arranged to obtain counterfeit goods and to sell such goods as genuine PEI products"); *Intel Corp. v. Terabyte Int'l Inc.*, 6 F.3d 614, 621-22 (9th Cir. 1993) (affirming district court determination that defendant's conduct was willful where defendant "knew and intentionally bought remarked chips"); *Chanel, Inc. v. Dudum*, 2012 WL 5833562, at *8 (N.D. Cal. Oct 29, 2012).

The TradeKey Defendants acted willfully in knowingly allowing thousands of listings offering replicas on their face to post on TradeKey.com, actively assisting premium members to post listings offering for sale replica goods, not removing listings offering replica goods but instead optimizing them to help find buyers for their counterfeiting members, maintaining a "Replica" and "Replica Retention" division in their sales department, and advising prospective customers that it was not a problem to offer and trade in replica goods through TradeKey.com.

### F.      Relief Requested

#### 1.      Injunctive Relief

Plaintiffs are entitled to injunctive relief on all of their claims.  15 U.S.C. § 1116(a) "Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Century 21*, 846 F.2d at 1180.

Plaintiffs are entitled to permanent injunctive relief on their trademark

infringement and unfair competition claims based on the equitable principles outlined in *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1137 n.11 (9th Cir. 2006).[5]   Specifically, Plaintiffs have suffered irreparable injury through the widespread offering for sale of products bearing counterfeits of their marks, monetary damages are inadequate to compensate the harm to the goodwill of Plaintiffs' brands, the balance of the hardships is in Plaintiffs' favor as TradeKey Defendants have no legal right to facilitate the sale of counterfeit merchandise, and the public interest would be served by removing counterfeit products from the marketplace.

## 2.   Statutory Damages

In a case involving the use of a "counterfeit mark," the Lanham Act permits a trademark plaintiff to elect to recover statutory damages instead of actual damages and profits.  15 U.S.C. § 1117(c).  Statutory damages under the Lanham Act can be awarded against contributory infringers.  *Akanoc*, 658 F.3d at 944-45 (rejecting contention that Lanham Act does not authorize statutory damages against contributory infringers).  Statutory damages are permitted in amounts not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, or in the case of willful infringement, in an amount not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed.  15 U.S.C. § 1117(c).

Maximum statutory damages are warranted where a defendant is a large scale operation and offers high quantities of counterfeit goods such as where a defendant is at the top of the distribution chain as a manufacturer, wholesaler, or distributor,

---

[5] "[A] plaintiff seeking a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.*

versus a retailer or individual seller. *Church & Dwight Co., Inc. v. Kaloti Enters. of Michigan, L.L.C.*,  697 F.Supp.2d 287, 295-302 (E.D.N.Y. 2009) (key factors to determine statutory damages were "(1) where along the chain of counterfeit distribution they are located; and (2) whether they dealt in large-scale distribution of counterfeit [products].")

Maximum statutory damages are also warranted where defendants act willfully or fails to comply with court orders or participate in a case. *Koninklijke Philips Elec., N.V. v. KXD Tech., Inc.*, 347 Fed. Appx. 275, 276 (9th Cir. 2009) (statutory maximum "was warranted by [defendant's] willfulness"). *Koon Chun*, 2007 WL 328696, at *12 (granting maximum statutory damages because defendants' use of the counterfeit goods was intentional)

Thousands of unauthorized member sellers have offered for sale counterfeits of Plaintiffs' branded products on TradeKey.com.  This Court previously entered default judgment against eighteen of those member sellers (the Default Defendants).  Here, TradeKey Defendants (SISCOM and TradeKey (Pvt) Ltd.) are jointly and severally liable, but TradeKey Defendants are not jointly and severally liable with the Default Defendants.  TradeKey Defendants' actions resulting in liability for contributory infringement, are separate infringements from the actions of the member sellers' direct infringement.  *Akanoc*, 658 F.3d at 944-45 ("[H]olding a defendant liable for the unauthorized acts of another is a primary purpose of the doctrine of contributory trademark liability.")

"Where separate infringements for which two or more defendants are not jointly liable are joined in the same action, separate awards of statutory damages would be appropriate." *Id.* at 946-947.  Accordingly, a separate award of statutory damages[6]: should be entered against TradeKey Defendants for all of the prior

---

[6] Plaintiffs note that Cal. Civ. Code § 3294(a) allows for the recovery of punitive damages on Plaintiffs Count 8 for unfair competition under California common law "where it is proven by clear and convincing evidence that the defendant has been
(Continued...)

confirmed infringements and additional evidence presented by Plaintiffs, and that such award take into account that the TradeKey Defendants have met the above three circumstances that warrant high statutory damages the facilitation of massive counterfeiting on the site by thousands of their members, the large scale and nature of the B2B TradeKey.com website (versus a consumer oriented site (B2C) that only sells single items direct to consumers), the knowing and willful conduct of the TradeKey Defendants, and the failure to comply with the Consent Injunction and Default Order requiring them to remove infringing listings.

## IV.   CONCLUSION

For all the foregoing reasons, Plaintiffs request that the Court grant summary judgment against Defendants Sawabeh Information Services Co. and TradeKey (Pvt) Ltd. on Counts III, IV, VII, VIII, and IX to award injunctive as requested in the proposed order, and to find that Plaintiffs are entitled to an award of statutory damages against TradeKey (Pvt) Ltd. and SISCOM, jointly and severally, with such amount of statutory damages to be set at a hearing, at trial, or other briefing as requested by the Court.

Dated: February 21, 2013                         Respectfully submitted,

                                                 JONES DAY


                                                 By:   _/s/ Susan M. Kayser___
                                                       Susan M. Kayser

_____

(...Continued)

guilty of oppression, fraud, or malice."  Although TradeKey Defendants' conduct meets the statute's definition of "malice" as TradeKey Defendants acted with a "willful and conscious disregard" of Plaintiffs' valuable trademark rights, Cal. Civ. Code § 3294(c)(1), Plaintiffs do not seek a separate punitive damages award "[b]ecause awards of statutory damages serve both compensatory and punitive purposes." *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 2010 U.S. Dist. LEXIS 85266, *44 (N.D. Cal. 2010) (citing *Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 996 (9th Cir. 1998)). Plaintiffs request that the Court consider the availability of punitive damages under Cal. Civ. Code § 3294 in its analysis of statutory damages.